FILED

SEP 22  PM 5:41

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

v.

CASE NO. 2:21-cr-83-JLB-NPM
26 U.S.C. § 7206(2)
26 U.S.C. § 7201
MARK A. GYETVAY
26 U.S.C. § 7203
18 U.S.C. §§ 1001 & 2
31 U.S.C. § 5314
31 U.S.C. § 5322(a)
31 C.F.R. §§ 1010.350,
1010.306(c)-(d), and
1010.840(b)
18 U.S.C. § 1343

## INDICTMENT

The Grand Jury charges:

### I.   The Defendant and His Employment

At all times material to this Indictment, unless otherwise specified:

1.      The defendant, MARK A. GYETVAY ("GYETVAY"), was a United States citizen who maintained residences in Naples, Florida, and Moscow, Russia.

2.      In or about 1981, GYETVAY graduated from a United States-based university with a Bachelor of Science degree in accounting, after which he worked in various consulting, accounting, and finance-related positions in the oil and gas industry.  In 1992, the defendant became a Certified Public

Accountant.

3.     In or about 1994, GYETVAY joined a large international accounting firm based in the United States and was transferred the following year to work in the office of that firm's Moscow, Russia, affiliate.  In 1996, GYETVAY became a partner at the accounting firm, at which he performed audit, consulting, and various accounting-related services for the firm's clients in Russia and elsewhere. Among the clients for whom GYETVAY performed significant services in Russia was a major gas and energy company (the "Russian Gas Company"), for which GYETVAY eventually became the accounting firm's lead audit partner.

4.     In 2003, the Russian Gas Company hired GYETVAY to become its Chief Financial Officer ("CFO"). As part of his compensation package with the Russian Gas Company, GYETVAY entered into an agreement in 2004 providing GYETVAY an option to purchase shares of stock of an affiliated company incorporated in the Cayman Islands (the "Cayman Affiliate"), which controlled one of the largest blocks of privately held shares of the Russian Gas Company.  Under this call option agreement, GYETVAY received the right to purchase 120,000 shares of the Cayman Affiliate at a price of $164 per share over a 5-year period, ending December 1, 2009.

5.     While serving as CFO, GYETVAY helped guide the Russian Gas

Company through its initial public offering of shares ("IPO"), which was carried out through the London Stock Exchange in 2005. In connection with the IPO, GYETVAY was promised a significant block of shares of the Russian Gas Company.

## II.  Income and Foreign Financial Account Reporting Obligations of United States Taxpayers

6.    U.S. citizens and residents who had income in excess of a threshold amount in any one calendar year ("U.S. taxpayers") were required to file a U.S. Individual Income Tax Return, Form 1040 ("tax return"), for that calendar year with the Internal Revenue Service ("IRS") by April 15 of the following year. On that tax return, U.S. taxpayers were obligated to report all of their worldwide income, including salary, bonuses, stock-based compensation, and all income earned from foreign financial accounts (such as bank, brokerage, and securities accounts), among other types of income.  United States taxpayers were also obligated to pay the taxes due on their income by the April 15 deadline.

7.    U.S. taxpayers also had an obligation to report to the IRS on the Schedule B of a tax return whether they had a financial interest in, or signature or other authority over, a financial account in a foreign country in a particular year by checking "Yes" or "No" in the appropriate box and identifying the country or countries where the foreign financial account(s) were maintained.

8.      In addition, U.S. taxpayers who had a financial interest in, or signature or other authority over, one or more financial accounts in a foreign country with an aggregate value of all such foreign accounts of more than $10,000 at any time during a particular year, were required to file with the Department of the Treasury a Report of Foreign Bank and Financial Accounts ("FBAR"), using Form TD-F 90-22.1 prior to January 1, 2013, and, after January 1, 2013, the renamed FinCEN Form 114. On an FBAR, a taxpayer was required to disclose, among other things, the name of each financial institution at which each account was held, the account numbers, and the maximum value of each account during the calendar year. For calendar years 2005 through 2015, the filing deadline for an FBAR was June 30 of the following year.

## III.   **GYETVAY's Swiss Bank Accounts**

9.      In or about September and October of 2005, GYETVAY caused the opening of an account at the Swiss bank Coutts & Co Ltd. ("Coutts") through a nominee corporate entity named Opotiki Marketing Ltd. ("Opotiki"), which was incorporated in Belize. In connection with the opening of the account, GYETVAY was listed as the sole "beneficial owner" of the account on the Swiss account-opening document that records such information, known as a Form A.  On another account-opening document, GYETVAY requested

4

that all correspondence from Coutts be held at the bank's "Hold Mail" counter, which meant that no correspondence would be sent to GYETVAY in the United States.

10.     In or about December 2007, GYETVAY caused the opening of a second account at Coutts.  Like the Opotiki account, the second account was opened in the name of a nominee corporate entity, Felicis Commercial Corp. ("Felicis"), which was incorporated in the British Virgin Islands.  In connection with the opening of the Felicis account, GYETVAY was listed on the Form A as the sole beneficial owner of the account.

11.     In or about April 2010, as part of a compliance project commenced in 2009, Coutts attempted to obtain tax and regulatory information from GYETVAY.  In response, in or about July 2010, GYETVAY caused his then-wife, a Russian citizen, to be listed as the beneficial owner of the Opotiki account. In doing so, GYETVAY listed a Moscow address for his then-wife rather than the Naples, Florida address at which she principally resided with GYETVAY at the time. GYETVAY also caused a copy of his then-wife's Russian passport to be provided to Coutts. GYETVAY then closed the Opotiki and Felicis accounts at Coutts and, between July and September 2010, caused accounts for both of those entities to be opened at the Swiss bank Hyposwiss Private Bank ("Hyposwiss").  In connection with opening the new accounts,

GYETVAY removed himself as beneficial owner and caused his then-wife to be listed as the sole beneficial owner on the Forms A. The account-opening documents also requested that all correspondence from Hyposwiss be "retained at the bank" and sent only to GYETVAY's Zurich-based wealth advisors, described below. In addition, although his then-wife resided principally at the residence she shared with GYETVAY in Naples, Florida, GYETVAY caused the account opening documents to list only a Moscow address for his then-wife, together with a copy of her Russian Passport.

12.     In October 2013, another Swiss bank, Falcon Private Bank AG ("Falcon"), acquired the assets of Hyposwiss, including the Opotiki and Felicis accounts. After the accounts came under the ownership of Falcon, GYETVAY maintained the Opotiki and Felicis account structure that listed GYETVAY's then-wife as sole beneficial owner. GYETVAY maintained the accounts and their assets at Falcon until mid-2015.

**IV.     GYETVAY's Swiss Wealth Advisory Firm**

13.     In or about 2005, GYETVAY retained a wealth advisory firm headquartered in Zurich, Switzerland (the "Swiss Wealth Firm"), which, between 2005 and 2015, helped GYETVAY hide and disguise his ownership and control of the Opotiki and Felicis accounts at the Swiss banks. For instance, when GYETVAY had his then-wife listed as a beneficial owner of the Opotiki

account at Coutts, the bank had to collect certain information about her as part of the bank's "know your customer" requirements. In response, an individual at the Swiss Wealth Firm sent a September 13, 2010 email to Coutts falsely stating that GYETVAY's then-wife was an accountant who had previously worked at a Russian company in the "finance" section, and that GYETVAY had "gifted" Opotiki and all its assets to her. In addition, when GYETVAY caused the transfer of the Opotiki and Felicis accounts from Coutts to Hyposwiss in October 2010, the Swiss Wealth Firm sent a memo to Hyposwiss that provided certain false information concerning the purpose of the transfer of the accounts and the source of the funds in the accounts. In particular, the Swiss Wealth Firm falsely stated in a written memo sent to Hyposwiss that GYETVAY's then-wife had friends who had accounts at Coutts and wanted to have the accounts at Hyposwiss, "where they are less obvious." In addition, the memo falsely stated that most of the assets in the Felicis account – which then exceeded $49,000,000 in value – stemmed from a "success reward" attributable to services provided by GYETVAY's then-wife to the Russian Gas Company, as "part of the owner's team which worked on the IPO of [the Russian Gas Company]." In reality, GYETVAY's then-wife played no role in connection with the Russian Gas Company's IPO and was never employed by, or provided services to, that company. In addition, she did not open the

accounts at Hyposwiss.

**V.     Overview of GYETVAY's Tax Fraud Scheme and Failure to Report Foreign Bank Accounts**

14.     Between 2005 and July 2015, GYETVAY devised and executed a scheme to evade taxes, defraud the IRS, and hide his ownership and control of his secret Swiss bank accounts, which, at various times between 2010 and 2015, held in excess of $93,000,000 in assets.  GYETVAY took multiple steps to execute the scheme, including: failing to file United States income tax returns for the tax years 2009 through 2014; filing false tax returns that were years late and under-reported his income and omitted the reporting of his ownership of, and authority over, the Swiss accounts; providing false information to the United States-based accountants who prepared his late-filed returns for certain years; failing to report millions of dollars of income and failing to pay millions of dollars in taxes; utilizing the Swiss accounts to make various investments and to purchase art, motor vehicles, and real estate in the United States and Italy; and failing to file FBARs that reported his ownership of, and authority over, his Swiss bank accounts. Among the items of income that GYETVAY fraudulently failed to report to the IRS were: (a) the proceeds of GYETVAY's exercise of the call option agreement in December 2007, which resulted in GYETVAY's receipt during 2007 of over $19,900,000 in income, a substantial portion of which he directed to his Opotiki account at Coutts; (b) GYETVAY's receipt in

2009 of over 7,000,000 shares of the Russian Gas Company, then worth over $16,000,000, which represented the stock-based compensation promised to GYETVAY in connection with the Russian Gas Company's IPO; and

(c) material amounts of dividend and interest income received in and through his Swiss bank accounts.

## VI.   Particulars of GYETVAY's Tax Fraud Scheme and his Failure to File FBARs

### A.   2005

15.     During the 2005 tax year, GYETVAY was paid approximately $280,700 in compensation by the Russian Gas Company. GYETVAY, however, failed to file a tax return by April 17, 2006, when it was due, and failed to remit to the IRS all the taxes due and owing by him for the 2005 tax year. He also failed to file an FBAR reporting his interest in his Opotiki account at Coutts.

16.     GYETVAY did not file his 2005 tax return until 2008, when he was contacted by his former accounting firm employer to prepare the return.  In his communications with the accounting firm, GYETVAY falsely omitted any mention of his financial interest in and authority over the Opotiki account during 2005.  Consequently, GYETVAY caused the accounting firm to prepare for him a 2005 tax return that (a) falsely claimed that GYETVAY did not have a financial interest in or authority over a financial account in a foreign country

holding in excess of $10,000; and (b) falsely omitted interest income GYETVAY received through the Opotiki account. GYETVAY signed and caused that false 2005 tax return to be filed with the IRS on or about August 14, 2008. Despite the fact that the accounting firm sent follow-up communications to GYETVAY, including those referring to FBARs (which included an FBAR template), GYETVAY failed to respond to that firm or request that it prepare his delinquent 2006 and 2007 tax returns or file any FBARs for 2005 through 2008.

**B.**   **2006-2008**

17.   GYETVAY did not timely file income tax returns for the tax years 2006 through 2008, despite earning substantial income during those years, and failed to remit to the IRS all of the taxes due and owing by him for those tax periods. Nor did GYETVAY timely file FBARs for those years reporting his financial interest and authority over his Swiss bank accounts, which, during each year from 2006 to 2008, contained millions of dollars in assets.

18.   GYETVAY did not retain an accountant to prepare his tax returns for 2006 through 2008 until about July 2010, when, to support his then-wife's efforts to obtain residency status in the United States and the concomitant necessity of GYETVAY to explain to immigration authorities his failure to file tax returns for the 2006 through 2008 tax years, he retained an Atlanta-based

10

accounting firm.  To aid its preparation of those tax returns, the accounting firm sent GYETVAY a detailed questionnaire for each year, which GYETVAY completed and emailed to the firm.  GYETVAY also sent various information concerning his income and foreign bank accounts in separate emails to the firm.

19.    In providing his income and other information to the Atlanta-based accounting firm for the 2006-2008 tax years, GYETVAY falsely represented in the questionnaires that he had no foreign financial accounts during that time period.  Moreover, in response to a follow-up email that specifically asked GYETVAY about foreign bank accounts holding in excess of $10,000, GYETVAY falsely represented that, from 2006 to 2008, the only foreign bank account he had with more than $10,000 was in Russia.  As a result, the Atlanta-based accounting firm did not prepare FBARs for GYETVAY to properly report his interests in his Swiss bank accounts.

20.  GYETVAY also falsely reported his income to the Atlanta-based accounting firm for 2006 through 2008.  For 2006, he reported to the firm that he received $593,700 in salary and other income from the Russian Gas Company when, in fact, he was paid over $884,000.  GYETVAY also omitted over $138,000 of interest income he earned through his Swiss account at Coutts. Consequently, GYETVAY caused the Atlanta-based accounting firm to prepare a tax return for him for the 2006 tax year that falsely and fraudulently:

(a) under-reported his income, and (b) stated that the only foreign account GYETVAY had during 2006 holding more than $10,000 was in Russia. GYETVAY signed the false tax return and caused it to be filed with the IRS on or about February 16, 2011.

21.    During the tax year 2007, GYETVAY was paid approximately $1,392,000 in wage and other income by the Russian Gas Company and received over $231,000 in interest income through his Swiss accounts. GYETVAY also received in excess of $19,900,000 in income as a result of his December 1, 2007 exercise of the call option agreement, purchasing 120,000 shares of the Cayman Affiliate at the strike price of $164 per share. GYETVAY then sold 55,122 of the shares at their market price, $526.66, and directed that over $9,350,552 of the resulting cash proceeds be deposited in his Opotiki account at Coutts.  GYETVAY also directed the Cayman Affiliate, which maintained an account at Coutts, to register the remaining 64,878 shares in the name of Felicis.

22.    In providing his income and other information to the Atlanta-based accounting firm for the 2007 tax year, GYETVAY falsely represented that he had not engaged in any "put or call transactions" during 2007.  GYETVAY also falsely reported to the firm that he received $880,580 in salary and other income from the Russian Gas Company when, in fact, he was paid

approximately $1,392,000. Consequently, GYETVAY caused the Atlanta-based accounting firm to prepare a tax return for him for the 2007 tax year that falsely and fraudulently: (a) under-reported his income, and (b) stated that the only foreign account GYETVAY had during 2007 holding more than $10,000 was in Russia. GYETVAY signed the false tax return and caused it to be filed with the IRS on or about November 2, 2011.

23.    In connection with the preparation of his tax return for the 2008 tax year, GYETVAY falsely reported to the Atlanta-based firm that he received $1,424,799 in salary and other income from the Russian Gas Company when, in fact, he was paid $2,024,760.  In addition, GYETVAY did not inform the accounting firm of over $152,000 in interest income he earned from his Swiss bank accounts at Coutts. Consequently, GYETVAY caused the Atlanta-based accounting firm to prepare a tax return for him for the 2008 tax year that falsely and fraudulently: (a) under-reported his income, and (b) stated that the only foreign account GYETVAY had during 2008 holding more than $10,000 was in Russia. GYETVAY signed the false 2008 tax return and caused it to be filed with the IRS on or about February 19, 2013.

24.    In addition to filing false tax returns for the tax years 2006 through 2008, GYETVAY rejected the Atlanta-based accounting firm's advice that GYETVAY file FBARs for the 2006 through 2009 tax years to report his foreign

bank accounts.

### C.    2009

25.    During the tax year 2009, GYETVAY was paid approximately $1,488,000 in wage and other income by the Russian Gas Company.   In addition, GYETVAY received during 2009, as stock-based compensation, over 7,000,000 shares of the Russian Gas Company, then worth approximately $16,906,000. GYETVAY also received over $509,000 in dividend income and over $5,000 in interest income from the Opotiki account he maintained at Coutts. GYETVAY, however, failed to file a 2009 tax return with the IRS on or before October 15, 2010, when it was due, and failed to pay to the IRS all of the taxes due and owing by April 15, 2010.  GYETVAY also failed to file, by June 30, 2010, an FBAR reporting his financial interest and authority over the Opotiki and Felicis bank accounts at Coutts, each of which, during the 2009 year, contained assets valued in excess of $10,000. The aggregate value of the assets maintained by GYETVAY in those accounts during 2009 was in excess of $49,000,000.

### D.    2010-2014

26.    During the tax year 2010, GYETVAY was paid approximately $2,375,099 in wage and other income by the Russian Gas Company. GYETVAY also received over $678,000 in dividends and over $4,100 in interest

income through his Swiss bank accounts. GYETVAY, however, failed to file a 2010 tax return with the IRS on or before October 17, 2011, when it was due, and failed to pay to the IRS all the taxes due and owing by April 15, 2011. GYETVAY also failed to file, by June 30, 2011, an FBAR reporting his financial interest and authority over the Opotiki and Felicis bank accounts at Coutts and Hyposwiss, each of which, during the 2010 year, contained assets valued in excess of $10,000. The aggregate value of the assets maintained by GYETVAY in those accounts during 2010 was in excess of $58,000,000.

27.    During the tax year 2011, GYETVAY was paid approximately $3,528,276 in wage and other income by the Russian Gas Company. GYETVAY also received over $1 million in dividends and over $2,600 in interest income through his Swiss bank accounts. GYETVAY, however, failed to file a 2011 tax return with the IRS on or before October 15, 2012, when it was due, and failed to pay to the IRS all of the taxes due and owing by April 15, 2012. GYETVAY also failed to file, by June 30, 2012, an FBAR reporting his financial interest and authority over the Opotiki and Felicis bank accounts at Hyposwiss, each of which, during the 2011 year, contained assets valued in excess of $10,000. The aggregate value of the assets GYETVAY maintained in those unreported accounts during 2011 exceeded $90,000,000.

28.    During the tax year 2012, GYETVAY was paid approximately

$3,544,528 in wage and other income by the Russian Gas Company. GYETVAY also received over $1 million in dividends and over $637,000 in interest income through his Swiss bank accounts. GYETVAY, however, failed to file a 2012 tax return with the IRS on or before October 15, 2013, when it was due, and failed to pay to the IRS all of the taxes due and owing by April 15, 2013. GYETVAY also failed to file, by June 30, 2013, an FBAR reporting his financial interest and authority over the Opotiki and Felicis bank accounts at Hyposwiss, each of which, during the 2012 year, contained assets valued in excess of $10,000. The aggregate value of the assets GYETVAY maintained in those unreported accounts during 2012 exceeded $86,000,000.

29.     During the tax year 2013, GYETVAY was paid approximately $4,929,489 in wage and other income by the Russian Gas Company. GYETVAY also received over $1.1 million in dividends and over $637,000 in interest income through his Swiss bank accounts. GYETVAY, however, failed to file a 2013 tax return with the IRS on or before October 15, 2014, when it was due, and failed to pay to the IRS all of the taxes due and owing by April 15, 2014. GYETVAY also failed to file, by June 30, 2014, an FBAR reporting his financial interest and authority over the Opotiki and Felicis bank accounts at Hyposwiss and Falcon, each of which, during the 2013 year, contained assets valued in excess of $10,000. The aggregate value of the assets maintained by

GYETVAY in those accounts during 2013 was in excess of $93,000,000.

30.    During the tax year 2014, GYETVAY was paid approximately $2,373,240 in wage and other income by the Russian Gas Company. GYETVAY also received over $1.6 million in dividends and over $679,000 in interest income through his Swiss bank accounts.  GYETVAY, however, failed to file a 2014 tax return with the IRS on or before April 15, 2015, when it was due, and failed to pay to the IRS all of the taxes due and owing by April 15, 2015.

### E.    The False FBARs GYETVAY Prepared and Filed for the Calendar Years 2014 and 2015

31.    On or about June 25, 2015, GYETVAY prepared and caused to be filed with the Department of Treasury an FBAR that falsely and fraudulently reported that GYETVAY had signatory authority, but no financial interest, in one financial account at Falcon, providing the account number for Felicis.  By falsely claiming only a signatory authority – and not a financial interest – over that one account, GYETVAY was not required to list a value for the assets in that account during the 2014 calendar year. Despite this representation on the 2014 FBAR, GYETVAY had a financial interest during 2014 in both the Opotiki and Felicis accounts at Falcon, which had assets valued at approximately $8,738,392 and $82,252,046, respectively, with an aggregate value during 2014 of in excess of $90,000,000.

32.     On or about June 15, 2016, GYETVAY prepared and caused to be filed with the Department of Treasury an FBAR that falsely and fraudulently reported that GYETVAY had an ownership interest only in "various" accounts located in Russia, with a value of $8,500,000.  During 2015, GYETVAY had an ownership interest during 2015 in both the Opotiki and Felicis accounts at Falcon, which had assets valued at approximately $7,823,107 and $69,482,592, respectively, with an aggregate total value in excess of $77,000,000.

## VII.   GYETVAY's False Offshore Compliance Filing with the IRS

33.     In 2015, the IRS oversaw two basic offshore compliance options by which certain U.S. taxpayers who had failed to report foreign assets and bank accounts and the associated income could belatedly come into compliance by filing delinquent returns and reports, and paying delinquent taxes.  The first, known as the Offshore Voluntary  Disclosure Program ("OVDP"), allowed taxpayers, even those who had willfully failed to report foreign accounts and income, to enter OVDP, provided they were not already under either civil or criminal investigation, and were accepted, or "cleared," by the Criminal Investigation Division of IRS to enter the program.  If accepted into OVDP, a taxpayer was required to, among other things: file complete and accurate delinquent or amended tax returns for the previous eight years; file delinquent or amended FBARs for the previous eight years; pay delinquent taxes for the

previous eight years; and pay a penalty between 27.5% to 50% of the highest aggregate value of the unreported accounts. The 50% penalty applied if, at the time of the application to OVDP, it was publicly disclosed that the bank at which the taxpayer had the undeclared accounts was cooperating with or being investigated by the IRS or Department of Justice ("DOJ"). In exchange for satisfying all the requirements of the OVDP, taxpayers could avoid criminal prosecution and resolve with finality all civil tax aspects of their noncompliance.

34.    The second option was to request treatment under the so-called "Streamlined Filing Compliance Procedures," which were designed for two separate categories of U.S. taxpayers – residents and those who met a specific non-residency test – whose failure to report foreign financial accounts and income was "non-willful," generally defined as attributable to negligence, inadvertence, or mistake, or conduct that was the result of a good faith misunderstanding about the law. The Streamlined Domestic Offshore Procedures ("SDO Procedures") was potentially available to U.S. taxpayers who had previously filed tax returns but had failed to report on those returns their foreign assets and financial accounts, as well as the income received through those assets and in those accounts. Those using the SDO Procedures were also required to certify and explain, under penalties of perjury, that the failure to report income, pay all tax, or submit all returns and reporting

documents was attributable to non-willful conduct.  Taxpayers who met the eligibility requirements for SDO Procedures were required to file amended tax returns for the three preceding years and delinquent FBARs for the preceding six years, and pay a penalty of 5% of the highest aggregate value of the unreported foreign assets and accounts.

35.   The   Streamlined   Foreign   Offshore   Procedures   ("SFO Procedures") component was available to taxpayers who met a specific non-residency test and had either not previously filed tax returns reporting their foreign accounts and income, or who had filed returns omitting such information.   To be eligible for the SFO Procedures, taxpayers had to satisfy a non-residency test requiring, among other things, that the taxpayer (and spouse, if filing jointly) must have resided physically outside the United States for at least 330 full days in any one or more of the three preceding years for which the taxpayer's tax return due date had passed.  As with the SDO Procedures, those using the SFO Procedures were required to certify and explain, under penalties of perjury, that the failure to report income, pay all tax, or submit all returns was attributable to non-willful conduct.  Taxpayers who met the eligibility requirements for the SFO Procedures were required to file tax returns for the three preceding years and delinquent FBARs for the preceding six years, and pay outstanding tax liabilities, but no penalties were imposed, including no

penalty on the value of unreported assets.

36.     GYETVAY was not eligible for the Streamlined Procedures because his failure to file tax returns, pay all taxes, and report his foreign financial accounts was willful.  In addition, GYETVAY was not eligible for the SDO Procedures because he failed to file tax returns, and was not eligible for the SFO Procedures because neither he nor his then-wife met the SFO Procedures' non-residency test.

37.     In or about mid-2014, Coutts notified GYETVAY and his then-wife that, in connection with a program then offered to Swiss banks by DOJ, called the Swiss Bank Program, Coutts intended to provide certain information concerning accounts maintained at Coutts by U.S. taxpayers and others. Coutts requested GYETVAY and his then-wife to provide a certification that GYETVAY had either properly disclosed the existence of, and any income received in, his foreign accounts at Coutts, or had entered OVDP or the Streamlined Offshore Procedures program.  In a written response to Coutts dated July 24, 2014, GYETVAY falsely certified that he had properly disclosed the existence of, and income received through, his accounts at Coutts as part of the Streamlined Procedures. Also in July 2014, GYETVAY caused a letter to be sent by his Switzerland-based attorney to Coutts indicating that GYETVAY would disclose, was in the process of disclosing, or had disclosed all previously

undeclared foreign bank accounts and assets.

38.     Despite being ineligible for the SDO and SFO Procedures, in late July 2015, GYETVAY signed an SFO application and caused it to be filed with the IRS. In that filing, signed under penalties of perjury, GYETVAY falsely certified that his failure to file returns, report income, and file FBARs was non-willful, as follows:

> I, Mark Gyetvay, have worked and resided in Russia since 1995. I have made annual tax payments to the United States Treasury while abroad and have endeavored to regularly file U.S. tax returns. Due to the increasing complexity of my US tax filings and the difficulty in finding qualified US tax preparers able to navigate Russian tax and financial statements, my returns have become increasingly delayed. My delay in filing U.S. tax returns is not due to any willfulness, but rather the result of my reasonable attempts to comply with increasingly difficult administrative requirements.

## COUNTS ONE THROUGH THREE
### (Aiding or Assisting the Preparation of False Tax Returns—2006 through 2008 Tax Years)

39.     The Grand Jury hereby realleges and incorporates by reference, as though fully set forth herein, the allegations contained in Paragraphs 1 through 24 of this Indictment.

40.     On or about the date set forth below in each count, in the Middle District of Florida, the defendant,

MARK ANTHONY GYETVAY

willfully aided and assisted in, and procured, counseled, and advised the preparation and presentation to the Internal Revenue Service of, a U.S. Individual Income Tax Return, Form 1040, for the calendar years specified below, which was false and fraudulent as to a material matter. The Form 1040 included the following false and fraudulent items, among others: (a) reported an amount of total income that, as GYETVAY then and there knew and believed, understated his total income; and (b) reported that GYETVAY had signatory and other authority over foreign financial accounts in Russia, which, as GYETVAY then and there knew and believed, falsely omitted financial accounts in Switzerland.

| COUNT | FILING DATE | TAX YEAR | FALSE MATERIAL MATTERS |
|-------|-------------|----------|------------------------|
| ONE | 2/16/2011 | 2006 | Total Income – $451,566 (line 22)<br>Location of Foreign Accounts – Russia<br>(Schedule B, line 7b; jurat) |
| TWO | 11/2/2011 | 2007 | Total Income – $730,590 (line 22)<br>Location of Foreign Accounts – Russia<br>(Schedule B, line 7b; jurat) |
| THREE | 2/19/2013 | 2008 | Total Income – $1,272,303 (line 22)<br>Location of Foreign Accounts – Russia<br>(Schedule B, line 7b; jurat) |

In violation of Title 26, United States Code, Section 7206(2).

## COUNT FOUR
### (Tax Evasion—2009 Tax Year)

41.     The Grand Jury hereby realleges and incorporates by reference, as though fully set forth herein, the allegations contained in Paragraphs 1 through 38 of this Indictment.

42.     Beginning on an unknown date, but at least as early as September 2005 through in or about July 2015, in the Middle District of Florida and elsewhere, the defendant,

### MARK ANTHONY GYETVAY

did willfully attempt to evade and defeat a substantial part of the income taxes due and owing by GYETVAY for the calendar year 2009 by failing to file a U.S. Income Tax Return, Form 1040, (failing to timely pay his federal income tax liabilities for 2009), and by committing the following affirmative acts of evasion, among others:

a.      From at least as early as September 2005 and continuing through 2012, defendant GYETVAY caused the opening of accounts at Coutts, Hyposwiss, and Falcon, in the names of his nominee companies Opotiki and Felicis;

b.      From at least as early as September 2005 and continuing through July 2015, defendant GYETVAY caused Coutts, Hyposwiss, and Falcon to "Hold Mail" for him, and thereby not send any statements or

correspondence to him in the United States;

      c.     From at least as early as July 2010 and continuing through July 2015, defendant GYETVAY caused his then-wife to be listed as a beneficial owner of Opotiki and Felicis;

      d.     From at least as early as September 2005, and continuing through July 2015, defendant GYETVAY caused substantial portions of his income for the calendar years 2006 through 2014 to be directed to, and hidden in, the Opotiki and Felicis accounts at Coutts, Hyposwiss, and Falcon;

      e.     From at least as early as September 2005 and continuing through July 2015, defendant GYETVAY caused Coutts, Hyposwiss, and Falcon, to transfer funds from the Opotiki and Felicis accounts to make personal investments and to pay for various personal expenses, including the purchase of art, motor vehicles, and real estate;

      f.     From at least as early as September 2005 and continuing through July 2015, defendant GYETVAY directed his Swiss Wealth Advisor to make certain transfers into and out of the Opotiki and Felicis accounts, including transfers to the Middle District of Florida;

      g.     In or about July 2010 through February 2013, defendant GYETVAY provided false information to his Atlanta-based accounting firm concerning his income and foreign bank accounts, causing the accounting firm

to prepare for GYETVAY false and fraudulent U.S. Individual Income Tax Returns, Forms 1040, for the 2006 through 2008 tax years, which returns he signed and caused to be filed with the IRS between February 2011 and February 2013;

h.   In or about September 2010, defendant GYETVAY signed under penalty of perjury, and caused to be filed with United States immigration authorities, an affidavit that falsely understated his assets;

i.   On or about July 18, 2015, defendant GYETVAY signed, and caused to be signed, and filed and caused to be filed with the IRS, an SFO procedures certification that falsely stated that his failure to file tax returns for earlier years was non-willful and provided a false portrayal of the reasons for his lack of compliance.

In violation of Title 26, United States Code, Section 7201.

## COUNTS FIVE THROUGH NINE
### (Failure to File Tax Returns—2010 through 2014 Tax Years)

43.   The Grand Jury hereby realleges and incorporates by reference, as though fully set forth herein, the allegations contained in Paragraphs 1 through 30 of this Indictment.

44.   On or about the tax return due dates set forth below for each count, in the Middle District of Florida, the defendant,

## MARK ANTHONY GYETVAY

did willfully fail to make an income tax return for the calendar years stated below, to the Internal Revenue Service, stating specifically the items of his gross income and any deductions and credits to which he was entitled, whereas, as GYETVAY then and there well knew and believed, he had gross income in excess of $2,000,000 for each of such years, and, by reason of such income, he was required by law following the close of each calendar year, and on or before each of the tax returns' due dates set forth below, to make said income tax return to the Internal Revenue Service:

| COUNT | CALENDAR YEAR | TAX RETURN DUE DATE |
|-------|---------------|---------------------|
| FIVE | 2010 | October 17, 2011 |
| SIX | 2011 | October 15, 2012 |
| SEVEN | 2012 | October 15, 2013 |
| EIGHT | 2013 | October 15, 2014 |
| NINE | 2014 | April 15, 2015 |

In violation of Title 26, United States Code, Section 7203.

## COUNT TEN
### (False Statements and Representations)

45.     The Grand Jury hereby realleges and incorporates by reference, as though fully set forth herein, the allegations contained in Paragraphs 1 through 38 and Paragraphs 42a through 42i of Count Four of this Indictment.

46.     On or about and between July 1, 2015 and July 30, 2015, in the Middle District of Florida, the defendant,

### MARK ANTHONY GYETVAY

did willfully and knowingly make and cause to be made materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the executive branch of the Government of the United States, by falsely stating and representing, in an SFO Procedures filing sent to the Internal Revenue Service, that his failure to report all income, pay all tax, and submit all required information returns, including FBARs, was "not due to any willfulness." Gyetvay also provided a false portrayal of the reasons for his lack of compliance.  The statements and representations were false and fraudulent because, as GYETVAY then and there knew, his prior failures to report all income, pay all tax, and submit all required information returns, including FBARs, were done willfully and his portrayal of the facts and circumstances was false.

In violation of Title 18, United States Code, Sections 1001 and 2.

## COUNTS ELEVEN AND TWELVE
**(Failure to File FBARs—Calendar Years 2014 and 2015)**

47.     The Grand Jury hereby realleges and incorporates by reference, as though fully set forth herein, the allegations contained in Paragraphs 1 through 38 and Paragraph 42a through 42i of Count Four of this Indictment.

48.     On or about the dates set forth below, in the Middle District of Florida, defendant

### MARK ANTHONY GYETVAY

did willfully fail to file with the U.S. Department of the Treasury an FBAR disclosing that he had a financial interest in, and signature and other authority over, a bank, securities, and financial account in a foreign country, which had an aggregate value in excess of $10,000 during the years listed below:

| COUNT | CALENDAR YEAR | FBAR DUE DATE | ACCOUNT FOR WHICH NO FBAR WAS FILED |
|-------|---------------|---------------|--------------------------------------|
| ELEVEN | 2014 | June 30, 2015 | Opotiki – Acct xxxx4056 |
| TWELVE | 2015 | June 30, 2016 | Opotiki – Acct xxxx4056 |

In violation of Title 31, United States Code, Sections 5314 & 5322(a); 31 Code of Federal Regulations, Sections 1010.350, 1010.306(c)-(d), and 1010.840(b).

## COUNTS THIRTEEN THROUGH FIFTEEN
### (Wire Fraud)

49.    The Grand Jury hereby realleges and incorporates by reference, as though fully set forth herein, the allegations contained in Paragraphs 1 through 38 and Paragraphs 42a through 42i of Count Four of this Indictment.

### The Scheme and Artifice

50.    Beginning on an unknown date, but at least as early as September 2005 through in or about June 2016, in the Middle District of Florida and elsewhere, defendant

### MARK ANTHONY GYETVAY

did knowingly and intentionally devise and intend to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, to wit, a scheme and artifice to defraud the Internal Revenue Service and the Department of Treasury.

### Manner and Means of the Scheme and Artifice

51.    The substance and manner of the means of the scheme and artifice is described in Paragraphs 1 through 38 of this Indictment, and the Grand Jury hereby realleges and incorporates by reference such section as though fully set forth herein.

**Execution of the Scheme and Artifice**

52.     Between December 2005 and June 2016, in the Middle District of Florida, and elsewhere, defendant

MARK ANTHONY GYETVAY

knowingly and intentionally executed the aforesaid scheme and artifice, by transmitting and causing to be transmitted, by means of wire and radio communications in interstate and foreign commerce, the following writings, signs, pictures, and sounds sent from, to, and through the Middle District of Florida:

| COUNT | DATE | NATURE OF WIRE COMMUNICATION |
|---|---|---|
| THIRTEEN | 6/25/2015 | FBAR Submission to Department of Treasury |
| FOURTEEN | 7/17/2015 | Email Approving Statement of Non-Willfulness for SFO Submission |
| FIFTEEN | 6/15/2016 | FBAR Submission to Department of Treasury |

In violation of Title 18, United States Code, Section 1343.

A TRUE BILL,

Foreperson

DAVID A. HUBBERT
Acting Assistant Attorney General

STUART M. GOLDBERG
Acting Deputy Assistant Attorney General
United States Department of Justice, Tax Division

By: Stanley J. Okula, Jr.
David Zisserson
Kevin Schneider Trial Attorneys

FORM OBD-34
9/22/21 Revised

No.

# UNITED STATES DISTRICT COURT
## Middle District of Florida
### Fort Myers Division

## THE UNITED STATES OF AMERICA

vs.

## MARK ANTHONY GYETVAY

## INDICTMENT

Violations:   26 U.S.C. §§ 7206(2), 7201, 7203
18 U.S.C. §§ 1001, 2, 1343
31 U.S.C. § 5314
31 U.S.C. § 5322(a)
31 C.F.R. §§ 1010.350, 1010.306(c)-(d), and 1010.840(b)

A true bill▮▮▮▮▮▮▮▮

▔▔▔▔▔▔▔ ▮▮▮▮▮▮▮▮
            Foreperson

Filed in open court this 22nd day
of September, 2021.

_____
            Clerk

Bail $_____