## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

UNITED STATES OF AMERICA

v.                                          CASE NO. 2:21-cr-83-TPB-NPM

MARK A. GYETVAY,

    Defendant.

_____/

## <u>MOTION FOR MODIFICATION OF RELEASE CONDITIONS</u>

Mark A. Gyetvay, by and through counsel, moves this Court for modification of the current terms and conditions of Mr. Gyetvay's release on the basis that the United States Department of Justice Tax Division (hereinafter, the "government") misrepresented material information and omitted material facts to the Magistrate Court at the bond hearings held on September 23 and September 24, 2021, including overstating the potential tax loss and overstating the strength of the government's evidence. *See* ECF Doc. 33 (Motion to Dismiss). The government repeatedly referred to its "powerfully strong" case and represented that it had "numerous reams of documentary evidence." *See* **Exhibit 1**, Tr. of Sept. 23, 2021 Hearing at p.12:3-5 and 18-20, p.13:13-14. Only six days after touting the strength of the government's case and the evidence supporting the indictment, the government filed a motion to delay Mr. Gyetvay's trial under 18 U.S.C. § 3161(h)(8), the Speedy Trial Act

1

("STA"), by six months to a year because the government needs more time to gather foreign evidence to support its case. *See* Mot. to Exclude Time Pursuant to 18 U.S.C. § 3161(h)(8), ECF Doc. 26.

The government also misled the Court to erroneously believe that Mr. Gyetvay failed to pay $40 million in tax. *See* **Exhibit 2**, Tr. of Sept. 24, 2021 Hearing at p. 10:1-5 ("I'm not sure how easy it would be to get anyone to sign as a surety on an $80 million bond, but I think, since the government has assets double what they believe is owed, that that's sufficient surety under these circumstances"). If the government can prove its case, which it cannot, the tax loss would be less than $5 million, *i.e.*, approximately 12.5% of the tax loss that the Magistrate Court erroneously believed the government could be entitled to. Under the Magistrate Court's rationale, the secured bond should only have been $10 million.

Further misleading the Magistrate Court, the government stated that Mr. Gyetvay hid $93 million from the United States government when, in truth and in fact, on or about August 10, 2015, Mr. Gyetvay disclosed his offshore accounts that held substantially all of his wealth on Foreign Bank Account Reports ("FBARs") for 2008 through 2013. *See* **Exhibit 1**, Tr. of Sept. 23, 2021 Hearing at p.10:9-16. In addition, Mr. Gyetvay disclosed his offshore accounts when he filed 2014 and 2015 amended FBARs on or about March 27, 2017. All

filings and full payment of tax, interest, and civil penalties occurred before the government commenced its investigation of Mr. Gyetvay in 2018.

The government also failed to mention at the bond hearing that in 2015 Mr. Gyetvay transferred substantially all of his wealth (including $84 million of stock related to a company called Novatek which is currently posted as the secured bond in this case) into accounts in the United States in Mr. Gyetvay's own name.

After having time to review the 33-page indictment and reviewing discovery produced by the government, Mr. Gyetvay's counsel was able to identify the misleading representations and material omissions that caused the Magistrate Court to impose unnecessarily "unusual" and "extraordinary" conditions of release.  *See* **Exhibit 1,** Tr. of Sept. 23, 2021 Hearing at p. 14:7-10.  Accordingly, Mr. Gyetvay asks that the Court modify his current stringent conditions of release based upon the true nature and circumstances and the real strength of the government's case.

**1. Background**

**a. The IRS Offshore Disclosure Policy and Practice**

Since 2009, the government has offered U.S. taxpayers who have an interest in foreign bank accounts various voluntary disclosure programs that have allowed taxpayers to file amended or delinquent income tax returns and FBARs, and pay any back tax owed, interest, and penalties.

3

When the first offshore voluntary disclosure program was announced in 2009, Douglas T. Shulman—then Commissioner of the Internal Revenue Service ("IRS")—publicly offered "a chance for people to come clean on their own" and encouraged taxpayers to make a voluntary disclosure to the IRS in order to "avoid criminal prosecution," "get a fair settlement," and have "certainty and consistency in how their case will be handled."[1]   When a subsequent offshore voluntary program was announced, Commissioner Shulman similarly stated that the IRS was presenting taxpayers with "a fair offer for people with offshore accounts who want to get right with the nation's taxpayers" and that those wishing to make a voluntary disclosure would be given "the chance to get certainty about how their case will be handled."[2] Commissioner Shulman further emphasized that taxpayers who made a voluntary disclosure could "avoid criminal prosecution[.]"[3]   On another occasion, Commissioner Shulman explained that a primary aim of the IRS's offshore voluntary disclosure initiatives was to bring "U.S. taxpayers back into

---

[1] "Statement from IRS Commissioner Doug Shulman on Offshore Income" (Mar. 26, 2009), available at https://www.bpmcpa.com/portalresource/CommissionerStatement.pdf (last accessed Oct. 21, 2021).

[2] "Second Special Voluntary Disclosure Initiative Opens; Those Hiding Assets Offshore Face Aug. 31 deadline" (IR-2011-14, Feb. 8, 2011), available at https://www.irs.gov/pub/irs-news/ir-11-014.pdf (last accessed Oct. 21, 2021).

[3] *Id.*

the system … back into compliance … so they properly report and pay their taxes for years to come."[4]  The government's public remarks and the highly-touted success of the IRS's voluntary disclosure programs induced thousands of taxpayers to come forward and address their unreported offshore accounts. The offshore voluntary disclosure programs evolved through several iterations before the IRS announced new "streamlined" offshore procedures that provide a path for both U.S. residents and non-residents to report previously undisclosed offshore assets, file amended or back tax returns, and pay civil penalties (the "Voluntary Disclosure Program").[5]

### b. Mr. Gyetvay's Voluntary Disclosure

In or around May 2014, one of Mr. Gyetvay's Swiss banks, Coutts & Co. ("Coutts"), advised him in a letter that it was participating in an amnesty program that the Department of Justice (DOJ) was offering to Swiss banks

---

[4] "Prepared Remarks Commissioner of Internal Revenue Douglas H. Shulman before the National Press Club" (Apr. 5, 2012), available at https://content.govdelivery.com/accounts/USIRS/bulletins/38c49b (last accessed Oct. 21, 2021); *see also* "IRS Shows Continued Progress on International Tax Evasion" (IR-11-094 Sept. 15, 2011) (quoting Commissioner Shulman: "My goal all along was to get people back into the U.S. tax system.") available at: https://www.irs.gov/pub/irs-news/ir-11-094.pdf (last accessed Oct. 21, 2021).

[5] *See generally*, "Streamlined Filing Compliance Procedures" available at: https://www.irs.gov/individuals/international-taxpayers/streamlined-filing-compliance-procedures (last accessed Oct. 21, 2021).

that held accounts owned by U.S. taxpayers (the "Swiss Bank Program").[6]  The letter further advised Mr. Gyetvay that, under the terms of the Swiss Bank Program, Coutts intended to disclose client information to DOJ and that, if Mr. Gyetvay had not reported his Swiss accounts to the Treasury Department on FBARs or had not made a voluntary disclosure to the IRS, he could be at risk of U.S. law enforcement efforts.  The DOJ and IRS recommended that Swiss banks in the Swiss Bank Program send out letters—like the letter Mr. Gyetvay received—to their customers encouraging those customers to make voluntary disclosures to the IRS.  However, during the bond hearing, the government made it appear as if the letter Mr. Gyetvay received from Coutts somehow disqualified him from the amnesty offered by the IRS Voluntary Disclosure Program.  *See* **Exhibit 1** Tr. of Sept. 23, 2021 Hearing at p. 10:20-25, p. 11:1-3, p. 14:11-15.  It did not.

Shortly after receiving the letter described above, Mr. Gyetvay engaged tax attorneys who promptly advised Coutts that he intended to submit a voluntary disclosure to the IRS.  Mr. Gyetvay, still residing and working abroad, had become delinquent with his U.S. tax filings.  Therefore, he engaged accountants to prepare his back income tax returns and FBARs.  On or about August 10, 2015, Mr. Gyetvay—following advice he received from his attorneys

---

[6] *See generally*, "Swiss Bank Program" available at:
https://www.justice.gov/tax/swiss-bank-program (last accessed Oct. 21, 2021).

and accountants, and in reliance on the government's encouragement to "come clean" and "avoid criminal prosecution"—submitted a voluntary disclosure to the IRS with tax returns and FBARs in accordance with the Voluntary Disclosure Program.  Some of those returns and filings were amended following Mr. Gyetvay's initial submissions to the IRS.

The government does not allege that the returns filed under the Voluntary Disclosure Program were false, nor does the government allege that Mr. Gyetvay did not pay all taxes due and owing for tax years 2010 through 2014.  Yet the government charged Mr. Gyetvay with failing to timely file tax returns for 2010 through 2014.  The government also charged tax offenses for 2006 through 2009.  Under the Voluntary Disclosure Program, Mr. Gyetvay was not required to take any additional action with respect to the 2006 through 2009 tax years.

### c. The Indictment and Bond Hearings

The IRS did not reject Mr. Gyetvay's submission under the Voluntary Disclosure Program, nor did it take issue with any of the income tax returns, FBARs, or amended returns submitted by Mr. Gyetvay.  However, in 2018 the DOJ Tax Division commenced a criminal tax investigation.  An indictment was returned against Mr. Gyetvay on September 22, 2021 that charged him with filing false tax returns, failing to file tax returns, failing to file FBARs, making false statements, and wire fraud.  *See* ECF Doc. 3 (the "Indictment").

7

The day after the Indictment was returned, Mr. Gyetvay was arrested after dropping his two daughters off at their middle school.[7]  At a bond hearing held later that day, counsel for the government argued that the nature of the charges in the Indictment and the strength of the government's evidence warranted what it conceded were "unusual" and "extraordinary" terms of pre-trial release.  *See* **Exhibit 1,** Tr. of Sept. 23, 2021 Hearing at p. 9:6-12 and p. 14:7-10.  Following the hearing, the Court entered an Appearance Bond and Order Setting Conditions of Release.  *See* ECF Doc. 18 (the "Bond/Order").  The Bond/Order was secured by $80,000,000.00 in securities (*i.e.*, the Novatek shares described above) held in "[a]ll the accounts maintained by Morgan Stanley in the name of or belonging to Mark A. Gyetvay, to include but not be limited to, account # xxx-xxxxx5-608."  *Id.*  The Bond/Order also imposed conditions of release that included home incarceration and electronic monitoring.  *See id.*  An Amended Appearance Bond and Order Setting Conditions of Release was entered on September 30, 2021.  *See* ECF Doc. 30 (the "Amended Bond/Order").  The Amended Bond/Order also contained the security provision for the Morgan Stanley account(s) described above, restricted Mr. Gyetvay's travel to Lee and Collier counties, and imposed a curfew requiring that Mr. Gyetvay remain in his home every day from 8:00pm

---

[7] Mr. Gyetvay is the primary caregiver for his two daughters.

to 6:00am.  In addition, Mr. Gyetvay has continued to be subject to electronic monitoring.

As detailed below, after the bond hearings, it became clear to the defense that the government's representations about the seriousness of the charges in this case and the strength of its case were misleading.  The government also omitted material facts that would have resulted in much less restrictive release conditions.

## 2.  Legal Standards

The Bail Reform Act of 1984 sets out four factors for the Court to consider when determining a defendant's eligibility for pretrial release and the conditions of release: (1) the nature and circumstances of the charges (including whether the offense at issue is a crime of violence, terrorism, or involves a minor victim, drugs, firearms, explosives, or destructive devices); (2) the weight of the evidence against the defendant; (3) the defendant's history and characteristics (including, *inter alia*, character, mental and physical health, family and community ties, employment, financial resources, drug/alcohol abuse, criminal history, and whether the current offense was committed while on probation, parole, or pretrial release); and (4) danger to the community.  *See* 18 U.S.C. § 3142(g).

If the Court determines that a defendant is eligible for release pending trial, then the defendant should be released on the standard condition that he

or she does not commit any crimes while on release, and "subject to the *least restrictive* further condition, or combination of conditions" to "reasonably assure" that the defendant will appear in court in the future and to protect the safety of the community.  18 U.S.C. § 3142(c)(1)(A)-(B) (emphasis added).  As the Eleventh Circuit has explained, the policy underpinning the Bail Reform Act "is to permit release under the least restrictive condition compatible with assuring the future appearance of the defendant." *United States v. Price*, 773 F.2d 1526, 1527 (11th Cir. 1985).

   3. **Argument**

      Many of the factors regarding Mr. Gyetvay's eligibility for release are either not in dispute or warrant release with minimal (or no) restrictions.  The charges in this case all relate to Mr. Gyetvay's tax filings, foreign bank account reporting, and alleged false statements to the IRS (or to his accountants).  Nothing about this case involves violent conduct, terrorism, minor children, narcotics, or weapons.  *See* 18 U.S.C. § 3142(g)(1).  Mr. Gyetvay is physically and mentally fit, has strong family and community ties in Florida (he resides in Naples with his two daughters who attend a local school and who rely on Mr. Gyetvay as their primary caregiver), is gainfully employed, does not have substance abuse issues, has no criminal record, and there is no allegation that he committed a crime while on probation, parole, or other release.  *See* 18 U.S.C. § 3142(g)(3)(A)-(B).  Lastly, the government conceded at the bond

hearing that Mr. Gyetvay poses no danger to the community.  *See* **Exhibit 1,** Tr. of Sept. 23, 2021 Hearing at p. 9:23; *see also* 18 U.S.C. § 3142(g)(4).

However, at the September 23, 2021, hearing, counsel for the government advanced two arguments for the imposition of "unusual" and "extraordinary" bond conditions in this case.  With respect to the nature and circumstances of the alleged offenses, the government claimed that Mr. Gyetvay was engaged in a long-running $40 million tax fraud scheme and that the government's case was "powerfully strong."  Under closer scrutiny, neither is true.

### a. The Nature and Circumstances of The Alleged Offenses Do Not Require Extraordinary Release Conditions

First, the government argued at the bond hearings that the conduct it has charged Mr. Gyetvay with committing was not an isolated incident but "involves a decade long scheme to defraud the IRS and the Department of Treasury involving tens of millions of dollars."  *See* **Exhibit 1,** Tr. of Sept. 23, 2021 Hearing at p. 10:1-4.  The government's assertions are simply not true. For example, the government represented to the Court that Mr. Gyetvay failed to file income tax returns.  *Id.* at p. 10:5-6.  But as described in detail below, before the government started its investigation and pursuant to the Voluntary Disclosure Program, Mr. Gyetvay actually late filed tax returns for the years covered by the failure to file tax counts and the one evasion count in the

11

Indictment.   Furthermore, Mr. Gyetvay paid all tax due and owing in connection with  those returns.

The government also represented at the bond hearings that Mr. Gyetvay hid $93 million in assets from the Treasury Department by using Swiss accounts and wealth advisors.  *Id.* at p. 10:9-16.  This is also untrue.  Mr. Gyetvay in fact disclosed his U.S. citizenship when he opened Swiss bank accounts and provided the banks with copies of his U.S. passport and Florida driver's license.  Furthermore, Mr. Gyetvay disclosed his Swiss accounts to the Treasury Department through the Voluntary Disclosure Program, on his income tax returns, and on FBARs.  The government went on to paint a picture at the bond hearings to suggest to the Court that Mr. Gyetvay has used his wealth and money from foreign accounts fund a lavish lifestyle.  *Id.*  But the government's baseless claim was only intended to improperly deny Mr. Gyetvay the least restrictive bond conditions, simply because he has been financially successful.

The government also claimed that Mr. Gyetvay owns a villa in Italy.  *Id.* He does not—a fact known to the government from its investigation.  The truth is Mr. Gyetvay never owned an Italian villa, but rather owned an interest in an Italian timeshare from approximately 2009-2013 (and that allowed him use of the timeshare just a few times per year).

The government also argued at the bond hearing that Mr. Gyetvay kept his accountants and the IRS "in the dark" about his interest in Swiss accounts. *Id.* at p. 10:17-19. Again, these representations were not true. Mr. Gyetvay did, in fact, disclose to his accountants his interest in financial accounts he held in Switzerland at Coutts, Hyposwiss Bank, and Falcon Private Bank, and the accountants, in turn, reported Mr. Gyetvay's interest in these accounts to the IRS pursuant to the terms of the Voluntary Disclosure Program. This was exactly what the Voluntary Disclosure Program was designed to accomplish, *i.e.*, provide a path for U.S. taxpayers with offshore assets to come into compliance by filing delinquent or amended income tax returns and FBARs and paying civil penalties.[8] Indeed, when he made his submissions to the Voluntary Disclosure Program—which counsel for the government misleadingly described at the bond hearing as just "some belated filings with the IRS"—Mr. Gyetvay joined tens of thousands of other similarly situated U.S. taxpayers with foreign assets. *See id.* at p. 11:1-3. The government went on to distort Mr. Gyetvay's participation in the Voluntary Disclosure Program as nefarious. *Id.* at p. 11:4-14. But as explained above, in or around May 2014, Mr. Gyetvay received a letter from Coutts, advising him that the bank was

---

[8] *See* IRS Streamlined Filing Compliance Procedures, available at: https://www.irs.gov/individuals/international-taxpayers/streamlined-filing-compliance-procedures (last accessed Oct. 21, 2021).

participating in the Swiss Bank Program and encouraging Mr. Gyetvay to enter the Voluntary Disclosure Program.  That letter—and similar letters to U.S. account holders from Swiss banks—was sent to Mr. Gyetvay pursuant to Coutts' cooperation with the Swiss Bank Program and at the direction of the United States government.

In this regard, the government seems to assume that simply because Mr. Gyetvay maintained funds in foreign bank accounts, then his ***voluntary*** disclosure of those accounts to the IRS pursuant to the Voluntary Disclosure Program ***must have been*** an admission that his prior non-disclosure of the accounts was willful.  *Id.*  The government is wrong and its position, if accepted, would allow the government to prosecute every single individual who has ever entered the Voluntary Disclosure Program.  This is plainly not the outcome the IRS intended when it invited and encouraged U.S. taxpayers to "come clean" by making voluntary disclosures of assets held offshore.  Importantly, the IRS has never challenged or rejected any of the submissions that Mr. Gyetvay made in accordance with the Voluntary Disclosure Program.

Nearly all of the charges described in the Indictment involve conduct that Mr. Gyetvay previously resolved in accordance with the Voluntary Disclosure Program.  For example, the government alleges in the Indictment that Mr. Gyetvay engaged in tax evasion because he, *inter alia*, failed to file a 2009 income tax return.  *See* Indictment ¶ 42.  This is false.  Mr. Gyetvay did,

14

in fact, late file a 2009 tax return, and the government has never asserted that the 2009 return was false (or even that it was incorrect in any way). The government also alleges that Mr. Gyetvay failed to file tax returns for 2010 through 2014. *See* Indictment ¶¶ 43-44. This is also misleading because Mr. Gyetvay did, in fact, late file tax returns for all of these tax years, in accordance with the requirements of the Voluntary Disclosure Program (which, as noted above, exists for these very situations). Under the Voluntary Disclosure Program, Mr. Gyetvay was not required to take any additional action with respect to the 2006 through 2009 tax years.

The sentencing estimate offered by the government at the bond hearing was not only highly premature, but it, too, was misleading. As Mr. Gyetvay's counsel noted on the record, based on statistics published by the U.S. Sentencing Commission for fiscal year 2020, the average sentence imposed in federal tax cases was just 18 months' incarceration, a fact that counsel for the government tellingly did not (and could not) refute. *See* **Exhibit 1**, Tr. of Sept. 23, 2021 Hearing at p. 18: 17-24. Now that the Court knows that if the government proved its case, which we doubt it can, the tax loss would be less than $5 million—not the $40 million which the government misleadingly allowed the Magistrate Court to accept as the possible harm to the government—it is clear that the government's representation that Mr. Gyetvay faces a term of seven to ten years was misleading. *See* **Exhibit 1,** Tr.

of Sept. 23, 2021 Hearing at p. 11:24-25 and p. 12:1-2; *see also* **Exhibit 2**, Tr. of Sept. 24, 2021 Hearing at p. 10:1-5.

### b. The Government's Case Is Not "Powerfully Strong"

The government's second argument in support of its request for the imposition of "unusual" and "extraordinary" bail conditions in this case was based on the purported strength of its case. *See* **Exhibit** 1, Tr. of Sept. 23, 2021 Hearing at p. 9:6-12 and p. 14:7-10. Indeed, at the bond hearings, counsel for the government twice described the case against Mr. Gyetvay as "powerfully strong." *Id.* at p. 12:3-5 and p. 13:13-14. Once again, that was not true. Counsel for the government also represented to the Court at the hearing that it has obtained "thousands" of emails sent by Mr. Gyetvay to his Swiss wealth advisors and bankers. *Id.* at p. 12:3-10. But the defense team's review of discovery produced by the government to date, specifically IRS Special Agent Lauren Kocinski's affidavit in support of an application for a search warrant related to Mr. Gyetvay's email service provider, states that the total number of email communications with his Swiss wealth advisors and bankers amounted to just 1,132 emails. Far short of the "thousands" claimed by the government. *See id.* at p. 12:3-10.

Similarly, counsel for the government represented to the Court at the September 23rd hearing that the government was in possession of "numerous reams of documentary evidence" that will purportedly prove that Mr. Gyetvay

16

made false statements to his accountants. *Id.* at p. 12:18-20. This claim was an exaggeration at best, and false at worst. At the hearing, counsel for the government only referenced routine annual accounting questionnaires used by nearly all accountants and a "memo to the [accountant's] file" regarding advice given to Mr. Gyetvay about FBAR filings. *Id.* at p. 13:1-14. These documents are hardly "numerous reams of documentary evidence" and provide yet another example of the government distorting the strength of its case against Mr. Gyetvay in order to have the Magistrate Court impose "extraordinary" release conditions.

Simply put, despite the government's misleading representations alleging that Mr. Gyetvay "amassed his wealth" by using foreign accounts and only transferred his offshore assets to the U.S. when he believed "he was going to be caught", *id.* at 14, the fact is Mr. Gyetvay filed tax returns for all of the years at issue in this case and he paid all tax due and owing for those years prior to the government's investigation and at the government's invitation through the Voluntary Disclosure Program. The IRS itself has never even audited these tax years and the IRS has never alleged that any of the tax returns filed for these years are false (or even incorrect). It is also a fact that Mr. Gyetvay made his submission to the Voluntary Disclosure Program as part of a good faith effort to come into compliance in accordance with the Voluntary Disclosure Program's primary policy goal. In addition, in 2015 (prior to the

17

government's investigation in this case), Mr. Gyetvay transferred substantially all of his wealth—including the $84 million in Novatek shares now encumbered by current the release terms—to the U.S., where it has remained ever since. The case against Mr. Gyetvay is a far cry from the "powerfully strong" case the government misrepresented to the Court.

The government further pressed the Magistrate Court for an "unusual" and "extraordinary" amount of a secured bond, and it **_again_** misled the Court. *See* **Exhibit 1,** Tr. of Sept. 23, 2021 Hearing at pp. 9:6-12 and 14:7-10. Specifically, with regard to the amount of security sought by the government, counsel for the government cited the case against Thomas Barrack, who was apparently required to post a $250 million security bond because his net worth was estimated to be at least $1 billion. *See id.* at p. 14:16-25 and p. 15:1-6. In other words, the government cited an example where someone in an unrelated case posted security that amounted to at most 25% of his net worth. Counsel for the government then asked the Court in this case to order Mr. Gyetvay to post security in the amount of $84 million based upon the government's estimate that Mr. Gyetvay's net worth is $125 million (*see id.* at p. 13:16-19)—*i.e.*, the government requested that Mr. Gyetvay post security representing 67% of his estimated net worth. *See id.* at p. 15:7-14.

In sum: the government's case is not "powerfully strong" and, as detailed above, its request for the "extraordinary" release conditions currently in place

was based almost entirely on misleading or false representations or material omissions made at the bond hearings.  Accordingly, the conditions of release currently in place in this case should be modified and should be replaced with the "least restrictive … combination of conditions" to "reasonably assure" that the defendant will appear in court in the future in light of the true nature and circumstances of the alleged offenses and the real strength of the government's case.  *See* 18 U.S.C. § 3142(c)(1)(A)-(B).

### c. The Government's Subsequent Motion for A Six-Month Delay Under the Speedy Trial Act Reveals Its Misleading Position at The Bond Hearings

Although the government gave all indications during the bond hearings that it was ready for trial, it subsequently revealed that it is not.  Indeed, on September 29, 2021—*i.e.*, less than a week after the bond hearings—the government revealed its true posture in this case in a motion to exclude time under the Speedy Trial Act (STA), 18 U.S.C. § 3161(h)(8).  *See* ECF Doc. 26 (the "STA Exclusion Motion").  In the STA Exclusion Motion, the government asked for six-months to a year exclusion of time under the STA to collect foreign evidence.  The government's position in the STA Exclusion Moton is plainly inconsistent with its misleading statements during the bond hearings regarding its so-called "powerfully strong" case.

### 4. Conclusion

During the bond hearings, the government argued for (and ultimately obtained) overly restrictive and "extraordinary" conditions based upon misrepresentations and material omissions.  Mr. Gyetvay respectfully requests that the release conditions be modified to reflect the true nature and circumstances of the alleged offenses and the true strength of the government's case.  Mr. Gyetvay has surrendered his passports, is willing to agree to reasonable domestic travel restrictions, a curfew of 11pm to 6am, and a reasonable bond amount to be secured by his Novatek shares.  Under the true facts and circumstances of this case, however, the electronic monitoring requirement is unduly restrictive.

Counsel for Mr. Gyetvay has communicated the basis of Mr. Gyetvay's motion to the government and conferred.  The government has not consented to the proposed modifications of his release conditions.

Respectfully submitted,


**/s/ Kevin Downing**
Kevin Downing
(Admitted *pro hac vice*)
Law Offices of Kevin Downing
601 New Jersey Avenue NW
Suite 620
Washington, D.C. 20001
Tel: 202-754-1982
Email: kevindowning@kdowninglaw.com
*Attorney for Defendant Mark A. Gyetvay*


**/s/ Matthew J. Mueller**
Matthew J. Mueller, FBN: 0047366
FOGARTY MUELLER HARRIS, PLLC
100 E. Madison Street
Suite 202
Tampa, Florida 33602
Tel:   813-682-1730
Fax:  813-682-1731
Email: matt@fmhlegal.com
*Attorney for Defendant Mark A. Gyetvay*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 21, 2021, I electronically filed the foregoing with the Clerk of Court by using the Court's CM/ECF system, thereby serving this document on all parties of record in this case.


**/s/ Matthew J. Mueller**
Matthew J. Mueller
*Attorney for Defendant Mark A. Gyetvay*

22