UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION


UNITED STATES OF AMERICA,       ) Fort Myers, Florida
                                )
                                ) Case 2:21-CR-83-JLB-NPM
Plaintiff                       )
                                ) Thursday, September 23, 2021
vs.                             )
                                ) 1:41 p.m. to 2:53 p.m.
MARK A. GYETVAY,                )
                                ) Courtroom 6B
Defendant                       )
_____)


INITIAL APPEARANCE/ARRAIGNMENT/BOND HEARING, PART 1
HELD BEFORE THE HONORABLE DOUGLAS N. FRAZIER,
United States Magistrate Judge


Official Court Reporter:
Jeffrey G. Thomas, RPR, CRR
2110 First Street, Suite 2-194
Fort Myers, FL  33901
Telephone:  (239) 461-2033


*(Proceedings recorded by Digital Recording Equipment.*
*Transcript produced using computer-aided transcription.)*

```
1                    A P P E A R A N C E S

2

   COUNSEL FOR GOVERNMENT:
3
                         United States Department of Justice
4                          Tax Division
                         150 M Street, N.E.
5                        Suite 2.214
                         Washington, DC 20002
6                        BY:  STANLEY J. OKULA , JR., ESQ.

7

   COUNSEL FOR DEFENDANT:
8
                         Fogarty Mueller Harris, PLLC
9                        100 E. Madison Street
                         Suite 202
10                       Tampa, FL 33602
                         BY:  MATTHEW J. MUELLER, ESQ.
11

12 ALSO PRESENT:

13                       TAD PARKS, Probation Officer

14                                * * *

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              I N D E X
 2    September 23, 2021                    Vol.    Page
 3    Preliminary Discussions                1        4
 4    Initial Appearance                     1        4
 5    Arraignment                            1        8
 6    Bond Hearing                           1        8
 7    Argument by Mr. Okula Re Bond          1        9
 8    Argument by Mr. Mueller                1       16
 9    Argument by Mr. Okula                  1       21
10    Order of Court                         1       23
11    Argument by Mr. Mueller                1       25
12    Order of Court                         1       26
13    Argument by Mr. Mueller                1       27
14    Recess                                 1       28
15    Argument by Mr. Okula                  1       28
16    Argument by Mr. Mueller                1       29
17    Order of Court                         1       30
18    Concluding Discussions                 1       31
19    Certificate of Court Reporter          1       34
20                          *  *  *
21
22
23
24
25
```

INITIAL APPEARANCE                                    4

```
 1                  * * * P R O C E E D I N G S * * *

 2                             - - -

 3            COURTROOM DEPUTY:  Calling Case 2:21-CR-83-JLB-NPM,

 4    United States of America versus Mark A. Gyetvay.

 5            THE COURT:  All right.  Mr. Gyetvay?

 6            THE DEFENDANT:  Jet-Vay is how it's pronounced.

 7            THE COURT:  Jet-Vay?  All right.

 8            And counsel?

 9            MR. MUELLER:  Good afternoon, Your Honor.  Matthew

10    Mueller on behalf of Mr. Gyetvay.

11            MR. OKULA:  Good afternoon, Your Honor.  Stanley

12    Okula, from the tax division of the Department of Justice, for

13    the government.

14            THE COURT:  All right.

15            Mr. Gyetvay, you're here because of an indictment

16    that was returned in this division of the Middle District of

17    Florida that charges you with offenses against the United

18    States.

19            I'm going do several things here today in this

20    proceeding.  I'm going advise you of the charges against you,

21    penalties you may face, and the rights that you have.  Those

22    rights include your right to remain silent and your right to

23    counsel.  I'll determine if you'll be released or detained

24    during the case; or, if counsel needs more time to address that

25    issue, we'll schedule a hearing at another time.  We'll also
```

1    set further deadlines or hearings in this case.

2              You have a constitutional right to remain silent.

3    You do not have to make a statement.  You don't have to make a

4    statement, at any time, to any law enforcement officer.  If you

5    do make a statement, anything you say can be used against you

6    in court, including at later proceedings in this case.  If

7    you've made a statement in the past, you need not make a

8    statement in the future.

9              Do you understand your rights to remain silent?

10             THE DEFENDANT:  Yes, I do, Your Honor.

11             THE COURT:  You have a right to counsel, of course.

12   And it's your intent to retain counsel?

13             THE DEFENDANT:  It is.

14             THE COURT:  All right.

15             And you're entering an appearance in this case,

16   Counsel?

17             MR. MUELLER:  Yes, Your Honor, I am.

18             THE COURT:  All right.  As I mentioned, the

19   government's filed an indictment in this case.  Have you

20   received a copy of the charges, counsel?

21             MR. MUELLER:  Yes.  We've received a copy of the

22   indictment, and I have had a chance to review it with

23   Mr. Gyetvay.

24             THE COURT:  All right.  Well, will government counsel

25   summarize the charges and inform of the maximum penalties,

1    please.

2               MR. OKULA:  Yes, Your Honor.  The indictment styled

3    the United States versus Mark Gyetvay is in 15 counts.

4               There are three counts of aiding and assisting the

5    filing of false tax returns, which are a violation of 7206(2)

6    of Title 26 of the United States Code, and for each of those

7    three charges the defendant faces up to three years

8    incarceration, up to $250,000 fine, one year supervised

9    release, a special assessment of $100, and the costs of

10   prosecution.

11              Count 4 of the indictment charges the defendant with

12   tax evasion for the 2009 tax year, and that charge carries a

13   maximum sentence of incarceration of five years, $250,000 fine

14   maximum, up to three years supervised release, special

15   assessment of $100, and the costs of prosecution.

16              Counts 5 through 9 of the indictment charge the

17   defendant with failing to file tax returns for the 2010 through

18   2014 tax years.  Each of those charges carries a maximum period

19   of incarceration of one year, a $250,000 fine, and up to

20   one year of supervised release, a special assessment of $100,

21   and the costs of prosecution.

22              Count 10 charges the defendant with making false

23   statements and representations to a department or agency of the

24   United States Government.  That carries a maximum term of

25   incarceration of five years, $250,000 fine, three years

1      supervised release, and a special assessment of $100.

2                  Counts 11 and 12 charge the defendant with willfully

3      failing to file foreign bank account records known as FBARs, in

4      violation of Title 31, Section 5314.  Each those two charges,

5      which are Counts 11 and 12, face . . . have a maximum term of

6      incarceration of five years, $250,000 fine, three years

7      supervised release, and a $100 special assessment.

8                  Finally, Counts 13 through 15, each of those three

9      counts charge a violation of the wire fraud statute under

10     Title 18, Section 1343.  Each of those three charges carry a

11     maximum term of incarceration of 20 years, a $1 million fine,

12     five years supervised release, and a special assessment of

13     $100.

14                 Thank you, Your Honor.

15                 THE COURT:  Do you understand the nature of the

16     charges and the potential penalties as described by the

17     prosecutor, sir?

18                 THE DEFENDANT:  Yes, I do.

19                 THE COURT:  Okay.  In accordance with the Due Process

20     Protection Act oral order, as required by Rule 5(f), the United

21     States is ordered to produce all exculpatory evidence to the

22     defendant pursuant to Brady versus Maryland and its progeny.

23     Failing do so in a timely manner may result in sanctions,

24     including the exclusion of evidence, adverse jury instructions,

25     dismissal of charges, or contempt proceedings.

1            All right.  Do you wish to proceed to arraignment,

2     counsel?

3            MR. MUELLER:  Yes, we do, Your Honor.

4            THE COURT:  All right.  Having heard the government's

5     summarization and the possible penalties, will you waive a

6     formal reading?

7            MR. MUELLER:  Yes, Your Honor, we would waive a

8     formal reading, and Mr. Gyetvay would enter a plea of not

9     guilty.

10            THE COURT:  Pleas of not guilty will be entered to

11     all charges in the indictment.

12            All right.  It's my understanding, due to the fact

13     that the government has filed a motion -- thank you -- the

14     government is not seeking detention, but is seeking to impose

15     relatively severe conditions concomitant to release; that is,

16     the conditions of release under the Bail Bond Reform Act.  They

17     are -- have you seen a copy of the motion, counsel?

18            MR. MUELLER:  I have a copy, yes, Your Honor.  I have

19     seen it.

20            THE COURT:  All right.

21            MR. OKULA:  If the Court pleases, at some point I'd

22     like to be heard -- and I know Your Honor has the motion.  I'd

23     like to elaborate a little bit on the Bail Reform Act factors,

24     Your Honor.

25            THE COURT:  Well, let's see.  Do you have any

1   objections to these conditions, Counsel?

2          MR. MUELLER:  Yes, we do, Your Honor.  If I may be

3   heard briefly on that?

4          THE COURT:  Then let's hear from the government then.

5          Counsel?

6          MR. OKULA:  Thank you, Your Honor.  And I want to

7   stress at the outset, Your Honor, that we do concede that there

8   are conditions or combination of conditions that would satisfy

9   the defendant's appearance; but, given the extraordinary facts

10  in this case, they justify, we respectfully submit, the

11  extraordinary numbers in the bond and the surety, essentially,

12  that we're requiring, or suggesting should be required.

13         THE COURT:  There are no presumptions in this case;

14  right?

15         MR. OKULA:  That's correct, there are none,

16  Your Honor.

17         THE COURT:  All right.

18         MR. OKULA:  But the Bail Reform Act does require the

19  Court to consider four factors:  The nature and circumstances

20  of the crimes charges charged, the weight of the evidence, the

21  history and characteristics of the defendant, and the

22  seriousness of danger.

23         We concede that danger is not an issue here, but

24  going with the nature and circumstances of the crimes,

25  Your Honor, this case does not involve an isolated incident of

1    false reporting by the defendant.  Instead, as the indictment

2    makes clear, it involves a decade long scheme to defraud the

3    IRS and the Department of Treasury involving tens of millions

4    of dollars.

5              The defendant failed to file tax returns for years

6    that he was making millions of dollars of income.  He lied

7    repeatedly to his United States accountants when he filed

8    belated returns and employed them to file those false returns.

9              He hid from the Department of Treasury, for

10   numerous years, significant assets, totaling at one point over

11   $93 million, that he stashed in secret Swiss bank accounts that

12   he had maintained by a group of Swiss wealth advisers who

13   helped him transfer money in and out of those accounts which

14   the defendant used by residences in Italy, in Colorado, to

15   refurbish his home in Naples, to buy Bentley automobiles, to

16   buy all high-end art.

17             All during that period, Your Honor, he kept his

18   accountants in the dark, kept the IRS in the dark, about those

19   secret Swiss bank accounts.

20             And it was not -- Your Honor, it was not any desire

21   by the defendant to make a clean breast of things and suddenly

22   report his assets to the IRS in 2015 because he thought it was

23   the right thing to do.  Instead, months earlier, he learned

24   that one of his Swiss banks was entering a Department of

25   Justice amnesty program that involved that bank turning over

1   information to the Department of Justice and the IRS.  It was

2   only then that prompted the defendant to make some belated

3   filings with the IRS.

4         And one of the critical belated filings that he made,

5   Your Honor, in order to enter one of the amnesty programs, was

6   he tried to certify that his prior non-filings were done

7   non-willfully; that is, without an intent to violate the

8   Internal Revenue laws.  And that, Your Honor, is one of the

9   false statement charges in the indictment.  And I suggest to

10   you that, based on all of the evidence, the defendant's

11   education -- he's a certified public accountant, Your Honor,

12   who's a partner at PricewaterhouseCoopers in the United States

13   and in London -- I'm sorry, and in Moscow, and that's how he

14   joined the Russian energy company there.

15         So this is not someone who didn't understand his tax

16   obligation.  He had a thorough understanding not only of his

17   duty to report, but his duty to file FBARs.  We have numerous

18   documentation in this case, Your Honor, showing that

19   accountants advised him of the FBAR requirement and that the

20   defendant dismissed some of their recommendations that he file,

21   and he just didn't file, didn't report them to the treasury,

22   all to hide his significant income from the Internal Revenue

23   Service and the Department of Treasury.

24         So it's a very serious case, Your Honor.  He's facing

25   guidelines between seven and ten years, and he's facing

1    statutory exposure of over 50 years based on the charges in the

2    indictment.

3              Turning, Your Honor, to the strength of the

4    government's case, the government's case here is powerfully

5    strong.  Pursuant to an e-mail search warrant authorized by

6    Magistrate Judge Mizell, the government obtained thousands of

7    e-mails sent by the defendant to his Swiss wealth advisers, to

8    his Swiss bankers, all involving the transfer of his monies

9    secretly into the United States in order to purchase art, to

10   purchase cars, to purchase real estate.

11             In addition, pursuant to a crime fraud ruling made by

12   Judge Chappell, she found that his filing with the Internal

13   Revenue Service, that amnesty filing, was part of a crime and a

14   fraud perpetrated on the IRS; and, pursuant to that ruling, we

15   obtained access to the communications between Mr. Gyetvay and

16   the corrupt Swiss attorneys who helped him prepare those

17   documents.

18             In addition to that, Your Honor, we have numerous

19   reams of documentary evidence showing that defendant lied, year

20   after year, to his accountants.

21             For instance, Your Honor, three of the years charged

22   in the indictment are the 2006 through 2008 tax years.  During

23   that period, the defendant retained an Atlanta-based accounting

24   firm to belatedly prepare some returns for him to file with the

25   IRS.

1              We have that accounting firm sending to Mr. Gyetvay a

2      detailed questionnaire essentially saying tell us what your

3      income is, tell us whether you have foreign bank accounts, tell

4      us about everything; and, year after year, Mr. Gyetvay filled

5      that out, by hand, e-mailed it to the Atlanta-based accounting

6      firm, and it was rife full of lies.  That led the accounting

7      firm to prepare false tax returns for Mr. Gyetvay, which he

8      signed and filed with the IRS.

9              We have accounting firm in Atlanta advising

10     Mr. Gyetvay to file FBARs to report his foreign accounts, and

11     they wrote the letter to the file, a memo to the file, saying

12     Mr. Gyetvay dismissed our advice that he file the FBARs that

13     he's obligated to do.  So, Your Honor, this is a powerfully

14     strong case against Mr. Gyetvay.

15             And the calculus, Your Honor, I think, respectfully,

16     is quite simple.  He's a man over 60 years old who's facing the

17     specter of guidelines sentence of between seven and ten years.

18     I daresay there's precious few defendants that you have come

19     before you with $125 million in net worth.  So the Court, I

20     respectfully request, has to set conditions that would provide

21     a strong motivation for the defendant to show up.  It would not

22     hurt him to part with 20 or $30 million if he has 70 or

23     $80 million left to live a lavish lifestyle in the other

24     countries where he has citizenship.

25             Recall, Your Honor, he is a citizen not only of the

1    United States, but of Russia, where we have no extradition

2    treaty, and the Edward Snowden case tells us about that, that

3    we can't get people back who were charged here where we have no

4    extradition treaty.  And he also has citizenship in Italy.  So

5    we would have to go through a whole extradition process to get

6    him back, and that is far from a certainty.

7            So, Your Honor, I respectfully suggest that -- are

8    the terms that we're asking for unusual, and even

9    extraordinary?  Yes; I concede that.  But are the facts of this

10   case extraordinary?  Yes, they are, indeed, Your Honor.

11           The defendant amassed his wealth by hiding his income

12   from the IRS and letting those assets grow in his foreign bank

13   accounts; and only after he learned that he was going to be

14   caught because the Swiss bank was turning over his information

15   did he decide to bring some of those assets back.

16           And, Your Honor, the conditions that we're asking for

17   are not unprecedented.  There was a case recently, within the

18   last three or four months, in California, where a businessman

19   there was arrested -- his name is Thomas Barrack,

20   B A R R A C K -- he was arrested on charges arising from the

21   Eastern District of New York based on Mr. Barrack being a

22   foreign agent of the United Arab Emirates and other countries.

23   The government -- or the magistrate there required or had a

24   $250 million bond imposed in that case based on the strength of

25   the government's case and the fact that Mr. Barrack was a

1   billionaire.  So, of course, the Court has to take into serious

2   consideration what are the defendant's resources, what are his

3   calculus, what is his calculus, and whether he's going to stay

4   around and face these serious charges, or how much it would

5   hurt, financially or otherwise, if he just decides not to show

6   up in court.

7          So I submit, Your Honor, based on all the facts that

8   our bail package that we're suggesting -- which, mind you,

9   Your Honor, still leaves over $40 million on the table for the

10  defendant -- that he be required to post his Morgan Stanley

11  securities account, that contains approximately $84 million as

12  of today, it contains the -- about 3.7 million shares of

13  NovaTech stock, the stock from his company that he transferred

14  back to the United States from his Swiss bank.

15         And I suggest to Your Honor that what we have is that

16  Your Honor direct the entry of some sort of escrow agreement,

17  that I'll come to terms with counsel for the defense, that in

18  the event that there is determined to be default on the bond,

19  the funds would essentially come to the United States.

20         And we think that's fairly . . . a fair set of

21  circumstances, given the defendant's wealth.  It still leaves

22  him ample resources to defend the case, but it also imposes a

23  significant financial penalty if he decides not to face them.

24         We also suggest that home monitoring is appropriate,

25  Your Honor.  Very easy, I suggest, to travel, even if he

1    surrenders his three passports, to get out of the country.  And

2    if he makes it to Switzerland, which does not extradite on tax

3    charges, or Russia, we'll never get him back.

4            So I'm happy to answer any additional questions, but

5    those are the conditions that we respectfully suggest should be

6    imposed by the Court.

7            And, Your Honor, we're also asking that the defendant

8    not be released until we effectuate the agreement that I just

9    outlined.  We think that the risk is too great for him to run

10   unless and until this default agreement were put in place.

11           Thank you, Your Honor.

12           THE COURT:  All right.

13           Counsel, before I hear from you, it seems that

14   there's going to be no question that home monitoring of some

15   sort is going to be imposed with GPS tracking, and that there

16   obviously is going to have to be some posting of some

17   securities to effectuate a bond in this case.  Is there any

18   issue with having -- they're seeking two financially

19   responsible sureties to sign the bond.  Is that an issue,

20   before we get to the money?

21           MR. MUELLER:  That is an issue.  And if I could have

22   a chance to kind of lay out some of the reasons why, I

23   appreciate the opportunity.

24           THE COURT:  Go ahead.

25           MR. MUELLER:  Thank you, Your Honor.

1          It's important, I think, for the Court to understand,

2    again, under the Bail Reform Act, as you know, the conditions

3    that ought to be set are merely the conditions sufficient to

4    secure the appearance of the defendant at trial.  And what

5    these conditions appear to us to be doing, Judge, is penalizing

6    the defendant for his wealth, which is, of course, not a

7    purpose of the Bail Reform Act.  And I'll quote the reasons why

8    I believe that.

9          The reasons why are that Mr. Gyetvay has very strong

10   ties to this community.  If Your Honor released him today, I

11   can tell you where he's going to go.  He's going to go and pick

12   up his two daughters at school, where he dropped them off this

13   morning before the government arrested him.  He lives with his

14   two under the age of 12 daughters at his home in Naples, which

15   he has owned since approximately 1999.

16         He, yes, has worked, for a number of years, for an

17   international company, and has lived abroad as well; but he's

18   at a stage where he has not resided outside the United States

19   since March of last year, and has largely lived a life of

20   taking care of his daughters, of whom he's the primary

21   caregiver.  His ex-wife doesn't live here in Naples, and so

22   he's the primary caregiver and father of those two girls.

23         Additionally, he has been aware, and his counsel have

24   been aware, of course, of this investigation for a number

25   of years, probably four to five years, and have been in regular

1    communication with the government.  And while I will take some

2    issue with the purported strength of the case that the

3    government outlined, I can tell that it's not as clear as they

4    purport it to be.

5              The last time I was in the courthouse here in Fort

6    Myers -- I can tell you, Your Honor, most of my practice takes

7    place in Tampa -- but we prevailed in front of Judge Chappell,

8    in which she found that the government was seeking to compel

9    the production of records in violation of Fifth Amendment for

10   Mr. Gyetvay.

11             So, as there always is, of course, there's two sides

12   to the story; but when you look at the charges in the

13   indictment, it's -- there's a lot of specificity pled, but

14   it's -- at the core, it's an unreported income case.  They're

15   accusing Mr. Gyetvay of failing to report income; and, in

16   failing to report, pay the taxes on that income.

17             The average sentence -- and this is according to the

18   U.S. Sentencing Guidelines from the fiscal year of 2020 -- the

19   average sentence imposed in a tax case was 18 months.

20   Moreover, there are any number of recent cases that -- you

21   know, that we're aware of, those of us who follow these

22   criminal tax cases, in which multiple millions of dollars of

23   money in foreign accounts of taxes owed have resulted in

24   sentences well below the guidelines.

25             So I don't believe that guidelines range proffered by

1    the government is really a suitable mechanism to understand,

2    you know, the likely sentencing outcomes in the case.  That's

3    by no means to say it's not a serious case, because these are

4    serious felony charges, Your Honor; but it's essentially a

5    failure to file -- a failure to report income type of a case.

6    Of course, you know, the indictment is silent on all the taxes

7    that were paid during this period, including, you know, in

8    conjunction with this voluntary disclosure that was -- you

9    know, that was discussed in there.

10           The government explained to you that their theory is

11   that he failed to -- in entering that program, he claimed that

12   he was -- lacked willfulness.  Of course, that's a legal

13   determination, and whether or not that adds anything to the

14   table with respect to a tax case which otherwise, again, would

15   be in the relative mine-run of the cases.  I understand the

16   defendant may be slightly wealthier than the average defendant,

17   but in no means are the allegations, quite frankly, much more

18   remarkable than a mine-run tax case, other than pled with great

19   specificity in the indictment.

20           For example, you know, five of these counts are

21   misdemeanor counts; right?  The failure to file counts for 2010

22   through 2014.  And again, a number of the other counts are

23   routine type charges that we see in a case such as this.

24           So when you overlay the severity of the conduct, and

25   the charges, and the likely sentence even if he were convicted

1    at trial on these charges, with his very strong incentives to

2    stay in the United States, and the fact that, if he were

3    inclined to flee, you know, he's had a number of years to do

4    so, and is not -- quite to the contrary, the indictment, at

5    Page 8, talks about there being approximately $90 million in

6    these Swiss accounts between 2010 and 2015.

7          I think, when Your Honor reviews the presentence --

8    or pretrial report, $90 million worth of securities are now

9    held domestically at Morgan Stanley.  Again, if someone were

10   purporting to, or planning to flee from these charges, not only

11   would it have long ago been planned and done, he would do the

12   opposite.  He wouldn't bring these assets back into the United

13   States.

14         The reality is, you know, Mr. Gyetvay intends to

15   defend these charges.  We've been defending these charges for

16   the last number of years; and he will continue do so, and will

17   request a trial, of course, and have that opportunity.

18         But I think his appearance can be secured for

19   significantly less than what the government is asking for.  And

20   I think the pretrial officer, I think, is pretty close to what

21   would be reasonable under the Bail Reform Act.

22         I think, as Your Honor said, the home monitoring, or

23   the electronic monitoring, however you refer to it, I think,

24   you know, we understand why the Court would want to impose

25   that, so we're not objecting to that.

ARGUMENT BY MR. OKULA                    21

1          We're not, of course, objecting to surrendering any

2     passports.  I can tell the Court -- I don't think she's here

3     yet, but we have a family member coming up from Naples with all

4     three of those travel documents, so those can be surrendered

5     over as soon as we have them here in the courthouse.

6          So, of course, those two conditions, in and of

7     themselves, should be sufficient to secure his appearance.  But

8     I respect that Your Honor may wish to have more skin in the

9     game, and so I think, you know, the defendant himself has

10    assets here in the district, there are three residences in the

11    district listed on the pretrial services report, and I believe,

12    you know, a bond in which -- in which those reports are put up

13    as collateral would be sufficient.  Because, as I said,

14    Mr. Gyetvay has no intention of fleeing, and is not a risk of

15    flight.

16         Substantially most of his assets are here

17    domestically, and this is where he wants to be, raising his

18    daughters, and defending himself from these charges which he

19    deems to be unwarranted.

20              THE COURT:  All right.

21              MR. OKULA:  Your Honor, may I just respond very, very

22    briefly?

23              THE COURT:  You may.

24              MR. OKULA:  Thank you.  First of all, this does not

25    involve a case where Mr. Gyetvay has paid all these taxes, as

1    Mr. Mueller suggested.  From at least 2007 year, when he

2    received over $20 million of compensation, he never paid taxes

3    on that, never reported that item to the IRS at all.  So this

4    doesn't involve a case of someone who has belatedly paid all

5    his taxes.

6              With respect to his family situation, Your Honor, the

7    defendant -- and this is something we've studied extensively,

8    because we have done an analysis of the time that defendant

9    spent in the country and out of the country between 2008 and

10   2018; and, for many of those years, Your Honor, more than half

11   the year was spent in Russia, and the defendant left his

12   children in the care of either nannies or family members at the

13   time, or at that time his -- his then wife.

14             His wife, his ex-wife, is in the United States.  She

15   lives in Colorado, so she would so she could ably take care of

16   the children for any period that he were not available or held

17   until bail is posted.  In fact, the defendant's sister, who

18   usually lives in New Jersey, is in town, locally, at this

19   very day, and could reasonably take over childcare issues in

20   the event that the defendant is held for a number of days until

21   the conditions are satisfied.  So I just want wish to make that

22   clear to the Court.

23             THE COURT:  Is there someone to get the kids today?

24   That's the first thing.

25             MR. MUELLER:  Yes, Your Honor.  We think we have

1    someone today to do that.

2            THE COURT:  All right.  Obviously, I'm going to set a

3    curfew and GPS monitoring with travel restrictions.  I'm going

4    to require the defendant to surrender all passports that he may

5    possess.  The defendant is to make no -- he's to also abide by

6    all the standard conditions that will be on the bond papers

7    that are the standard ones for this particular district.  He's

8    to have no -- make no efforts to make any travel arrangements,

9    of any type or any sort, with any airlines, travel agencies,

10   private airlines, or whatnot.  None.

11           Travel will be restricted, without court permission

12   or pretrial permission, to Lee and Collier Counties.

13   Understanding counsel is from Tampa, we can fix the system

14   whereby he'll just have to contact pretrial services, and

15   they'll know he's leaving, because it will ping, to go to

16   Tampa.  So it will be limited to those counties between here

17   and there.  So that's Charlotte, Manatee, Sarasota, and

18   Hillsborough Counties.

19           MR. MUELLER:  Thank you, Your Honor.

20           THE COURT:  I am going to require two sureties to

21   sign the bond.

22           I understand the government's position.  I also

23   understand the defendant's position as to these rather onerous

24   conditions.  However, having looked at the financial

25   documentations supplied, it looks like that there is sufficient

1    assets in this Morgan Stanley account to satisfy what the

2    government requests.

3           It will remain up to counsel to figure out how you

4    would accommodate that.  An escrow issue may be that.  But the

5    funds would then be remained in Morgan Stanley, and accrue

6    interest or whatnot.  But just the government would have, of

7    course, primary lien if the defendant were not to appear for

8    proceedings.  I don't see that that's a terrible burden under

9    these circumstances because it's in one account.

10          If I saw all the other assets, it would take longer,

11   actually, to perfect, as opposed to just this one asset, which

12   would satisfy me that the defendant wouldn't be a risk of

13   flight.  And there appears to be other assets that would be

14   sufficient to do anything else, and if it became necessary to

15   remove monies for whatever reason I can't think of, we have

16   that ability do that in hindsight.

17          So I am going to require that the parties come up

18   with a way to secure that account sufficient to satisfy the

19   government, subject, of course, to my review, what I think.

20          This obviously can't be done from the Lee County

21   Jail.  There's no way that he can remain in custody there and

22   get this done, that I can think of, due to their restrictions.

23   It's just difficult to even get in and out during COVID over

24   there.

25          How long do you think it would take, counsel, to get

1   this part of a bond perfected, this agreement to forfeit or

2   whatever it might be, an escrow account on the Morgan Stanley

3   account?

4           MR. OKULA:  May I have a minute?

5           THE COURT:  Yes, you may.

6           MR. MUELLER:  Well, Your Honor, if -- I know we

7   haven't had a chance to confer -- I mean, one possibility with

8   respect to the securities that occurred to us is that there

9   could be some requirement that, affectively, the status quo is

10  maintained, that nothing's done with them without providing

11  notice to the government, so that then there -- they could, you

12  know, raise that with the Court, so there'd be no transfer or

13  sale without providing notice to the government.  And at that

14  point, you know, if it wasn't worked out, the Court could get

15  involved, but otherwise, it would effectively maintain the

16  status quo.

17          MR. OKULA:  Judge, that gives us no security.  The

18  defendant could get out, could call his broker, transfer the

19  money to a foreign account, and then he could skip town, and

20  we're left holding the bag.

21          THE COURT:  There's got to be some agreement from

22  Morgan Stanley.  This is what's going to take time, I'm

23  assuming.  There's got to be some agreement with Morgan Stanley

24  that none of those assets can be alienated out of that account,

25  for any purpose, until further order of the Court.  How long

1    that would take, that's still my question.

2              How long do you think this would take?

3              MR. MUELLER:  Well, we, of course, would work as

4    diligently as possible with counsel for the government.

5              THE COURT:  Tomorrow's Friday.

6              MR. MUELLER:  Yeah.  Not having done this particular

7    thing before, it's hard to estimate; but, yeah, it would

8    probably take a few days.  I think, in the meantime -- again, I

9    think to Your Honor's point, it can't very well be done from

10   the county jail under current circumstances.  But, with all the

11   other conditions currently in place, I would submit that risk

12   of flight is pretty much eliminated with, you know, the

13   monitoring and the surrender of passports.  So while we work

14   this out, I would think, Your Honor, any concern about flight

15   in the meantime is just not an issue.

16             MR. OKULA:  Well, Your Honor, at least with respect

17   to the surrender of the passports, Your Honor --

18             THE COURT:  Well, those things are going to have to

19   be.  I'm wondering how long this is going to take, is the final

20   piece of the bond.  I'm trying to think of a way that we can

21   accord the ability do this, but I'm having trouble figuring a

22   way out right now.  Let me think.

23             I'm going to require this.  The surrender of the

24   passports has to be done before he can be released from

25   custody.  Sounded like, to me, you think you can accomplish

1    that today.

2            How soon can we have the electronic monitoring under

3    different circumstances set up?

4            MR. PARKS:  I can install it today, Your Honor.

5            THE COURT:  Okay.

6            The problem I have, counsel, is that I can ensure

7    that he's not going anywhere, we can start the monitoring, and

8    he can be on house arrest until this is all done, and ensure

9    that he's not going to flee.  But I have trouble with the

10   ability to pick up the phone and dial Morgan Stanley, and I'm

11   not sure how -- that doesn't happen as fast as people think it

12   does.  But then again, I don't deal with that many millions of

13   dollars, so it gets harder for me to move my money than it is

14   for other people.

15           I need to have some . . . .

16           MR. MUELLER:  Judge, I can represent -- I don't

17   believe this is -- these are fully liquid securities that could

18   just be, you know, spent today.  You know, for example, we

19   have, if -- you know -- you know, just trying to be helpful, if

20   possible to, the Court, you know, Mr. Gyetvay's longtime

21   counsel is up in Washington D.C., and I'm representing him with

22   that counsel.

23           You know, if Your Honor wished to take maybe a brief

24   recess, I can confer with Mr. Okula for the government and with

25   counsel, and -- you know, the counsel who will be -- we will

1   file a motion to have him admitted, but for the meantime we

2   might be able to expedite an arrangement that would satisfy the

3   Court on that.

4            THE COURT:  We'll do that.  That's the best way to

5   work it out, because this isn't my forté.  But if you can show

6   me a way that we have pretty much a guarantee that these funds

7   in Morgan Stanley are frozen, I think the government would be

8   happy with that.  That's all we have to do, is we have to

9   ensure that they're frozen.  And then I would be willing to let

10  him go as soon as the passports are here, and we can do the

11  other part to perfecting the bond, the signatures, the

12  sureties, can be done by Monday.

13           MR. MUELLER:  Okay.

14           THE COURT:  But that's gonna be the thing.  It's

15  whatever we broker.  And I'll give you some time to discuss

16  that and see what you can work out.

17           MR. MUELLER:  Okay.

18           THE COURT:  All right.  Court will be in recess.

19           (Court was recessed.)

20                         AFTER RECESS

21           THE COURT:  All right.  What have we done?

22           MR. OKULA:  Your Honor, I think we've reached

23  agreement on this, and Mr. Mueller will correct me if I'm

24  wrong, if I recite what we have agreed to.

25           Basically what we have agreed to is that Mr. Mueller

ARGUMENT BY MR. MUELLER                29

1    and his co-counsel are going to obtain essentially a power of

2    attorney with respect to the JPMorgan account and the shares.

3    They are going to communicate to JPMorgan's legal department

4    that Mr. Gyetvay has signed a power of attorney, and that no

5    instructions of any regard are to be taken with respect to the

6    account except from Mr. Mueller or his co-counsel; and that,

7    when and if I get confirmation from the legal department that

8    that has been implemented, the government would agree that

9    Mr. Gyetvay could be released.

10            There's a second component of that, Your Honor,

11   that -- that's the initial one to allow Mr. Gyetvay to be

12   released.  Mr. Mueller and his partner have also agreed that

13   they . . . one of their firms is going to take physical

14   possession, in their escrow account, of the shares pending the

15   outcome of the matter.

16            THE COURT:  Okay.

17            Counsel?

18            MR. MUELLER:  Yes, Your Honor, that expresses, you

19   know, the agreement that we discussed.  The one point I would

20   raise with Your Honor is I think one of the reasons for the

21   power of attorney, is we're not -- it's not clear to us,

22   standing here today, how long it would take to effectuate the

23   transfer to some kind of escrow account.  So I can't -- I don't

24   know if I can make an accurate estimation as to how long that

25   will take; but, you know, we're going to make our best efforts

1   to get, you know, the documents from Morgan Stanley today so

2   that, hopefully, the Court is satisfied that nothing is going

3   to happen with that account, and we can proceed.

4          I would also advise the Court I do now have all three

5   of Mr. Gyetvay's passports, which, you know, we would obviously

6   surrender as part of the conditions.

7          THE COURT:  Okay.  Let me get this for the record so

8   we can -- and then we'll talk about it again.

9          The conditions of release will be as follows:  Report

10  to pretrial service as directed.  Travel will be restricted to

11  Lee and Collier Counties.  Permission to travel will be granted

12  by pretrial.  And there will be a monitoring system, GPS,

13  provided by -- paid for by the defendant and provided by

14  pretrial services.

15         Additionally, there will be an agreement whereby a

16  power of attorney concerning the shares will be made in

17  accordance and approved by the government that will provide

18  that the shares of the Morgan Stanley account . . . do we have

19  a number for this account?  We'll need that for the bond

20  papers.  All right.  I think we can go on.  But I'll need the

21  number of that.  That will be on the bond papers.  So we'll

22  have that there.

23         And then, with the further requirement that that will

24  be put in an escrow account, as agreed upon between counsel for

25  the defendant and counsel for the government.  That's all that

1    we'll have to put in the verbiage.

2            No drug testing will be required, Tad.

3            Okay.  And the defendant is further to be -- there

4    will be a curfew from 8:00 p.m. to 6:00 a.m. when we initiate

5    full monitoring.  But the defendant will be on house arrest

6    until such time as all of the attributes of the bond are

7    accomplished by the parties.  So, for a few days, defendant

8    will be on house arrest.

9            Now if, for some reason, he needs to be outside of

10   the house, you'll have to contact pretrial services; and, for

11   good cause that has do with perfecting these bond issues, I

12   might allow some travel within these environs.  If we have to

13   go someplace and get something notarized or whatever.  But that

14   will have to be accomplished through counsel for the defendant

15   and pretrial and myself.  That will be the only exception.  And

16   then, once all of this is perfected, like I say, the travel

17   will be restricted to Lee and Collier Counties, with travel to

18   see the lawyer accomplished up in Tampa by -- or other places

19   by approval by pretrial services.

20           Counsel?

21           MR. OKULA:  I'm getting the account number,

22   Your Honor.  I'll have it in a moment.

23           THE COURT:  Okay.

24           MR. MUELLER:  Judge, it is our understanding, based

25   on the fact that the 80 -- or that the Morgan Stanley account

1    containing the $84 million of security is going to be security

2    for the bond.  Is the bond going to have the face amount of the

3    $80 million that the government requested?

4              THE COURT:  Yes.  Yes, it will.

5              MR. MUELLER:  Okay and does Your Honor wish to set a

6    timeframe within which the sureties need to cosign the bond?

7              THE COURT:  I'm not sure how they're going to work

8    that out.  Again, I think we should have that done by next

9    Wednesday?  Okay.  The sureties will be identified and signed

10   the bond papers by next Wednesday.

11             MR. OKULA:  Your Honor, I have the account number, if

12   I may recite it for Your Honor.

13             THE COURT:  Would you give it to the Courtroom

14   Deputy?

15             MR. OKULA:  I'd be happy to, Your Honor.

16             THE COURT:  That way, we don't get a . . . .

17             (There was discussion off the record.)

18             THE COURT:  Do you think you're going to be able to

19   get this done?

20             MR. MUELLER:  We're actively working on it,

21   Your Honor, so I will endeavor to do that.  Many of my

22   co-counsel, I know, are already working as we speak, so . . . .

23             THE COURT:  The question I have to the marshal, how

24   long can we leave him here in the courthouse?

25             U.S. MARSHAL:  Until 5:00 p.m.

1          THE COURT:  5:00 o'clock.  After that, they're going

2     to transport him.

3          MR. MUELLER:  Okay.  Do we notify chambers and the

4     marshals when we have the necessary documents?

5          MR. OKULA:  I think the sequence has to be that

6     they're going to notify chambers, that they notify chambers

7     that they've satisfied the government, because one of the

8     conditions is that --

9          THE COURT:  He'll have to say yes.  If he does that,

10    who you'll need to have to contact is the Courtroom Deputy,

11    okay?  And if it's not done by the time she leaves, she will

12    give you my cell phone number.

13         MR. MUELLER:  Okay.

14         THE COURT:  And I'm not sure . . . .  I guess we'd

15    have the paperwork -- I'm just not thinking this is going to

16    happen today.  If we can't get it done by 5:00 o'clock, it's

17    not going to happen, because there's no way they can get the

18    paperwork to the marshals for him to be released.  And the

19    marshals have to do what they have do, and get other prisoners

20    taken, whatever they may have to do.  So I'm not thinking it's

21    getting done by 5:00 o'clock.

22         MR. OKULA:  Does Your Honor wish to maybe, given that

23    premise, like bookmark a continuation of the hearing tomorrow?

24    Because if it's implemented by, say, midday tomorrow, then he

25    could be released from here tomorrow?

1          THE COURT:  I'm the duty judge again tomorrow, as

2    well as next week.  I will be in in the morning.  That's all it

3    will take, is to say yes, and I'll sign it.  So if we can't get

4    it done by 5:00 o'clock, we'll just reconvene tomorrow morning.

5          Somebody contact chambers as soon as . . . first

6    thing in the morning, or contact Wendy first thing in the

7    morning, and tell us what the status is, and I'll be available

8    to sign the bond and get it accomplished.

9          MR. MUELLER:  We appreciate that, Your Honor.  We're

10   working as hard as we can to get it to everyone today.  So

11   we'll try that, but I understand . . . .

12         THE COURT:  Well, the courthouse closes at 5:00.

13   Plus, they have other stuff they have to do.  And if they'll

14   accommodate us till 5:00 o'clock, I'd be appreciative of that,

15   but that's about the best we can do.  All right?

16         If there's nothing further, we're in recess.

17         MR. OKULA:  Thank you, Your Honor.

18         THE COURT:  All right.

19              -- -- -- -- -- -- -- --

20     (Thereupon, at 2:53 p.m., the above-entitled matter was

21     concluded.)

22              -- -- -- -- -- -- -- --

23

24

25

```
 1                          CERTIFICATE

 2        I CERTIFY THAT THE FOREGOING TRANSCRIPT IS A TRUE AND

 3   ACCURATE TRANSCRIPT FROM THE ORIGINAL DIGITAL RECORDING CREATED

 4   DURING THE PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER.

 5

 6        Dated this 30th day of September, 2021.

 7

 8

 9                              JEFFREY G. THOMAS, RPR, CRR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```