

**U.S. Department of Justice**

**Tax Division**

*Washington, D.C. 20530*

CDC:TJS:JES:MWKotila
5-16-4684
2014200692

Keith D. Krakaur, Esq.
Christopher J. Gunther, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
601 Lexington Avenue
31st Floor
New York, New York 10022

> Re:  Coutts & Co Ltd
> DOJ Swiss Bank Program – Category 2
> Non-Prosecution Agreement

Dear Messrs. Krakaur and Gunther:

On December 31, 2013, Coutts & Co Ltd ("Coutts") submitted a Letter of Intent to participate in Category 2 of the Department of Justice's Program for Non-Prosecution Agreements or Non-Target Letters for Swiss Banks, as announced on August 29, 2013 (hereafter "Swiss Bank Program"). This Non-Prosecution Agreement ("Agreement") is entered into based on the representations of Coutts in its Letter of Intent and information provided by Coutts pursuant to the terms of the Swiss Bank Program. The Swiss Bank Program is incorporated by reference herein in its entirety in this Agreement.[1] Any violation by Coutts of the Swiss Bank Program will constitute a breach of this Agreement.

On the understandings specified below, the Department of Justice will not prosecute Coutts for any tax-related offenses under Titles 18 or 26, United States Code, or for any monetary transaction offenses under Title 31, United States Code, Sections 5314 and 5322, in connection with undeclared U.S. Related Accounts held by Coutts during the Applicable Period (the "conduct"). Coutts admits, accepts, and acknowledges responsibility for the conduct set forth in the Statement of Facts attached hereto as Exhibit A and agrees not to make any public

---

[1] Capitalized terms shall have the meaning ascribed to them in the Swiss Bank Program.

statement contradicting the Statement of Facts. This Agreement does not provide any protection against prosecution for any offenses except as set forth above, and applies only to Coutts and does not apply to any other entities or to any individuals. Coutts expressly understands that the protections provided under this Agreement shall not apply to any acquirer or successor entity unless and until such acquirer or successor formally adopts and executes this Agreement. Coutts enters into this Agreement pursuant to the authority granted by its Board of Directors in the form of a Board Resolution (a copy of which is attached hereto as Exhibit B).

In recognition of the conduct described in this Agreement and in accordance with the terms of the Swiss Bank Program, Coutts agrees to pay the sum of $78,484,000 as a penalty to the Department of Justice ("the Department"). This shall be paid directly to the United States within seven (7) days of the execution of this Agreement pursuant to payment instructions provided to Coutts. This payment is in lieu of restitution, forfeiture, or criminal fine against Coutts for the conduct described in this Agreement. The Department will take no further action to collect any additional criminal penalty from Coutts with respect to the conduct described in this Agreement, unless the Tax Division determines Coutts has materially violated the terms of this Agreement or the Swiss Bank Program as described on pages 5-6 below. Coutts acknowledges that this penalty payment is a final payment and no portion of the payment will be refunded or returned under any circumstance, including a determination by the Tax Division that Coutts has violated any provision of this Agreement. Coutts agrees that it shall not file any petitions for remission, restoration, or any other assertion of ownership or request for return relating to the penalty amount or the calculation thereof, or file any other action or motion, or make any request or claim whatsoever, seeking to collaterally attack the payment or calculation of the penalty. Coutts agrees that it shall not assist any others in filing any such claims, petitions, actions, or motions. Coutts further agrees that no portion of the penalty that Coutts has agreed to pay to the Department under the terms of this Agreement will serve as a basis for Coutts to claim, assert, or apply for, either directly or indirectly, any tax deduction, any tax credit, or any other offset against any U.S. federal, state, or local tax or taxable income.

The Department enters into this Agreement based, in part, on the following Swiss Bank Program factors:

(a) Coutts' timely, voluntary, and thorough disclosure of its conduct, including:

- how its cross-border business for U.S. Related Accounts was structured, operated, and supervised (including internal reporting and other communications with and among management);

- the name and function of the individuals who structured, operated, or supervised the cross-border business for U.S. Related Accounts during the Applicable Period;

- how Coutts attracted and serviced account holders; and

- an in-person presentation and documentation, properly translated, supporting the disclosure of the above information and other information that was requested by the Tax Division;

(b) Coutts' cooperation with the Tax Division, including conducting an internal investigation and making presentations to the Tax Division on the status and findings of the internal investigation;

(c) Coutts' production of information about its U.S. Related Accounts, including:

- the total number of U.S. Related Accounts and the maximum dollar value, in the aggregate, of the U.S. Related Accounts that (i) existed on August 1, 2008; (ii) were opened between August 1, 2008, and February 28, 2009; and (iii) were opened after February 28, 2009;

- the total number of accounts that were closed during the Applicable Period; and

- upon execution of the Agreement, as to each account that was closed during the Applicable Period, (i) the maximum value, in dollars, of each account, during the Applicable Period; (ii) the number of U.S. persons or entities affiliated or potentially affiliated with each account, and further noting the nature of the relationship to the account of each such U.S. person or entity or potential U.S. person or entity (e.g., a financial interest, beneficial interest, ownership, or signature authority, whether directly or indirectly, or other authority); (iii) whether it was held in the name of an individual or an entity; (iv) whether it held U.S. securities at any time during the Applicable Period; (v) the name and function of any relationship manager, client advisor, asset manager, financial advisor, trustee, fiduciary, nominee, attorney, accountant, or other individual or entity functioning in a similar capacity known by Coutts to be affiliated with said account at any time during the Applicable Period; and (vi) information concerning the transfer of funds into and out of the account during the Applicable Period, including (a) whether funds were deposited or withdrawn in cash; (b) whether funds were transferred through an intermediary (including but not limited to an asset manager, financial advisor, trustee, fiduciary, nominee, attorney, accountant, or other third party functioning in a similar capacity) and the name and function of any such intermediary; (c) identification of any financial institution and domicile of any financial institution that transferred funds into or received funds from the account; and (d) identification of any country to or from which funds were transferred; and

(d) Coutts' retention of a qualified independent examiner who has verified the information Coutts disclosed pursuant to II.D.2 of the Swiss Bank Program.

Under the terms of this Agreement, Coutts shall: (a) commit no U.S. federal offenses; and (b) truthfully and completely disclose, and continue to disclose during the term of this Agreement, consistent with applicable law and regulations, all material information described in Part II.D.1 of the Swiss Bank Program that is not protected by a valid claim of privilege or work product with respect to the activities of Coutts, those of its parent company and its affiliates, and its officers, directors, employees, agents, consultants, and others, which information can be used for any purpose, except as otherwise limited in this Agreement.

Notwithstanding the term of this Agreement, Coutts shall also, subject to applicable laws or regulations:  (a) cooperate fully with the Department, the Internal Revenue Service, and any other federal law enforcement agency designated by the Department regarding all matters related to the conduct described in this Agreement; (b) provide all necessary information and assist the United States with the drafting of treaty requests seeking account information of U.S. Related Accounts, whether open or closed, and collect and maintain all records that are potentially responsive to such treaty requests in order to facilitate a prompt response; (c) assist the Department or any designated federal law enforcement agency in any investigation, prosecution, or civil proceeding arising out of or related to the conduct covered by this Agreement by providing logistical and technical support for any meeting, interview, federal grand jury proceeding, or any federal trial or other federal court proceeding; (d) use its best efforts promptly to secure the attendance and truthful statements or testimony of any officer, director, employee, agent, or consultant of Coutts at any meeting or interview or before a federal grand jury or at any federal trial or other federal court proceeding regarding matters arising out of or related to the conduct covered by this Agreement; (e) provide testimony of a competent witness as needed to enable the Department and any designated federal law enforcement agency to use the information and evidence obtained pursuant to Coutts' participation in the Swiss Bank Program; (f) provide the Department, upon request, consistent with applicable law and regulations, all information, documents, records, or other tangible evidence not protected by a valid claim of privilege or work product regarding matters arising out of or related to the conduct covered by this Agreement about which the Department or any designated federal law enforcement agency inquires, including the translation of significant documents at the expense of Coutts; and (g) provide to any state law enforcement agency such assistance as may reasonably be requested in order to establish the basis for admission into evidence of documents already in the possession of such state law enforcement agency in connection with any state civil or criminal tax proceedings brought by such state law enforcement agency against an individual arising out of or related to the conduct described in this Agreement.

Coutts further agrees to undertake the following:

1.    The Tax Division has agreed to specific dollar threshold limitations for the initial production of transaction information pursuant to Part II.D.2.b.vi of the Swiss Bank Program, and set forth in subparagraph (c) on page 3 of this Agreement. Coutts agrees that, to the extent it has not provided complete transaction information, it will promptly provide the entirety of the transaction information upon request of the Tax Division.

2.    Coutts agrees to close as soon as practicable, and in no event later than two years from the date of this Agreement, any and all accounts of recalcitrant account holders, as defined in Section 1471(d)(6) of the Internal Revenue Code; has implemented, or will implement, procedures to prevent its employees from assisting recalcitrant account holders to engage in acts of further concealment in connection with closing any account or transferring any funds; and will not open any U.S. Related Accounts except on conditions that ensure that the account will be declared to the United States and will be subject to disclosure by Coutts.

3.       Coutts agrees to use best efforts to close as soon as practicable, and in no event later than the four-year term of this Agreement, any and all U.S. Related Accounts classified as "dormant" in accordance with applicable laws, regulations and guidelines, and will provide periodic reporting upon request of the Tax Division if unable to close any dormant accounts within that time period. Coutts will only provide banking or securities services in connection with any such "dormant" account to the extent that such services are required pursuant to applicable laws, regulations and guidelines. If at any point contact with the account holder(s) (or other person(s) with authority over the account) is re-established, Coutts will promptly proceed to follow the procedures described above in paragraph 2.

4.       Coutts agrees to retain all records relating to its U.S. cross-border business, including records relating to all U.S. Related Accounts closed during the Applicable Period, for a period of ten (10) years from the termination date of the this Agreement.

With respect to any information, testimony, documents, records or other tangible evidence provided to the Tax Division pursuant to this Agreement, the Tax Division provides notice that it may, subject to applicable law and regulations, disclose such information or materials to other domestic governmental authorities for purposes of law enforcement or regulatory action as the Tax Division, in its sole discretion, shall deem appropriate.

Coutts' obligations under this Agreement shall continue for a period of four (4) years from the date this Agreement is fully executed. Coutts, however, shall cooperate fully with the Department in any and all matters relating to the conduct described in this Agreement, until the date on which all civil or criminal examinations, investigations, or proceedings, including all appeals, are concluded, whether those examinations, investigations, or proceedings are concluded within the four-year term of this Agreement.

It is understood that if the Tax Division determines, in its sole discretion, that: (a) Coutts committed any U.S. federal offenses during the term of this Agreement; (b) Coutts or any of its representatives have given materially false, incomplete, or misleading testimony or information; (c) the misconduct extended beyond that described in the Statement of Facts or disclosed to the Tax Division pursuant to Part II.D.1 of the Swiss Bank Program; or (d) Coutts has otherwise materially violated any provision of this Agreement or the terms of the Swiss Bank Program, then (i) Coutts shall thereafter be subject to prosecution and any applicable penalty, including restitution, forfeiture, or criminal fine, for any federal offense of which the Department has knowledge, including perjury and obstruction of justice; (ii) all statements made by Coutts' representatives to the Tax Division or other designated law enforcement agents, including but not limited to the appended Statement of Facts, any testimony given by Coutts' representatives before a grand jury or other tribunal whether prior to or subsequent to the signing of this Agreement, and any leads therefrom, and any documents provided to the Department, the Internal Revenue Service, or designated law enforcement authority by Coutts shall be admissible in evidence in any criminal proceeding brought against Coutts and relied upon as evidence to support any penalty on Coutts; and (iii) Coutts shall assert no claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, or any other federal rule that such statements or documents or any leads therefrom should be suppressed.

Determination of whether Coutts has breached this Agreement and whether to pursue prosecution of Coutts shall be in the Tax Division's sole discretion. The decision whether conduct or statements of any current director, officer or employee, or any person acting on behalf of, or at the direction of, Coutts, will be imputed to Coutts for the purpose of determining whether Coutts has materially violated any provision of this Agreement shall be in the sole discretion of the Tax Division.

In the event that the Tax Division determines that Coutts has breached this Agreement, the Tax Division agrees to provide Coutts with written notice of such breach prior to instituting any prosecution resulting from such breach. Within thirty (30) days of receipt of such notice, Coutts may respond to the Tax Division in writing to explain the nature and circumstances of such breach, as well as the actions that Coutts has taken to address and remediate the situation, which explanation the Tax Division shall consider in determining whether to pursue prosecution of Coutts.

In addition, any prosecution for any offense referred to on page 1 of this Agreement that is not time-barred by the applicable statute of limitations on the date of the announcement of the Swiss Bank Program (August 29, 2013) may be commenced against Coutts, notwithstanding the expiration of the statute of limitations between such date and the commencement of such prosecution. For any such prosecutions, Coutts waives any defenses premised upon the expiration of the statute of limitations, as well as any constitutional, statutory, or other claim concerning pre-indictment delay and agrees that such waiver is knowing, voluntary, and in express reliance upon the advice of Coutts' counsel.

It is understood that the terms of this Agreement do not bind any other federal, state, or local prosecuting authorities other than the Department. If requested by Coutts, the Tax Division will, however, bring the cooperation of Coutts to the attention of such other prosecuting offices or regulatory agencies.

It is further understood that this Agreement and the Statement of Facts attached hereto may be disclosed to the public by the Department and Coutts consistent with Part V.B of the Swiss Bank Program.

This Agreement supersedes all prior understandings, promises and/or conditions between the Department and Coutts. No additional promises, agreements, and conditions have been entered into other than those set forth in this Agreement and none will be entered into unless in writing and signed by both parties.

UNITED STATES DEPARTMENT OF JUSTICE
TAX DIVISION

CAROLINE D. CIRAOLO
Acting Assistant Attorney General

12/23/2015
Date

THOMAS J. SAWYER
Senior Counsel for International Tax Matters

23 December 2015
Date

JOHN E. SULLIVAN
Senior Litigation Counsel

12/23/15
Date

MARK W. KOTILA
Trial Attorney

12/23/15
Date

AGREED AND CONSENTED TO:
COUTTS & CO LTD

By: MICHAEL J.W. BLAKE
Chief Executive Officer

19 December 2015
Date

By: SIMON A. TRIPPEL
General Counsel

21 / Dec / 2015
Date

APPROVED:

KEITH D. KRAKAUR, ESQ.
Counsel for Coutts & Co Ltd

December 22, 2015
Date

CHRISTOPHER J. GUNTHER, ESQ.
Counsel for Coutts & Co Ltd

December 22, 2015
Date

Page 7 of 7

**EXHIBIT A TO COUTTS & CO LTD
NON-PROSECUTION AGREEMENT**

## STATEMENT OF FACTS

### INTRODUCTION

1. Coutts & Co Ltd ("Coutts" or the "Bank") is a Swiss private bank headquartered in Zurich and has operating subsidiaries in Geneva and on the Isle of Man and branches in Geneva, Hong Kong, Monaco and Singapore.  During the Applicable Period,[1] the Bank was part of the international Wealth Management Division of The Royal Bank of Scotland Group plc, which is majority-owned by the United Kingdom government, and had no offices, branches, or subsidiaries in the United States.  For example, the Bank closed its New York branch in 1997, and closed its representative office in Florida in 2005, shortly after the Bank had acquired the Florida office as part of its acquisition of Bank von Ernst & Cie AG in 2003.

2. Coutts provided private banking services to individuals and entities in and outside Switzerland, including citizens and residents of the United States ("U.S. taxpayers").  The Bank also acted as a custodian of assets that were managed by external asset managers principally based in Switzerland, including assets beneficially owned and controlled by U.S. taxpayers.

3. During the Applicable Period, the Bank held and managed 1,337 U.S. Related Accounts, which included both declared and undeclared accounts, with a peak of assets under management of approximately $2.1 billion.  The latter figure represents approximately four percent of the Bank's total assets under management of approximately $51.5 billion.

### U.S. INCOME TAX & REPORTING OBLIGATIONS

4. U.S. citizens, resident aliens, and legal permanent residents have an obligation to report all income earned from foreign bank accounts on their tax returns and to pay the taxes due on that income.  Since tax year 1976, U.S. citizens, resident aliens, and legal permanent residents have had an obligation to report to the Internal Revenue Service ("IRS") on the Schedule B of a U.S. Individual Income Tax Return, Form 1040, whether that individual had a financial interest in, or signatory authority for, a financial account in a foreign country in a particular year by checking "Yes" or "No" in the appropriate box and identifying the country where the account was maintained.

5. Since 1970, U.S. citizens, resident aliens, and legal permanent residents who have had a financial interest in, or signatory authority for, one or more financial accounts in a foreign country with an aggregate value of more than $10,000 at any time during a particular year were required to file with the Department of the Treasury a Report of Foreign Bank and

---

[1] Capitalized terms not otherwise defined in this Statement of Facts have the meanings set forth in the Program for Non-Prosecution Agreements or Non-Target Letters for Swiss Banks, issued on August 29, 2013 (the "Swiss Bank Program").

Financial Accounts, FinCEN Form 114 (the "FBAR," formerly known as Form TD F 90-22.1). The FBAR was due on June 30 of the following year.

6.  An "undeclared account" was a financial account owned by an individual subject to U.S. tax, maintained in a foreign country, and that had not been reported by the individual account owner to the U.S. government on an income tax return, FBAR, or otherwise.

7.  Since 1935, Switzerland has maintained criminal laws that ensure the secrecy of client relationships at Swiss banks. While Swiss law permits the exchange of information in response to administrative requests made pursuant to a tax treaty with the United States and certain legal requests in cases of tax fraud, Swiss law otherwise prohibits the disclosure of identifying information without client authorization. Because of the secrecy guarantee that they created, these Swiss criminal provisions have been misused by some U.S. clients to conceal their Swiss bank accounts from U.S. authorities.

8.  In or about 2008, Swiss bank UBS publicly announced that it was the target of a criminal investigation by the IRS and the U.S. Department of Justice (the "Department") and that it would be exiting and no longer accepting certain U.S. clients. On February 18, 2009, the Department and UBS filed a deferred prosecution agreement in the U.S. District Court for the Southern District of Florida, in which UBS admitted that its cross-border banking business used Swiss privacy law to aid and assist U.S. clients in opening and maintaining undeclared assets and income from the IRS. Since UBS, several other Swiss banks have publicly announced that they were or are the targets of similar criminal investigations and that they would likewise be exiting and not accepting certain U.S. clients. These cases have been closely monitored by banks operating in Switzerland, including Coutts, since at least August of 2008.

## COUTTS' QUALIFIED INTERMEDIARY AGREEMENT
## AND ITS ROLE IN NON-COMPLIANT U.S. RELATED ACCOUNTS

9.  Effective in or about January 2001, Coutts entered into a Qualified Intermediary Agreement ("QI Agreement") with the IRS. The Qualified Intermediary ("QI") regime provided a comprehensive framework for U.S. information reporting and tax withholding by a non-U.S. financial institution regarding U.S. securities. The QI Agreement was designed to help ensure that non-U.S. persons were subject to the proper U.S. withholding tax rates and that U.S. persons were properly paying U.S. tax, in each case, with respect to U.S. securities held in an account with the QI.

10. The QI Agreement expressly recognized that a non-U.S. financial institution such as Coutts may be prohibited by foreign law, such as Swiss law, from disclosing an account holder's name or other identifying information. In general, a QI subject to such foreign-law restrictions must request that its U.S. clients either (a) grant the QI authority to disclose the client's identity or disclose himself by mandating the QI to provide an IRS Form W-9 completed by the account holder, or (b) grant the QI authority to sell all U.S. securities of the account holder (in the case of accounts opened before January 1, 2001) or to exclude all U.S. securities from the account (in the case of accounts opened on or after January 1, 2001). Following the effective date of the QI Agreement, a sale of U.S.

Page 2 of 9

securities, if any, held by a U.S. person who chose not to provide a QI with an IRS Form W-9 was subject to tax information reporting on an anonymous basis and backup withholding.

11. To comply with its responsibilities as a QI, Coutts asked its U.S. clients to expressly instruct it, on standard QI forms that were widely used in the Swiss banking industry prior to the Applicable Period, (a) to sign a Form W-9 and report their account to the IRS or (b) not to disclose their names to the IRS, authorize the bank to sell all the U.S. securities (for accounts opened prior to 2001), and prohibit the purchase of any U.S. securities.

12. As a consequence of Coutts entering into a QI Agreement with the IRS, certain relationship managers and supervisory relationship managers opened accounts for U.S. clients in the name of nominee offshore entities and insurance wrappers, discussed more fully below. In connection with these accounts, Coutts employees knowingly accepted and included in Coutts' account records IRS Forms W-8BEN (or equivalent bank document) provided by the directors of the offshore companies that represented under penalty of perjury that such companies were the beneficial owners, for U.S. federal income tax purposes, of the assets in the Coutts accounts. In certain cases, the IRS Forms W-8BEN (or equivalent bank document) were false or misleading in that the U.S. taxpayer who owned the offshore company actually directed and controlled the management and disposition of the assets in the company accounts and/or otherwise functioned as the beneficial owner of such assets in disregard of the formalities of the purported corporate ownership.

## OVERVIEW OF COUTTS' BUSINESS WITH U.S. RELATED ACCOUNTS

13. Unlike Europe, the Middle East and Asia, the U.S. has not been one of the Bank's target markets. Nonetheless, during the Applicable Period, the Bank provided certain services also to U.S. residents and citizens. The Bank was aware that U.S. taxpayers had a legal duty to report to the IRS and pay taxes on all of their income, including income earned in accounts that these U.S. taxpayers maintained at the Bank.

14. Nonetheless, it has opened, serviced, and profited from accounts for U.S. clients who Coutts knew or had reason to know were likely not complying with these obligations. Due in part to the assistance of Coutts and its personnel, and with the knowledge that Swiss banking secrecy laws would prevent Coutts from disclosing their identities to the IRS, hundreds of U.S. clients of Coutts filed false and fraudulent U.S. Individual Income Tax Returns, Forms 1040, which failed to report their respective interests in their accounts and the related income. Hundreds of U.S. clients of Coutts also failed to file and otherwise report their undeclared accounts on FBARs.

15. Since August 2008, Coutts has accepted over $150 million in inflows from other Swiss banks that were being investigated by the U.S. Department of Justice, and opened 465 accounts for U.S. clients, some of whom did not comply with U.S. tax or FBAR obligations.

16. Private bankers (referred to as "relationship managers") served as the primary contact for U.S. clients with accounts at Coutts. During the Applicable Period, the Bank employed approximately 350 relationship managers who were responsible for managing at least one U.S. client account held at Coutts since August of 2008. Certain relationship managers assisted or otherwise facilitated some U.S. individual taxpayers in establishing and maintaining undeclared accounts in a manner designed to conceal the U.S. taxpayers' ownership or beneficial interest in their accounts.

17. Coutts maintained undeclared accounts for U.S. clients in different units throughout the bank. However, it primarily serviced U.S. client accounts in Switzerland at desks in Zurich and Geneva, such as the International & U.S. desk and the Russia desk in Zurich, and the Russia desk and the U.K. & Ireland desk in Geneva.

18. Relationship managers typically communicated via telephone, fax, business email, and mail (when hold mail services were declined by the client) with certain of their clients in the United States. However, certain relationship managers occasionally communicated via personal email for reasons that included the concealment of client nexuses to the United States. For example, in order to conceal their U.S. client's undeclared accounts at Coutts, relationship managers on the Russia desk in Geneva used private telephones and email accounts to communicate with clients in the United States.

19. Prior to December 2008, several relationship managers from the private banking desks traveled to the United States. The purpose of these visits was to maintain existing relationships with U.S. clients and recruit new clients. During the Applicable Period, five U.S. business trips were approved by the U.S. Competence Center, which was established in October 2008 and, among other things,[2] was responsible for reviewing and approving proposed business trips to the United States. Review of the 18 relationship managers with the U.S. Related Accounts with the highest assets under management showed that three relationship managers based in Switzerland traveled to the United States during the Applicable Period once, twice, and three times, respectively. Three relationship managers employed by other group entities located outside of Switzerland traveled to the United States 11 times. For example, in 2008 and 2009, a relationship manager traveled to the United States to meet existing and potential clients.

20. Coutts relationship managers in Switzerland aided and assisted certain U.S. clients with undeclared accounts at Coutts to evade their income taxes by placing their assets in the names of structures formed, maintained, and managed by various subsidiary trust companies of Coutts. Coutts has operated its own trust companies in Liechtenstein and Switzerland. These companies provided structuring services to Bank clients. The structures they created included but were not limited to foundations, trusts, and companies incorporated or based in offshore locations such as the Bahamas, British Virgin Islands, Channel Islands, Panama, and Liechtenstein. By operation of Swiss bank secrecy laws, the U.S. client's ownership of these structures would not be disclosed to U.S. authorities. In all, more than 500 of the 1,337 of U.S. client accounts held at Coutts

---

[2] See paragraphs 33-36 for more information on the history and function of the U.S. Competence Center.

since August of 2008 had some type of structure with a U.S. beneficial owner, comprising more than $1 billion in assets under management.

21. In addition to the relationships they had with affiliated trust companies, Coutts relationship managers coordinated with external trust companies to create and administer offshore structures incorporated or based in offshore locations such as the British Virgin Islands, Panama, and Liechtenstein for its U.S. clients. For example, one relationship manager had three U.S. clients with undeclared accounts held in the names of British Virgin Islands companies. These three accounts totaled approximately $130 million.

22. Because Swiss law requires Coutts to identify the true beneficial owner of structures on a document called a Form A, it knew that these were U.S. client accounts. Nonetheless, for numerous U.S. client accounts, Coutts relationship managers and other employees knowingly accepted and included in Coutts' account records IRS Forms W-8BEN (or equivalent bank document) provided by the directors of the offshore companies that falsely represented under penalty of perjury that such companies were the beneficial owners, for U.S. income tax purposes, of the assets in the Coutts accounts. This aided and assisted the U.S. clients in concealing these assets and income from the IRS.

23. During the Applicable Period, two relationship managers, from the Zurich private banking desk and from the affiliated "Coutts Cayman Limited," assisted at least three U.S. clients in setting up accounts that were owned by insurance companies, and which held assets relating to insurance products that were issued to U.S. taxpayer clients of the respective insurance companies. Such accounts, known commonly as "insurance-wrappers," were titled in the names of insurance companies, but were funded with assets that were transferred to the accounts for the beneficial owners of the insurance products (the "policy holder"). The assets in these accounts, while titled in the names of insurance companies, were managed by external asset managers, for the ultimate benefit of the policy holders, through powers of investment that were given by the insurance companies to the external asset managers. Insurance wrappers were marketed to Swiss banks, including to Coutts, by third-party providers in the wake of the UBS investigation as a means of disguising the beneficial ownership of U.S. clients. By the operation of Swiss bank secrecy laws, the U.S. client's ownership would not be disclosed to U.S. authorities.

24. Of the 1,377 U.S. Related Accounts held at Coutts, approximately 234 were serviced and managed by six external service providers, including two external asset managers. The maximum aggregate value of these accounts totaled approximately $768 million. One of the service providers was a Massachusetts-based lawyer who introduced and managed five accounts valued at more than $85 million. Coutts had remuneration agreements with the external asset managers, whose compensation was based upon a percentage, ranging from 20% to 30%, of various items, including custody fees, account administration fees, brokerage fees, and commissions.

25. The Massachusetts-based lawyer introduced at least five U.S. taxpayers as beneficial owners of offshore companies and foundations, including sham entities, to the Bank. In one instance, an account was opened in June 1998 by a British Virgin Islands company after the relevant forms were forwarded to the Bank by the Massachusetts-based lawyer.

The Form A for this account stated that the beneficial owner of the British Virgin Islands company was a dual U.S./Ukrainian citizen residing in the United States.

26. Another of these external asset managers worked with a Liechtenstein provider of structuring services in setting up entities including offshore companies and foundations, including sham entities for U.S. clients with undeclared accounts at Coutts. These structures included foundations created under Liechtenstein, British Virgin Islands, and Belize law. The Liechtenstein provider earned an agreed-upon fee for providing its services to the Bank's clients. In one instance, an account was opened in June 2009 by a British Virgin Islands company, established and administered by the Liechtenstein provider, whose beneficial owner was a U.S. national and resident born in Ukraine.

27. Coutts also opened and maintained at least 117 accounts for U.S. taxpayer-clients transferring funds from other Swiss financial institutions, including UBS and Credit Suisse, that were closing such accounts, while knowing or having reason to know that a portion of the accounts at such other institutions were or likely were undeclared. These accounts had a collective high balance of approximately $169 million. Some of these accounts were opened as late as the summer of 2012.

28. Coutts also offered a variety of traditional Swiss banking services which it knew could assist and did in certain cases in fact assist U.S. clients in the concealment of assets and income from the IRS. One such service was hold mail. For an annual fee of approximately $800, Coutts would hold all mail correspondence for a particular client at the Bank. Almost half of its U.S. clients used hold mail services. Coutts also offered code name or numbered account services. For an annual fee of approximately $800, the Bank would allow U.S. beneficial owners to disguise his or her true identity in favor of a code name or number. Approximately 10% of Coutt's U.S. clients used this service. These services allowed U.S. clients to minimize the paper trail associated with the undeclared assets and income they held at Coutts in Switzerland.

29. Coutts also assisted U.S. clients in concealing the assets and income in their undeclared accounts by opening accounts for Eastern Europeans residing in the United States, or having dual U.S./Eastern Europe citizenship, without recording the U.S. connection in certain records of the Bank. For example, one account holder, a Russian citizen domiciled in Russia, opened an account at the Bank in June 2012. The Bank's records do not reflect that he was in fact a dual U.S./Russian citizen with another domicile in the United States. On the Bank's Qualified Intermediary compliance form, the same account holder falsely declared that he was not a U.S. person.

30. Coutts also assisted U.S. clients in concealing the assets and income in their undeclared accounts by processing requests from U.S. taxpayers to transfer assets from accounts being closed to non-U.S. related Coutts accounts, or to Coutts accounts that were restructured to eliminate the U.S. connection. For example, in one instance, in 2001 a joint account was opened by couple living in Singapore. The husband was a U.S. citizen; the wife was a French citizen. After the Bank requested the account holder to provide an IRS Form W-9, the husband instructed the Bank to close the joint account and internally transfer assets totaling $15.1 million to a Coutts account held jointly by his wife and

children.  The husband had signatory authority over the newly opened account based on a general power of attorney, and he continued to manage the assets and was the only contact person for the Bank with respect to this account.

31. Coutts also assisted some U.S. clients in concealing their undeclared account funds upon the closure of their accounts.  In one case, between July 2011 and April 2014, Coutts assisted a U.S. client in transferring $33 million from an undeclared account held in the name of a Belize corporation to 11 other accounts at Coutts held in the names of nominee entities.  In 25 instances, Coutts processed cash withdrawals at account closure.  In six of these instances, the U.S. client withdrew more than $500,000 in cash shortly before the account was closed.  For example, in August 2009, a U.S. beneficial owner withdrew $629,000 in cash from an account held in the name of a Liechtenstein foundation at account closure.

## MITIGATING FACTORS

32. In 2005, Coutts issued a U.S. Country Business Guide, which stated in its introduction, inter alia, that the Bank would not accept funds from U.S. residents if it had reason to believe that the funds were being placed abroad for the purpose of unlawfully avoiding tax obligations in the United States.  In 2006, the Bank adopted a so-called "U.S. Master Decision Tree" to ensure compliance with the Securities Exchange Act of 1934 and the Investment Advisers Act of 1940 (the "U.S. Securities Acts"), i.e., to prevent investment advisory and brokerage in possible breach of U.S. regulations;  it also focused on compliance with QI rules.

33. In October 2008, Coutts refined and enhanced its existing U.S. compliance framework by establishing a U.S. Competence Center to ensure that policies and procedures adequately addressed regulatory requirements.  The Bank also required the Head of the U.S. Competence Center to approve new accounts if any of the parties involved was a person domiciled or incorporated in the United States (so-called "CLAC 3 approval") and any business trips to the United States.  An exception was made for "banking-only" clients whose activities (e.g., deposits, lending, credit cards) were not subject to the U.S. Securities Acts, and which due their nature were unlikely to generate relevant capital gains or other income.  These clients did not receive investment advice, and the Bank's systems prevented such clients from opening securities accounts.

34. In March 2009, the U.S. Competence Center decided to stop accepting new U.S. clients with non-tax transparent assets, i.e., those clients who were not prepared to provide a Form W-9 (or documentary evidence of their tax compliance, as applicable).  In June 2009, the Bank launched a tax compliance review of all accounts with a broadly defined U.S. nexus.  As part of this initiative, in October 2009, the Bank decided to exit all U.S. clients with balances of less than 200,000 Swiss francs, who were below the fund thresholds expected from the Bank from private banking clients and who were generating insufficient revenues to cover the increased compliance costs associated with U.S. accounts.

35. As an additional measure, Coutts retained U.S. qualified tax lawyers of an international law firm to review the account dossiers of all other U.S. clients to determine if affirmative evidence of these clients' tax compliance was on file. External counsel determined that a Form W-9 was required for individual account holders, Form 5471 in case of controlled foreign corporations, and Form 3520-A in case of non-U.S. trusts or foundations. Where the external tax lawyers determined that the required form was not present in the Bank's dossiers, the Bank contacted the client by mail and asked that the client submit the missing form. The Bank additionally required that the client sign a declaration agreeing to the disclosure of their accounts to the IRS pursuant to applicable law. The Bank's outside counsel was actively involved in drafting appropriate correspondence and, starting in April 2010, assisting in exiting any non-compliant U.S. clients who failed to submit the requested documents within the deadlines given by the Bank. The exit of these recalcitrant clients was carried out in a structured and centralized liquidation process, which was largely completed by the end of 2010 as planned.

36. In December 2009, Coutts issued a new U.S. Business Guide setting out the requirements and procedures for entering into relationships with and servicing U.S. clients. The guide re-emphasized, in particular, the restrictive regulatory environment and the responsibilities of the U.S. Competence Center. It also informed that the Bank was required to obtain a Form W-9 from U.S. taxpayers and to report these U.S. taxpayers according to the QI rules. Also in December 2009, as an additional control measure, the Bank started to centralize the servicing of all U.S. clients (except for "banking only" clients) at the U.S. Competence Center.

37. In March 2010, in order to implement the "U.S. taxpayers' acceptance rule" (as described in paragraphs 34 and 35) introduced in early 2009, CLAC 3 approval was extended to cover not only U.S. residents but also U.S. citizens not domiciled in the United States. In November 2012, in an effort to further enhance its U.S. compliance framework, the Bank decided, inter alia, to no longer maintain even execution-only securities accounts for U.S. domiciled clients, thereby further restricting the services offered to U.S. clients including clients who passed the tax compliance check launched in 2009 and prior SEC compliance checks. As a result of this decision, the Bank has terminated the majority of those relationships and transferred or is in the process of transferring the remaining relationships to another duly licensed bank and investment adviser.

38. Throughout its participation in the Swiss Bank Program, Coutts committed to providing full cooperation to the U.S. government and has made timely and comprehensive disclosures regarding its U.S. cross-border business. Specifically, the Bank, with the assistance of U.S. and Swiss counsel, and in compliance with Swiss privacy law has:

    • conducted an internal investigation which included but is not limited to: (a) interviews of relationship managers and other employees; (b) reviews of client account files and correspondence; (c) analysis of relevant management policies; and (d) email searches;

Page 8 of 9

- through outside counsel, assisted in Swiss governmental efforts to establish streamlined procedures for approving treaty requests, and proactively prepared dossiers for IRS tax treaty requests;

- described in detail the structure of its U.S. cross-border business which included but is not limited to: (a) its cross-border business policies; (b) a summary of U.S. Related Accounts by assets under management; (c) information about U.S. Related Accounts associated with external asset managers and other providers and relationship managers; (d) information about accounts held in the names of entities, including sham entities; and (e) written narrative summaries of certain U.S. Related Accounts, including the top 20 accounts by assets under management; and

- provided a list of the names and functions of individuals who structured, operated, or supervised the U. S. cross-border business at Coutts.

**EXHIBIT B TO NON-PROSECUTION AGREEMENT**

**CERTIFICATE OF CORPORATE RESOLUTION OF THE BOARD OF DIRECTORS**
**OF COUTTS & CO LTD**

I, Jane Rihner, Secretary of the Board of Coutts & Co Ltd (the **Bank**), a corporation duly organized and existing under the laws of Switzerland, do hereby certify that the following is a complete and accurate copy of a resolution adopted by the Board of Directors of the Bank at a meeting held on December 19, 2015, at which a quorum was present and resolved as follows:

— That the Board of Directors has (i) reviewed the entire Non-Prosecution Agreement attached hereto, including the Statement of Facts attached as Exhibit A to the Non-Prosecution Agreement; (ii) consulted with US counsel in connection with this matter; and (iii) unanimously voted to enter into the Non-Prosecution Agreement, including to pay a sum of USD 78'484'000 to the U.S. Department of Justice in connection with the Non-Prosecution Agreement; and

— That Michael J.W. Blake, CEO, and Simon A. Trippel, General Counsel, or any two other members of the Bank's General Management Committee, all registered in the Commercial Register of the Canton of Zurich as having joint signatory authority, are hereby authorized (i) to jointly execute the Non-Prosecution Agreement on behalf of the Bank substantially in such form as reviewed by the Board of Directors with such non-material changes to the Non-Prosecution Agreement and the accompanying Statement of Facts as each of them may approve; and (ii) to take, on behalf of the Bank, all actions as may be necessary or advisable in order to carry out the foregoing; and

— That Keith D. Krakaur and Christopher J. Gunther, Skadden, Arps, Slate, Meagher & Flom LLP are hereby authorized to sign the Non-Prosecution Agreement in their capacity as the Bank's U.S. counsel.

I further certify that the above resolution has not been amended or revoked in any respect and remains in full force and effect.

IN WITNESS WHEREOF, I have executed this Certification this 21st day of December 2015.

Jane Rihner
Secretary of the Board of Directors of Coutts & Co Ltd