UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

v.                                            CASE NO. 2:21-cr-83-TPB-NPM

MARK A. GYETVAY

**UNITED STATES' RESPONSE TO DEFENDANT'S
FIRST MOTION _IN LIMINE_**

The United States respectfully submits this response in opposition to Defendant Mark Gyetvay's first motion _in limine._ (Doc. 175) ("Motion"). The Motion seeks to exclude certain foreign business records that the Government plans to introduce pursuant to 18 U.S.C. § 3505, which permits such records to be received in evidence without the necessity of live testimony. In particular, the Defendant seeks to exclude: (1) bank account records obtained from three Swiss banks (Coutts, Hyposwiss, and Falcon); (2) official tax records obtained from the Russian Federation's Federal Tax Service ("FTS"); and (3) financial statements and related documents obtained from Lubbock Fine, a U.K.-based accounting firm that prepared the financial statements and relied on the related documents in doing so.

The Defendant maintains that there are reasons to question the reliability of the records received from each of these sources. But, with the exception of one document described below—a summary "Response" provided by Russia's FTS in response to the Government's request for tax records—all of the foreign business records are

accompanied by appropriate Section 3505 certifications, and thus the Defendant's challenges to the admission of the records are meritless. Accordingly, the records are properly admissible under 18 U.S.C. § 3505 without the need to call document custodians.

## I.      Governing Legal Principles

Section 3505 allows the admission of foreign records of regularly conducted activity if supported by a signed certification meeting "specifically delineated standards." *United States v. Ross*, 33 F.3d 1507, 1515 (11th Cir. 1994).  As the Eleventh Circuit has explained, in fashioning Section 3505, "Congress designed the hearsay portion of section 3505 to track closely the business records exception to hearsay contained in Federal Rule of Evidence 803(6)." *Id.*; *see also*  H.R.REP. No. 907, 98th Cong., 2d Sess. 3, *reprinted in* 1984 U.S.C.C.A.N. 3182, 3578, 3581 (Subsection 3505(a)(1) "should be interpreted in the same manner as the comparable language in Rule 803(6) is interpreted."). In doing so, Congress intended to create "a simple, inexpensive substitute for the cumbersome and expensive procedures" formerly required for the admission of foreign records of regularly conducted activity. *Id.* at 3182, 3580.  In short, Congress intended that, in lieu of live witnesses, Section 3505 be utilized to introduce foreign business records, when they are accompanied by a valid certification.

The reliability of business records—and the reason they are excluded from hearsay—"is said variously to be supplied by systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business in

relying upon them, or by a duty to make an accurate record as part of a continuing job or occupation." Fed.R.Evid. 803(6) advisory committee's note. Tracing the business records exception back to its origins, Wigmore emphasized the importance of the requirement that the record in question be made as part of a "habit and system of making such a record with regularity." 5 John Henry Wigmore, Evidence in Trials at Common Law § 1522, at 442 (Chadbourn rev.1974). He explained that the entry must be "part of a series of entries or reports, not a casual or isolated one. . . . [A] memorandum casually made, would not answer this requirement." *Id*. § 1525, at 446. The Supreme Court in *Palmer v. Hoffman*, 318 U.S. 109, 113–14, (1943), held that the analysis should focus on whether the entries were "made systematically or as a matter of routine to record events or occurrences, to reflect transactions with others, or to provide internal controls" for the business, such as "payrolls, accounts receivable, accounts payable, bills of lading and the like." *Id*.

Relatedly, the Eleventh Circuit has repeatedly made clear that "[i]t is not essential that the offering witness be the recorder or even be certain of who recorded the item. It is sufficient that the witness be able to identify the record as authentic and specify that it was made and preserved in the regular course of business." *United States v. Atchley*, 699 F.2d 1055, 1059 (11th Cir. 1983) (proponent of document ordinarily need not be the entity whose first-hand knowledge was the basis of the facts sought to be proved and there is no requirement that the government establish when and by whom the documents were prepared or precisely how they were compiled); *see also United States v. Brown*, 553 F.3d 768, 792 (5th Cir. 2008). Furthermore, as long as there

is additional circumstantial evidence to support the trustworthiness of the documents, it is not necessary for the individual who prepared the documents to testify. *Itel Capital Corp. v. Cups Coal Co.*, 707 F.2d 1253, 1259 (11th Cir.1983).

Additionally, courts have not construed the rules so strictly as to require that the business records take a particular form, and have routinely held that documents prepared or communicated by a third party are properly admitted as part of the business entity's records if the business integrated the document into its records and relied on them. *United States v. Hawkins*, 905 F.2d 1489 (11th Cir. 1990); *United States v. Parker*, 749 F.2d 628 (11th Cir. 1984); s*ee also United States v. Childs*, 5 F.3d 1328, 1333-34 (9th Cir. 1993); *United States v. Jakobetz*, 955 F.2d 786, 801 (2d Cir. 1992; *United States v. Sokolow*, 91 F.3d 396, 403 (3d Cir.1996) (explaining that business records exception still applies even though the records were derived from outside sources as long as there are other assurances of accuracy present).

## II.   DISCUSSION

### A.   The Swiss Bank Records are Admissible

The Section 3505 certifications for all three Swiss banks plainly satisfy the requirements of the rule, and the Defendant does not argue otherwise. The Defendant nevertheless argues that the Government should be required to produce a custodian witness from each of the banks to admit the documents at trial. In advancing that argument, the Defendant relies on language in the non-prosecution agreement ("NPA") entered into by each of the banks with the Department of Justice, requiring

4

the banks to make witnesses available, if needed.  In addition, although essentially conceding that the "bank statement" portions of the Swiss records are accurate and valid, *see* Motion at 1 & n.1, the Defendant nonetheless argues that there are indications that the Swiss bank records are not reliable and, in some cases, riddled with falsities. Finally, he contends that the bank certifications are infirm because the Government was involved in drafting the language found in the records certifications executed by each bank.  None of these reasons, individually or collectively, calls into question the certifications, let alone mandates that the Government produce custodians from the banks at trial.

First, the fact that the banks are required to provide a witness as part of their NPAs is irrelevant. Essentially, the Defendant seems to be arguing that a records certification should be deemed valid only if a custodian is unavailable. But neither 18 U.S.C. § 3505 nor Federal Rule of Evidence 803(6) contains such a requirement.  Thus, it is immaterial whether the Government has access to custodian witnesses from the banks.  Tellingly, the Defendant cites to no case holding that a custodian must, if available, be called to testify, notwithstanding the existence of a valid certification. In fact, no such requirement exists.  *United States v. Towns*, 718 F.3d 404, 408-410 (5th Cir. 2013) (no need to call pharmacy cashiers where pharmacy records were authenticated pursuant to business records certification); *United States v. Klinzing*, 315 F.3d 803, 809 (7th Cir. 2003) ("Rule 803(6) was amended to avoid the expense and inconvenience of producing time-consuming foundation witness testimony in situations where the authenticity of the business records could be confirmed by written

declaration"); *see also* Fed.R.Evid. 803 advisory committee's note (stating that Rule 902(11), Rule 902(12), and § 3505 provide adequate assurance of authenticity for business records without foundation testimony).[1]

Similarly, it is immaterial that the Government was involved in drafting the language of the certifications. The Government routinely sends draft business record certifications with its treaty and other document requests, as part of its efforts to ensure that the entities and individuals who are required to produce business records—particularly foreign entities and individuals unfamiliar with the requirements of United States law—accurately address, if appropriate, all of the requirements of Section 3505 and the business records rule. Thus, far from constituting some nefarious practice, providing draft certifications to businesses and other entities is simply good lawyering, designed to ensure that, where appropriate, valid business records are received into evidence. Again, the Defendant has cited to no case suggesting, let alone holding, that providing the required language is improper or that it somehow invalidates a properly executed records attestation.

The Defendant claims next that there are concerns over the reliability of the records because the three Swiss banks, as part of their NPAs, have admitted to criminal conduct, some which involved helping U.S. taxpayers—like the Defendant—conceal

---

[1] Judge Steele's opinion in *United States v. Hough*, 2013 WL 5671300 (M.D. Fla. 2013), is not to the contrary.  The Court there upheld the admission of the foreign bank records of UBS—an institution, like Coutts, that helped numerous United States taxpayers evade their taxes—because the Government decided to employ not only a Section 3505 certification, but also to call a bank employee.  The Court had no occasion to address the issue of whether calling a live witness was required, given a valid Section 3505 certification.

their ownership or beneficial interest in the Swiss accounts.  Although the Defendant

suggests that the banks had a motive to alter their records to "curry favor" with the

Government (Motion at 5), he offers no evidence that such a thing actually happened.

A speculative, unsupported conspiracy theory is no grounds for the Court to reject a

duly-executed business records certification. In any event, "[t]he motive behind the

preparation of a business record is not generally a ground for excluding a record." *In

re WorldCom, Inc. Securities Litigation*, 2005 WL 375313 at *8 (S.D.N.Y. Feb. 17, 2005)

(quoting Advisory Committee Notes explaining that, the "absence of a motivation to

misrepresent has not traditionally been a requirement of the rule").

Moreover, the Defendant's argument fails because it conflates the 803(6)

elements (which a proponent of business records must satisfy) with absolute accuracy

of the documents (which a proponent need not). Records made "at or near the time of

the event, by a person with knowledge, and kept in the regular course of business," are

considered non-hearsay because they can be relied upon to reflect what was conveyed

to the author of the record at the time it was made, and maintained by the entity as

part of its practices.  If someone—like the Defendant in this case— intends to conceal

his ownership of a foreign bank account by providing false information during the

account-opening process, the record-keeping processes of the bank will necessarily

record that false information. Therefore, even though the information conveyed is not

true, the record-gathering and maintenance processes ensure that the documents

reliably record the information as it was given.  In other words, they are reliable in

their routine recording of information, whether it is accurate or not.  Accordingly,

"Rule 803(6) does not require testimony [or certification] that the record is accurate." *United States v. Towns*, 718 F.3d at 409 (quoting *Wilson v. Zapata Off–Shore Co.,* 939 F.2d 260 (5th Cir.1991)).  Rather, it is "enough" that the sworn statement of the custodian contained language that "track[ed] the language of Rule 803(6) nearly word for word." *Id*.

Finally, to the extent that the Defendant's challenge to the Swiss bank records hinges on a concern that documents—such as "Know Your Customer" and beneficial ownership documents—containing false information will be improperly admitted, that concern is unfounded for one simple reason: bank records containing false information will not be offered by the Government for their truth and thus no violation of the hearsay rule will occur.  Indeed, the Government plans to demonstrate that falsities in the documents—which were made through the efforts of the Defendant and his agents—were part and parcel of the Defendant's scheme to hide his ownership and control of income and assets in the Defendant's unreported Swiss accounts. The rules of evidence do not bar such an approach. *See United States v. Williams*, 865 F.3d 1328, 1343 (11th Cir. 2017) ("When a statement is entered into evidence to show its falsity, the statement is not hearsay"); *United States v. Adkins*, 741 F.2d 744, 746 (5th Cir. 1984) ("When statements are introduced to prove the *falsity* of the matter asserted, they are not inadmissible as hearsay").  In sum, neither the rules of evidence nor common sense should allow the Defendant to hide his income and assets through the use of false and fraudulent documents, and then cry foul when those same documents are used against him to prove his criminal behavior.

* * * * * *

The Swiss bank records at issue here are indisputably records of a regularly conducted activity, which were made at or near the time of the events by individuals whose job duties entailed making those records. Contrary to the Defendant's claim, there is no requirement of absolute accuracy for business records to be admitted. Instead, "[w]hat is more important—and actually required—is the testimony of the custodian [or a certification] ensur[ing] such records are free from adulteration after the fact." *United States v. Towns*, 718 F.3d at 410 (5th Cir. 2013); s*ee also United States v. Jones*, 554 F.2d 251, 252 (5th Cir. 1977) (proper foundation for business records established through recitations of "facts contained in FRE 803(6)"). Accordingly, the Defendant's challenge to the admission of those records pursuant to Section 3505 fails. So, too, does his argument that live witnesses must authenticate the Swiss bank records.[2]

**B.     The Russian Federal Tax Service Records are Admissible**

The Defendant advances three arguments in challenging the records obtained from the Russian FTS. Those records detail monthly income the Defendant received for each year between 2005 and 2018, together with the totals for each year and the amounts of taxes withheld and paid over to the Russian FTS. The FTS records also include the Defendant's employment contracts with Novatek for the period 2013-2018.

---

[2] Given that the person certifying the records need not be familiar with the content of the documents, it is apparent that the defendant's insistence on custodians is about providing him an avenue to ask questions and elicit irrelevant testimony regarding the Swiss banks' conduct. *See Atchley*, 699 F.2d at 1059.

First, relying on the facts that the Russian payroll records provide a breakdown of the various items of income that he received on a monthly basis, the Defendant complains that the Russian payroll records "do not comport with U.S. payroll tax rules or U.S. payroll recordkeeping for a salaried employee."  Motion at 8.  Second, he observes that there is an inconsistency between the method of payment described in the employment contracts and the income items set out on the annual statements. *Id*. Finally, he contends that a summary document provided by the Russian FTS—entitled "Response"—is not a legitimate business record because it was prepared in direct response to the IRS's request for the Defendant's income information.  *Id.*

As an initial matter, the Government concedes that the "Response" is not a business record because it was not maintained or collected as part of the FTS's business practices.  Rather, it was created as part of Russia's response to the IRS's Tax Treaty request. The Government therefore will not seek to offer the "Response" into evidence.

The remainder of the Defendant's challenges, however, are without foundation. The fact that the Russian tax reporting system does not "comport" in all respects with the system employed in the United States is of no moment.  That complaint does not render unreliable the annual income statements certified by the FTS as legitimate business records of the FTS, showing, in detail, the amounts and nature of the Defendant's income from various sources, as well as the amounts withheld by Novatek. Simply put, a foreign business record does not lose its admissibility because it is prepared in a manner different from its United States analog.  Moreover, the

10

Defendant has advanced no genuine reason to question the reliability of the payroll records.

In fact, in addition to the FTS certification, there are strong reasons to conclude that the FTS records are reliable. First, like records collected by the IRS and maintained as business records, the FTS records relating to the Defendant consist largely of information that employers like Novatek are obligated to report to the FTS on an annual basis, including income paid to an employee and the amounts withheld and paid to the FTS as taxes.  This routine, legally-mandated practice makes the Russian tax records highly reliable as quintessential business records.  *See* Article 226, Russian Tax Code (setting forth obligations of employers to report employee income and to withhold and remit taxes to FTS); Doc. 121 (describing the same obligations in Rule 26.1 Notice).  Indeed, it is for this very reason that courts have routinely held that IRS records qualify as business records. *United States v. Goodman*, 527 F. App'x 697, 699 (10th Cir. 2013) (IRS transcripts and information contained thereon—"routinely compiled by the IRS from legally mandated reports submitted by third parties in the normal course of business"—were "admissible under the business-record and public-record hearsay exceptions in Fed.R.Evid. 803(6) and (8)"); *United States v. Hayes,* 861 F.2d 1225, 1228 (10th Cir.1988) (proper foundation laid for IRS computer records under Fed.R.Evid. 803(6) where Government established that IRS "tax records were kept in the ordinary course of business and that it was the regular practice of the IRS to keep such records"); *United States v. Farris*, 517 F.2d 226, 227 (7th Cir. 1975) (computer print-outs of defendant's tax records, certified by the Secretary of the

Treasury, properly admitted under 803(6)); *Myrick v. United States*, 217 F. Supp. 2d 979, 982 (D. Ariz. 2002) (IRS records properly admitted under 803(6) as "records of regularly conducted activity" of IRS), *aff'd*, 70 F. App'x 956 (9th Cir. 2003); *United States v. Fusero*, 106 F. Supp. 2d 921, 924 (E.D. Mich. 2000) ("As the Court stated during the trial, there are a number of cases holding that computer-generated records of the Internal Revenue Service (IRS), kept in the ordinary course of business, are admissible at trial pursuant to [FRE] 803(6).").

Reliability can also be found in the Defendant's own use of figures contained in the FTS records. In particular, when the Defendant had to supply income data to the Immigration authorities in support of his then-wife's application for status in the United States, he provided a letter from Novatek dated November 11, 2010, which confirmed his monthly salary of 1,815,000 Russian Rubles, plus performance-based bonuses. *See* Exhibit A.  When compared to the FTS payroll records from 2010, as seen in Exhibits B (translated) and C (native language), the amount of compensation listed for November 2010 is 1,815,000 Russian Rubles—the same figure.  Novatek's verification of the precise figure contained in the FTS records provides a strong indicia of reliability.

In addition to being admissible under 18 U.S.C. § 3505, the FTS records are also admissible under two other rules of evidence: Fed. R Evid. 902(4) (Certified Copies of Public Records), and 807 (the Residual Hearsay Exception).

The certification from the Russian FTS plainly serves to authenticate copies of "document[s] that [were] recorded or filed in a public office as authorized by law," as

it was made by an FTS official, someone undoubtedly "authorized to make the certification." The FTS records are therefore properly self-authenticating under 902(4) and thus admissible. *See United States v. Palciauskas*, 559 F. Supp. 1294, 1296 (M.D. Fla. 1983) (Rule 902(4) applicable to wartime documents from the Soviet Union and Israel), *aff'd*, 734 F.2d 625 (11th Cir. 1984).

The residual hearsay exception is also applicable here. Federal Rule of Evidence 807 provides that a hearsay statement is not excluded by the hearsay rule if (1) the statement has equivalent circumstantial guarantees of trustworthiness; (2) it is offered as evidence of a material fact; (3) it is more probative for which it is offered than any other evidence that the proponent can reasonably obtain; and (4) admitting it serves the interests of justice. The Russian FTS records establish the Defendant's annual salary and other compensation payments, as well as his Russian tax withholdings, from Novatek. This evidence is critical to showing that the Defendant filed false tax returns and also failed to timely file returns despite being required to do so. The records carry compelling guarantees of trustworthiness. They represent Novatek's legally mandated reporting of compensation and tax withholdings each year to the FTS. And, as explained above, the Government provided an example to demonstrate the accuracy of the records (through an income figure that the Defendant embraced), while the defendant has failed to provide any reason to question the reliability of the Russian income records. Thus, although Rule 807 is generally applicable only in exceptional cases, the strong guarantees of trustworthiness and the indispensable role played by this evidence make this such as case.

The Defendant's final challenge—to the employment contracts provided by the FTS—requires little discussion. These records are plainly covered by the FTS certification, as they were gathered and maintained by the FTS in the regular course of its business, and those records relate directly to the Defendant's employment and income.   In any event, even if the contracts were not construed to be "business records," they were signed by the defendant and thus admissible as adoptive admissions of a party opponent.  *See, e.g., United States v. Heath*, 536 F.2d 1069, 1070 (5th Cir. 1976) ("A person signing a document sufficiently adopts the writing as his own to make the written statement his"); *McQueeney v. Wilmington Trust Co.*, 779 F.2d 916, 930 (3d Cir. 1985) ("we believe that McQueeney's signature on each of the cards is an unequivocal adoption of the contents therein"); *United States v. Smith*, 609 F.2d 1294, 1301 n.7 (9th Cir. 1979) (in affirming the introduction of hotel receipts under the business record exception to the hearsay rule, the court noted that "[s]ince the records contain [the defendant's] signature, they may more appropriately be regarded as nonhearsay admissions under Fed. R. Evid. 801(d)(2)(A) and 801(d)(2)(B)").

In sum, the Defendant has advanced no sound reason to question the trustworthiness of the FTS records—which are properly certified as foreign business records.

## III.    The Lubbock Fine Records are Admissible

The Defendant does not contest that Lubbock Fine, a London-based accounting firm, prepared audited financial statements for SWGI Growth Fund (Cayman) Limited and SWGI Growth Fund (Cyprus) Limited, the latter of which the Defendant

served as a director of until approximately 2005.  The Defendant also acknowledges that Lubbock Fine received records from these two entities to execute its audit function.  Motion at 9-10.  This incorporation of the SWGI records into the Lubbock Fine records resulted in a Section 3505 certification by Lubbock Fine—the terms of which the Defendant does not contest.

The Defendant nonetheless contends that the records obtained from SWGI by Lubbock Fine are inadmissible unless the Government can demonstrate that the underlying records are sufficiently trustworthy. In advancing this argument, the Defendant cites *United States v. Bueno-Siera*, 99 F.3d 375 (11th Cir. 1996), to support his contention that the Government is required to have a testifying witness who can establish that the incorporated records are sufficiently trustworthy.  But *Bueno-Siera* announced no such categorical rule. Instead, it observed that,

> the proponent of a document ordinarily need not be the entity whose first-hand knowledge was the basis of the facts sought to be proved …. To satisfy Rule 803(6), however, the proponent must establish that it was the business practice of the recording entity to obtain such information from persons with personal knowledge and the business practice of the proponent to maintain the records produced by the recording entity.

*Id.* at 379.

The court in *Bueno-Siera* never stated that the proponent of the evidence must call a live witness to meet this burden.  On the contrary, the court made clear that "[t]he touchstone of admissibility under the business records exception to the hearsay rule is reliability, and a trial judge has broad discretion to determine the admissibility of such evidence."  *Id.* at 378.  The question for this Court is whether there is any

15

reason to question the reliability and accuracy of the records Lubbock Fine received from the SWGI entities and incorporated into their own files. *See United States v. Hawkins*, 905 F.2d 1489 (11th Cir. 1990); *MRT Construction, Inc. v. Hardrives, Inc.*, 158 F.3d 478, 483 (9th Cir. 1998) ("records a business receives from others are admissible under Federal Rule of Evidence 803(6) when those records are kept in the regular course of that business, relied upon by that business, and where that business has a substantial interest in the accuracy of those records") (citing *United States v. Childs*, 5 F.3d 1328, 1333-34 n.3 (9th Cir. 1993)); *Air Land Forwarders, Inc. v. United States*, 172 F.3d 1338, 1344 (Fed. Cir. 1999) (holding that the government was not required to produce a witness who could testify about the creation of the underlying records because "such testimony is not necessary where an organization incorporated the records of another entity into its own, relied upon those records in its day-to-day operations, and where there are other strong indicia of reliability"); *Wilmington Savings Fund Society, FBS v. Business Law Group*, P.A., 2017 WL 10276172 at *2 (M.D. F.L. Feb. 15, 2017) ("the business records of one business may become the business records of another business when such successor business integrates them within its own records if the successor business regularly relies upon those records and circumstances indicate the records are trustworthy").

There is no reason to question the reliability of the records that Lubbock Fine received from the SWGI entities. It was hired to prepare audited financial statements, meaning that it necessarily relied on the records it received to be accurate. In detailing the elaborate work it performed in connection with its audits of the SWGI entities,

Lubbock Fine explained as follows in a "Report to the Shareholders of SWGI Growth Fund," which was made part of each financial statement from 2003 through 2010:

> We conducted our audit in accordance with International Standards on Auditing.  These standards require that we plan and perform the audit to obtain reasonable assurance that the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

*See* Exhibit D.  If this were not enough, a Lubbock Fine Senior Manager directly involved in the 2003-2005 audits explained the numerous steps taken by the firm to gather and rely on SWGI documents in preparing the SWGI financial statements. Those steps included numerous interactions with SWGI management and personnel to obtain—and therefore directly rely on—SWGI business records.  *See* Affidavit of Andrew Saxby, attached as Exhibit E.  Given Lubbock Fine's obligation to "test" the accuracy of the information provided by the SWGI entities, and other incentives to ensure that the documentation provided was trustworthy, the documents incorporated by Lubbock Fine are properly deemed the "business records" of Lubbock Fine. *See Saks International, Inc. v. M/V Export Champion*, 817 F.2d 1011, 1013 (2d Cir. 1987) (documents can properly be deemed business records even though they are records of an entity other than the entity offering them as business records; "no requirement that the person whose first-hand knowledge was the basis of the entry be identified, so long as it was the business entity's regular practice to get information from such person"); *Matter of Ollag Construction Equipment Corp.*, 665 F.2d 43, 46 (2d Cir. 1981) (upholding

admission of financial statements provided to, and relied upon, by bank); *United States v. Ullrich*, 580 F.2d 765, 771-72 (5th Cir. 1978) (auto dealerships incorporation of accounting records prepared by others properly considered business record of dealership, observing that accounting document was used in regular course of dealership's business).

In sum, the SWGI records relied upon by Lubbock Fine, including lists of SWGI shareholders (with an example attached as Exhibit F), are properly certified by Lubbock Fine as its own business records.

## CONLUSION

The Defendant's challenge to the Section 3505 certifications, and his attendant request that live witnesses be called, should be rejected.

Respectfully submitted,

DAVID A. HUBBERT
Deputy Assistant Attorney General

STUART M. GOLDBERG
Acting Deputy Assistant Attorney  General
U.S. Department of Justice, Tax Division

By:   /s/ Kevin Schneider
       Stanley J. Okula, Jr.
       Senior Litigation Counsel
       David Zisserson
       Assistant Chief--SCES
       Kevin Schneider
       Trial Attorney
       (202) 616-3427
       Kevin.schneider@usdoj.gov

## Certificate of Service

I certify that on January 17, 2023, I electronically filed this document with the Clerk of Court using the CM/ECF system, which will send notification to all counsel of record.

/s/ Kevin Schneider
U.S. Department of Justice
Tax Division