UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

v.                                                CASE NO.  2:21-cr-83-JNE-NPM

MARK A. GYETVAY

## GOVERNMENT'S SENTENCING MEMORANDUM

## I.    PRELIMINARY STATEMENT

Gyetvay is an accountant and experienced business professional who, over the course of a decade, utilized a series of secret Swiss bank accounts to criminally hide his income and over $93 million of assets from the Internal Revenue Service; willfully failed to file timely tax returns; filed false tax returns that fraudulently omitted tens of millions of dollars of income; willfully failed to file FBARs; and lied repeatedly to his United States-based tax preparers.  Finally, after all of that conduct, Gyetvay made blatantly false statements to the IRS by claiming in his sworn Streamlined Procedures certification that his previous failure to file tax returns and FBARs was attributable to "non-willful" conduct.

The reason behind Gyetvay's false Streamlined Procedures filing was the same as what animated his other tax and FBAR crimes: unadulterated greed.  Indeed, just as his prior false tax reporting and utilization of Swiss accounts were designed to evade paying the IRS the full measure of taxes he owed, his false Streamline Procedures filing was designed to evade the tax and FBAR penalties he otherwise would have been required to pay had he entered the IRS's other offshore reporting initiative—the Offshore Voluntary Disclosure Program ("OVDP")—or had the IRS

1

detected his conduct and assessed civil penalties against him.

Gyetvay now unrepentantly stands before this Court as if he did nothing wrong—as if the jury's guilty verdicts never occurred and as if he is owed more money by the IRS than he owes in taxes, penalties, and interest.  This is the position Gyetvay has consistently assumed throughout this case.  Indeed, following his indictment, Gyetvay, who in fact owes tens of millions of dollars to the IRS, defiantly declared to the IRS agents who took him into custody that, "This will be the last time you guys will get a f****** dollar from me.  Because this is bull****.  Total bull****.  The amount of taxes I pay."  In a similar vein, in order to avoid the Court's proper determination of the true harm his criminal conduct caused, Gyetvay blinks reality by contending that over $40 million of share-based compensation he was paid was either never received by him or did not constitute income at all.  Likewise, Gyetvay contends that there is no tax loss under the Sentencing Guidelines even for the counts of conviction because he ultimately paid the taxes that were due.

But Gyetvay's attempt to blink reality does not change reality.  The proof at trial established that Gyetvay's decade-long criminal conduct involved his willful failure to report over $60 million of income and tax penalties, resulting in an aggregate tax loss of over $30 million.  The evidence also showed that Gyetvay hid over $93 million in his secret Swiss accounts and, through his false Streamlined Procedures filing, sought to evade over $45 million in FBAR penalties.

As explained below, the scope and duration of Gyetvay's criminal conduct, together with a lack of remorse that is noteworthy for its failure to acknowledge *any* criminal conduct, warrants a sentence of 121 months, within the sentencing range properly calculated by the Probation Department in the Presentence Investigation Report ("PSR").

## II.    **PROCEDURAL HISTORY**

On September 21, 2021, a grand jury returned a 15-count indictment charging Gyetvay with a series of crimes involving tax fraud, failure to file tax returns, and failure to file foreign bank accounts reports ("FBARs").  Doc. 3.

Following the return of a second superseding indictment that largely mirrored the initial indictment, Doc. 101, the defendant proceeded to trial on March 20, 2023.  Doc. 239. The jury convicted the defendant of Counts 10 through 13.  Doc. 261.  Those counts charged the defendant with failing to file his U.S. Income Tax Returns, Forms 1040, for 2013 (Count Ten) and 2014 (Count Eleven), in violation of Title 26, United States Code, Section 7203. Count Twelve charged the defendant with making a false statement to the IRS in August 2015 when he falsely stated that his failure to file FBARs and tax returns was non-willful, in violation of Title 18, United States Code, Section 1001.  Count Thirteen charged the defendant with failing to file an FBAR with the Treasury Department for the 2014 calendar year that reported all of his Swiss Bank accounts containing in excess of $10,000 in assets, in violation of Title 31, United States Code, Section 5314. *Id.*

The jury could not come to a unanimous verdict on Counts 1 through 9 and Count 15 of the indictment.  Those counts charged aiding and assisting the filing of false tax returns for 2006-08 (Counts One through Three); tax evasion for 2007-09 (Counts Four through Six); failing to file timely tax returns for 2010-2012 (Counts Seven through Nine); and wire fraud (Count Fifteen).  The jury acquitted the defendant of Count 14,

also charging wire fraud.  *Id.*

## III.   THE OFFENSE CONDUCT AND RELEVANT CONDUCT

Notwithstanding the Court's familiarity with the trial evidence and the detailed PSR, what follows is a thorough review of the offense conduct and relevant conduct. Such a comprehensive treatment of the facts is warranted given the scope of the defendant's objections to facts contained in the PSR that were clearly established at trial.

### A.   The Defendant's Education, Work History, and Share-based Compensation

Following his 1981 graduation from Arizona State University with a degree in accounting, Gyetvay has spent virtually his whole professional career providing sophisticated consulting and accounting-related services for large energy companies throughout the world. *See* Government Exhibit ("GX") 65c; PSR ¶¶ 98, 106.

After spending a year at the New York offices of Coopers & Lybrand ("C&L"), Gyetvay moved in 1995 to C&L's offices in Moscow, Russia, where he worked for C&L's energy clients and was made partner in July 1996.  Following the merger of C&L and PriceWaterhouse in 1998, Gyetvay became a partner of the new firm—PriceWaterhouseCoopers ("PWC").  As a PWC partner, Gyetvay became the key engagement partner for various PWC clients in the Russian energy sector, including Novatek, which was then a privately held gas company controlled by one of its principal shareholders, Russian billionaire Leonid Mikhelson.  *Id.*; PSR ¶¶ 104-05.

While serving as engagement partner for Novatek from 1999-2003, Gyetvay

4

worked closely with Novatek's corporate executives, including Mikhelson, who was looking to make Novatek a public company through an IPO on the London Stock Exchange. Gyetvay ultimately accepted an offer to join Novatek as its Chief Financial Officer in 2003. In addition to his job as Novatek's CFO, Gyetvay was also made a Deputy Chairman of Novatek's Board of Directors, and a Director of one of Novatek's affiliated companies—SWGI Capital Management ("SWGI Capital"). *Id.*; GX 65c.

In order to incentivize Gyetvay to join Novatek as CFO, SWGI Capital entered into an agreement with Gyetvay in December 2004 that gave Gyetvay the right to purchase shares of a different affiliated company, SWGI Growth Fund (Cayman), over a five-year period. That agreement—called a "Call Option Agreement"—specified that Gyetvay could purchase up to 120,000 shares of SWGI Growth at a price of $164 per share. Gyetvay was able to exercise the option and purchase the SWGI Growth shares at any point between December 1, 2006 and December 1, 2009. *See* GX 210. Through the terms of the call option agreement, Gyetvay thus stood to receive a significant amount of share-based compensation in the event that the shares of SWGI Growth increased in value. When Gyetvay exercised the Call Option in October 2007 and purchased all 120,000 shares, they had increased in value to $526.66 per share. As a result of the exercise of the call option in 2007, Gyetvay received over $43 million in share-based compensation—none of which he has ever reported to the IRS. 03/23/23 Tr. at 127-131; GX 246; PSR ¶ 34.

In addition to the share-based compensation from the Call Option Agreement,

5

Novatek promised Gyetvay that he would receive share-based compensation, in the form of Novatek shares, in the event that Novatek completed its IPO.  In or about July 2005, as a result of Novatek's completion of its IPO, Gyetvay was promised 1.5% of Novatek's shares, so long as he continued to serve as Novatek's CFO for 5 years and continued to serve as a Director of SWGI Growth (Cyprus) for the same period.  PSR ¶¶ 15, 27; s*ee also* Defense Exhibit 187. Although Gyetvay did not serve as a director of SWGI for the full five-year term, he did serve as CFO for sufficient time to have his IPO shares vest. Consequently, in March 2009, Gyetvay received over seven million shares of Novatek stock, then worth over $16 million.

### B.   Gyetvay's Secret Swiss Bank Accounts

In anticipation of receiving—and hiding from the IRS—his share-based compensation from the Call Option Agreement and from the IPO shares, Gyetvay took steps beginning in 2005 to open a series of financial accounts at Coutts Bank in Geneva, Switzerland. Having previously served as a signatory for a Coutts financial account in Switzerland held by SWGI Growth (between 2003 and 2005), Gyetvay was familiar with Coutts, at which Michelson maintained one or more accounts as well.  With the help of a Zurich-based wealth management firm named Millennium Wealth Management ("MWM"), Gyetvay opened his first Swiss account at Coutts in mid-2005 in the name of Opotiki Marketing Ltd. ("Opotiki"), a Belize (Central America) corporation of which Gyetvay was listed as the beneficial owner. *See* GX 65; PSR ¶¶ 20-22. Cooper also enlisted nominee individuals to act as the officers and directors of Opotiki.  Gyetvay deposited

6

$100,000 into the account in 2005 and greater amounts in subsequent years.  In late December 2007 and early 2008, Gyetvay used the Opotiki account to deposit over $9 million in cash that he received as a result of his 2007 exercise of the Call Option agreement.[1]  *See* GX 210.

Although Gyetvay deposited the $9 million of cash from the exercise of the Call Option into the Opotiki account at Coutts, he originally planned to utilize a separate Swiss account to hold those funds. GX 68c. More specifically, in or about December 2007, Gyetvay caused a second account to be opened at Coutts, again with the help of MWM's Allan Cooper, who caused the incorporation of a nominee foreign company named Felicis Commercial Corp. ("Felicis") in the British Virgin Islands.  Coutts' Know Your Customer ("KYC") documentation for the Felicis account reported that the expected size of the account was approximately 9 million "USD," and the intended use of the account as follows:  "The account will be used to hold funds received when the BO exercises a call option in SWGI Growth Fund, which he holds."  GX 68c.  As he did with Opotiki,

---

[1]  By signing a document called "Notice Exercising Option," Gyetvay exercised the Call Option Agreement in or about October 2007. GX 210 (page 2). He executed what is known as a "cashless exercise," which is a device that allows someone who lacks the cash to purchase all of the shares available through an option agreement to simultaneously sell shares to generate enough cash and then use that cash to purchase the available shares.  03/23/23 Tr. at 127. Gyetvay thus sold 55,122 shares of SWGI Growth for $526.66 per share, which yielded $29,030,552.  Gyetvay then used those proceeds to pay $19,680,000 for the 120,000 shares, which cost $164 per share.  GX 246. The remaining cash of $9,350,552 was wire-transferred to the Opotiki account, at Gyetvay's direction, in late December 2007 and early January 2008.  03/23/23 Tr. at 129-131. With respect to the 64,878 unsold SWGI shares, Gyetvay directed that they be listed in the name of Felicis Commercial Corp., the entity he caused to be set up to own another financial account at Coutts (described below). GX 210. Beginning in 2007, SWGI Growth's share registry listed Felicis (and thus Gyetvay) as the owner of the 64,878 remaining shares. *See* GXs 216, 221.

Gyetvay had himself listed as the beneficial owner of the Felicis account when it was opened. *See* GX 68. Following the opening of the account through 2015, Gyetvay used the Felicis account to receive, hold, and hide from the IRS tens of millions of dollars of assets and income, including dividend and interest income and share-based compensation.

In mid-2010, as part of a bank compliance initiative, Coutts Bank in Switzerland informed Gyetvay that he needed to "regularize" the Opotiki and Felicis accounts, which required Gyetvay (whose United States passport and address were used to open the accounts) to demonstrate to Coutts that he was complying with United States tax reporting requirements. PSR ¶ 22. Gyetvay was specifically told by Allan Cooper of MWM that Coutts threatened to close the accounts if Gyetvay failed to comply. *See* GX 71 (email exchange between Gyetvay and Cooper).

Despite being given the opportunity by Coutts to establish his tax compliance— that is, follow the law—Gyetvay decided to double down on his fraud. He closed the accounts at Coutts and, with Allan Cooper's help, opened new Opotiki and Felicis accounts at Hyposwiss, a different Swiss bank. In connection with this change of banks, Gyetvay brought his wife into his criminal web by causing her —a Russian citizen—to execute documents that listed her as the sole beneficial owner of the new accounts. Gyetvay also caused his wife's Russian passport and Russian address to be used on the account-opening documents, thus making the account appear as if it had no United States connection. *See* GX 66A; PSR ¶ 23.

8

After enlisting his wife to serve as the nominee "beneficial owner" of the Opotiki and Felicis accounts at Hyposwiss, Gyetvay had her sign—essentially as a puppet—various documents to authorize transfers out of those accounts between 2010 and 2014, to pay for various items such as home renovations for their Naples, Florida residence. 03/23/23 Tr. at 66-68. These transfers were in addition to the transfers that Gyetvay had personally authorized via email correspondence with a Coutts banker, using the secret Swiss accounts to purchase millions of dollars of art, automobiles, real estate, and investments. *See* GX 155.

Between 2005 and 2014, Gyetvay's aggregate balance in the Opotiki and Felicis accounts increased exponentially in value, as a result of deposits made into the accounts and the significant increase in the value of Novatek and other shares. The aggregate account balances for the period 2005 through 2014 were as follows:

| YEAR | AGGREGATE BALANCE |
|------|-------------------|
| 2005 | $100,000 |
| 2006 | $5,582,617 |
| 2007 | $5,473,159 |
| 2008 | $13,239,640 |
| 2009 | $48,663,210 |
| 2010 | $58,423,373 |
| 2011 | $91,083,481 |
| 2012 | $86,966,682 |
| 2013 | $93,412,774 |
| 2014 | $90,990,438 |

*See* GX 238 (list of aggregate balances). Gyetvay willfully failed to file timely FBARS for the calendar years between 2005 and 2013. He never filed FBARs for 2005-2007. He filed FBARs for 2008-2013 years late, in connection with his false Streamlined Procedures

filing with the IRS in 2015.

For the calendar year 2014, Gyetvay failed to comply with the FBAR requirement because the FBAR he personally prepared and filed in June 2015 willfully omitted the Opotiki account—despite the fact that the Opotiki account had a high balance of $8,558,452 during 2014 calendar year. GX 55 (amended FBAR for 2014). This conduct formed the basis of Gyetvay's conviction on Count Thirteen. Notably, Gyetvay also falsely claimed on that FBAR that he had only "signatory" authority over the Felicis account, when, in truth, he had an ownership interest.

### C.   Gyetvay's False Tax Reporting

Despite his schooling and training as a CPA, his partnership at one of the world's largest accounting firms, and his experience as the CFO of one of the world's largest energy companies, Gyetvay simply disregarded his obligation to file timely tax returns with the IRS.  For the tax years immediately prior to the years charged in the Indictment, Gyetvay's filing history with the IRS was as follows:

| TAX YEAR | FILING DATE |
|----------|-------------|
| 2001 | 03/15/2003 |
| 2002 | 02/09/2006 |
| 2003 | 04/06/2006 |
| 2004 | 11/07/2007 |

The proof at trial demonstrated that Gyetvay filed tax returns for 2005 through 2008 that were not only years late but were also materially false in various ways.  In 2008, Gyetvay hired a specialized group at PWC to prepare his years-late 2005 tax return. This group at PWC specialized in preparing tax returns for clients who lived and worked

10

abroad. Gyetvay failed to disclose his Swiss bank account to the PWC accountants, despite it being a required disclosure on Schedule B attached to the return.   He also willfully failed to file an FBAR, even though the PWC accountants provided him with a blank form and separately reminded him of the requirement in an email.   Gyetvay failed to file his 2005 return until August 2008.

In mid-2010, Gyetvay hired an Atlanta-based accountant, Alex Knight, to prepare his 2006-2009 tax returns.[2]   To start the return preparation process, Knight sent Gyetvay annual tax organizers to understand his income and tax obligations for 2006-2008. Gyetvay repeatedly lied on these organizers and separately provided false information in response to questions Knight and his colleague posed to Gyetvay. For example, Gyetvay repeatedly—and falsely—understated his wage income from Novatek.   He also falsely reported to Knight that he did not exercise any call options in 2007 when he in fact did— and which, as detailed above, resulted in over $43 million of income. When Knight and his colleague asked Gyetvay about foreign accounts, Gyetvay falsely told them that he

---

[2] What prompted Gyetvay's retention of Knight was not a genuine desire to come into compliance with his ever-increasing tax delinquencies but, instead, Gyetvay's desire to convey to U.S. Immigration authorities a contrived explanation for his lack of tax compliance, when filling out paperwork as a sponsor for his then-wife's application for permanent residency. 03/22/23 Tr. at 59-61. In connection with that paperwork, Gyetvay falsely told Knight that he had not filed his 2006-2009 tax returns because of the loss of records occasioned by an office move in Russia. Gyetvay had Knight prepare a letter on his firm's letterhead reciting that false story. *Id.* Gyetvay caused that letter to be sent to the U.S. immigration authorities, in an effort to deceive the immigration authorities concerning the reasons behind his tax filing delinquencies for 2006-2009. In addition, when filling out his sponsorship affidavit, Gyetvay falsely stated that his total assets were approximately $1.3 million.   In truth, as noted above, his secret Swiss accounts then contained over $50 million.

had only one account in Russia. 03/22/23 Tr. 70. This false information caused Gyetvay's Schedules B to be false for failing to disclose accounts in Switzerland. Gyetvay also falsely omitted from the information he provided Knight hundreds of thousands of dollars of interest and dividend income that he earned in those accounts. PSR ¶¶ 29-31.

After Gyetvay informed Knight about what he claimed was the only foreign account he maintained with assets in excess of $10,000—a bank account in Russia—Knight advised Gyetvay that he was required to file an FBAR for that account for 2006 and any other year prior to 2010 that the account had more than $10,000. Gyetvay, however, "dismissed" Knight's advice, which so alarmed Knight that he had his accounting firm associate write a memo-to-file in 2011 noting that Gyetvay had rejected Knight's advice. That memo stated:

> We advised Mark Gyetvay of his obligation to file Foreign Bank Account Report forms for past years, but Mark dismissed our recommendation and did not file such forms for years prior to 2010. He indicated that he will provide us with the necessary information to start filing an FBAR form for 2010.

*See* GX 191.

Despite retaining Knight in 2010, Gyetvay did not file his 2008 return until early 2013. And, instead of having Knight prepare his 2009 return, as originally agreed, Gyetvay simply went on another long hiatus from filing his tax returns. Below is a summary of the falsities from Gyetvay's returns as a result of his providing demonstrably false information to Knight:

12

| Year | Due Date | Filing Date | Unreported Wages | Unreported Interest | Unreported Dividends | Unreported Call Option |
|------|----------|-------------|------------------|---------------------|----------------------|------------------------|
| 2006 | 04/16/07 | 02/16/11 | $269,483 | $138,206 | $0 | $0 |
| 2007 | 04/15/08 | 11/02/11 | $442,324 | $231,648 | $0 | $43,519,200 |
| 2008 | 04/15/09 | 02/19/13 | $1,000,373 | $152,469 | $692,000 | $0 |

PSR ¶ 31; GX 234-36; 239-41.

Gyetvay willfully failed to file his 2009, 2010, and 2014 tax returns until 2017.  GX 237. He also willfully failed to file timely 2011-2013 tax returns. *Id.*  He filed the 2011-13 returns in August 2015 with his Streamlined Procedures submission—after learning that his Swiss bank was preparing to turn over account information to U.S. authorities.

Gyetvay failed to timely file all five of these returns despite earning millions of dollars of wages, dividends, and interest income. GX 242, 243. Gyetvay also willfully failed to report over $16 million of stock-based compensation he was paid in 2009, based on the Novatek IPO.  GX 245.  The total amounts he failed to timely report for 2009-2014 are summarized below:

| Tax Year | Unreported Wages | Unreported Interest | Unreported Dividends | Unreported Stock Income |
|----------|------------------|---------------------|----------------------|-------------------------|
| 2009 | $1,374,390 | $5,068 | $514,566 | $16,748,492 |
| 2010 | $2,373,010 | $4,168 | $678,915 | $0 |
| 2011 | $3,787,666 | $2,623 | $1,022,376 | $0 |
| 2012 | $3,449,334 | $637,323 | $1,059,602 | $0 |
| 2013 | $5,000,513 | $677,100 | $1,160,915 | $0 |
| 2014 | $3,526,984 | $679,239 | $1,630,795 | $0 |

GX 243; PSR ¶ 31.

**D.** **Gyetvay's False filing in the IRS's "Streamlined Procedures"**

    **1.** **Background**

In July 2014, Coutts Bank sent letters to Gyetvay informing him that Coutts had decided to participate in a disclosure program fashioned by the United States Department of Justice and the IRS called the "Swiss Bank Program" ("SBP"). *See, e.g.,* GX 65j. Under the SBP, Swiss banks like Coutts that had assisted U.S. taxpayers in hiding their assets and evading their U.S. reporting obligations were required to disclose certain information to DOJ concerning the U.S.-related accounts they had maintained. Because the Swiss banks that participated in the SBP could reduce their penalties by demonstrating to DOJ that their U.S. clients had ultimately disclosed their accounts to the IRS, the banks sent letters to their U.S. taxpayer clients informing them of the available IRS offshore disclosure initiatives by which those clients could belatedly report income and assets to the IRS, and urging them to participate. The banks' urging in this regard was accompanied by a warning that the banks were preparing to turn over certain anonymized account information to the U.S. authorities and that the information could be used by DOJ and IRS to prepare treaty requests to obtain information concerning client accounts. The banks also requested their U.S. taxpayer clients to execute and return to the banks a form indicating whether they had disclosed their accounts and assets to the IRS.

The letters Coutts sent to Gyetvay advised him of the availability of two IRS disclosure programs then in existence—the Offshore Voluntary Disclosure Program

("OVDP") and the "Streamlined Procedures". Under the OVDP, U.S. taxpayers were required to, among other things, file eight years of delinquent tax returns and FBARS and pay all taxes and interest. The OVDP participants were also required to pay (1) accuracy-related penalties and delinquency penalties, including failure-to-file and failure-to-pay penalties; and (2) an FBAR penalty that ranged between 27.5% and 50% of the aggregate high balance amount contained in the unreported accounts. GX 264. Significantly, OVDP was available to taxpayers who had willfully committed tax fraud, provided they received clearance to participate by the IRS's Criminal Investigation arm. And in exchange for making the required disclosures and payments in the OVDP, taxpayers received a promise from the IRS that they would not be referred for criminal prosecution. *See* GX 264.

In contrast to OVDP, the IRS's Streamlined Procedures were available only to taxpayers whose failure to report income and foreign accounts was attributable to non-willful conduct. There was a domestic program and a foreign program, based on the filing histories and residencies of the taxpayers.

Significantly, the reporting obligations and financial penalties for participants in the Streamlined Procedures (both Domestic and Foreign) were significantly less than those required by OVDP. Specifically, taxpayers who were eligible to use the Streamlined Procedures were required to file tax returns only for the preceding three years (as opposed to the eight years required by OVDP). Moreover, Streamlined Procedures filers (both Foreign and Domestic) were not subject to failure-to-file and failure-to-pay penalties,

15

accuracy-related penalties, or information return penalties that would normally apply to taxpayers who had failed to file tax returns and pay their taxes. Finally, the filers would not be subject to civil FBAR penalties. See GX 266-67.[3]

To demonstrate their eligibility for the IRS's Streamlined Procedures, taxpayers were required to certify, under penalty of perjury, that their failure to report income and assets was attributable to "non-willful" conduct, which was defined as "conduct due to negligence, inadvertence, mistake or conduct that is the good faith result of a misunderstanding of the law." *See* GX 50a. Taxpayers were also required to explain the facts demonstrating how their conduct was "non-willful."

### 2. Gyetvay's False Certification

As demonstrated at trial, Gyetvay's failure to report all his income and foreign accounts between 2005 and 2014 was attributable to his willful conduct, thus making him ineligible for the IRS's Streamlined Procedures.[4] Notwithstanding this, Gyetvay retained a Swiss law firm called Anaford and filed various Streamlined Procedures documents,

---

[3] Taxpayers who filed pursuant to the Streamlined Domestic Offshore Procedures were subject to a penalty of 5% of the aggregate highest value of their unreported foreign accounts. Streamlined Foreign Offshore Procedures filers were not subject to this penalty. This penalty was separate and distinct from the typical civil penalties based on FBAR violations. Both domestic and foreign filers would be protected from those penalties, provided they genuinely qualified for the program.

[4] Gyetvay was also ineligible because he was a non-filer (thereby making him ineligible for the Domestic branch of the Streamlined Procedures) and also could not satisfy the non-residency test (thus disqualifying him from the Streamlined Foreign Offshore Procedures).

including a sworn certification.

After collaborating with the Anaford attorneys on the wording of his "non-willfulness" certification, GX 73, which was contained on an IRS Form 14653, Gyetvay signed that form in late July 2015 and caused it to be filed with the IRS in Austin, Texas, in August 2015.  On the form, Gyetvay swore to the truth of the following facts:

> "I, Mark Gyetvay, have worked and resided in Russia since 1995.  I have made annual tax payments to the United States Treasury while abroad and have endeavored to regularly file U.S. tax returns. Due to the increasing complexity of my US tax filings and the difficulty in finding qualified US tax preparers able to navigate Russian tax and financial statements, my returns have become increasingly delayed.  My delay in filing U.S. tax returns is not due to any willfulness, but rather the result of my reasonable attempts to comply with increasingly difficult administrative requirements."

*See* GX s 50a, 50b.

Gyetvay's willfully false "non-willfulness" statement—which he submitted to the IRS in an effort to criminally avoid the tax delinquency penalties and FBAR penalties he would have faced by participating in OVDP or if he had otherwise been audited by the IRS—formed the basis of the jury's finding of guilt on Count Twelve.

## IV.   SENTENCING GUIDELINE CALCULATIONS

What follows is a detailed description of the Sentencing Guidelines calculations for the four counts of conviction.  Although those convictions involve three separate statutes, they should be grouped pursuant to U.S.S.G. §§ 3D1.2 through 3D1.4, consistent with the determination made by the Probation Department and resulting in a Final Offense Level of 32. *See* PSR ¶¶ 55-62.

### A.   Counts Ten & Eleven—Willful Failure to File Tax Returns (2013 and 2014)

#### 1.   Tax Loss

The aggregate tax loss for the convictions on the two tax counts is $3,284,986 ($1,734,099 (Count Ten) + $1,544,887 (Count Eleven)). That loss figure, based on the calculations by the IRS Revenue Agent who testified at trial, is utilized because the tax Guideline specifies that the tax loss for failures to file returns "is the amount of tax that the taxpayer owed and did not pay." § 2T1.1(c)(2). And the fact that the defendant made late payments does not reduce the loss amount. § 2T1.1(c)(5) ("The tax loss is not reduced by any payment of the tax subsequent to the commission of the offense").[5]

The total loss figure, however, is not limited to the two counts of conviction because the loss calculation must take into consideration "relevant conduct." The tax Guideline has its own relevant conduct provision, commanding that, "[i]n determining the total tax loss attributable to the offense (see 1B1.3(a)(2)), *all conduct violating the tax laws should be considered as part of the same course of conduct or common scheme or plan* unless the evidence demonstrates that the conduct is clearly unrelated." § 2T1.1. Application Note 2 (emphasis added). *See United States v. Rhaheed,* 511 Fed. App'x 825, 828 (11th Cir. 2013) (citing § 2T1.1 "relevant conduct" commentary in upholding inclusion of additional tax loss). Because the evidence overwhelmingly shows that Gyetvay engaged in a long-

---

[5] It should be noted that the tax loss calculations for 2013 and 2014—as well as the other tax years—take into account estimated tax payments that were made prior to the date the crime was committed—that is, the tax return due date.

running series of violations of the Internal Revenue Code, the tax loss figure must take into account the losses attributable to Counts One through Nine.[6]

The trial record reflects—as summarized above—that Gyetvay regularly failed to timely file returns, and, when he did file them, he filed materially false returns that omitted dividend, interest, and wage-related income, as well as income attributable to the Call Option Agreement in 2007 and IPO shares in 2009. Those willful omissions resulted in significant tax liabilities. In sum, because Gyetvay's willful failure to file his 2013 and 2014 returns were part of his scheme to hide income from the IRS, the Court should include the tax loss from each year between 2006 and 2014 in the calculation of the base offense level.

Accordingly, the base offense level is 28, based on a total tax loss of over $25,000,000. *See* § 2T4.1(L). That loss figure is broken out as follows:

---

[6]   As noted above, Counts One through Three charged Gyetvay with aiding and assisting the filing of false tax returns, while Counts Four through Six charged him with tax evasion. The loss for tax evasion and false tax returns "is the total amount of loss that was the object of the offense (i.e., the loss that would have resulted had the offense been successfully completed). § 2T1.1(c)(1). The loss for failures to file returns "is the amount of tax that the taxpayer owed and did not pay." § 2T1.1(c)(2).

| Year | Tax Loss |
|:---:|:---|
| 2006 | $ 171,163[7] |
| 2007 | $ 15,515,136 |
| 2008 | $ 684,084 |
| 2009 | $ 5,691,934 |
| 2010 | $ 291,292 |
| 2011 | $ 2,873,842 |
| 2012 | $ 1,116,903 |
| 2013 | $ 1,734,099 |
| 2014 | $ 1,544,887 |
| **Total** | **$ 29,623,340** |

## 2.    Sophisticated Means

The defendant qualifies for a 2-level enhancement for the use of sophisticated means.  U.S.S.G. § 2T1.1(b)(2).  The tax Guidelines specifically provide, in an application note, that offense conduct "such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts ordinarily indicates sophisticated means."  Commentary, Application Note 5 to § 2T1.1.  There can be no dispute that the defendant's structuring and utilization of the Swiss accounts—including using foreign entities with non-U.S. directors, nominee owners with foreign passports (including Gyetvay's then-wife), and hold-mail directives to the banks—supports the

---

[7] The tax loss figures for 2006-2010, 2012, and 2014 noted in this table are slightly higher than those contained in the Government's charts at trial because the defendant's tax returns contained additional false items that, although not charged in the indictment, emerged as a result of the proof admitted at trial.  The false items consisted of a false "housing deduction" that Gyetvay claimed for all the years noted above, based on fraudulently reporting to his accountants that he paid "rent" for his Moscow housing in amounts between approximately $60,000 and $91,000 for the years 2006-2010 and 2012.  The deduction amount claimed for 2014 was $9,139.  Gyetvay was not entitled to claim the housing deduction because he owned his principal residence in Moscow from 2005 through 2018.  In addition, for the tax year 2008, the defendant also willfully omitted from his tax return over $692,000 in dividend income—which his own witness, Thomas Bishop, acknowledged at trial.

imposition of a "sophisticated means" enhancement.

### 3. Count Ten and Eleven Total Offense Level

Based on a loss greater than $25,000,000, which yields a base offense level of 28, and a 2-level upward adjustment for sophisticated means, the total offense level for the Count Ten and Count Eleven offenses is 30. *See* U.S.S.G. §§ 2T4.1(L), 2T1.1(b)(2)

### B. Count Twelve—False Statements Made to the IRS

### 1. Loss Amount

The Sentencing Guidelines generally refer convictions under 18 U.S.C. § 1001 to be governed by § 2B1.1. *See* U.S.S.G. Appendix A. A cross-reference contained in § 2B1.1(c)(3), however, provides that convictions under § 1001 may be governed by another section of the Guidelines "if the conduct set forth in the count of conviction establishes an offense that is specifically covered by another Guideline in Chapter Two." The conduct underlying the Count Twelve conviction—making a materially false statement, under oath, on a document filed with the IRS—establishes various offenses under Title 26, including Section 7206 (making it a crime to subscribe to materially false document filed with IRS, or aiding and assisting the preparation of such a document), and Section 7201 (tax evasion). Accordingly, because the object of the Count Twelve false statement offense was to perpetuate a fraud on the IRS—by falsely attempting to qualify for the IRS's Streamlined Procedures and thereby endeavoring to fraudulently evade tax

delinquency and FBAR penalties—the Count Twelve conviction should be governed by § 2T1.1.[8]

A willful FBAR violation—like the one found by the jury in this case—can subject the violator to a civil penalty of 50 percent of the balance of the undisclosed account at the time of the violation.  31 U.S.C. §§ 5321(a)(5)(C)-(D). The violation occurs when the U.S. person fails to disclose the account—that is, on the reporting date. As applicable to the 2011-2013 years for which the defendant willfully failed to file FBARs, that date was June 30 of the subsequent year. Therefore, the defendant's willful FBAR violation for 2013 was based on 50% of the value of the undisclosed accounts on June 30, 2014.

The total penalties that Gyetvay tried to evade through his false statement to the IRS are as follows:

---

[8] The penalties Gyetvay sought to evade are appropriately considered part of the "tax loss" even though the Count Twelve conviction was not for evading payment of tax in violation of 26 U.S.C. § 7201 or willfully failing to pay tax in violation of 26 U.S.C. § 7203.  *See* U.S.S.G. § 2T1.1 Application Note 1 (noting that tax loss may include penalties and interest in evasion of payment cases under 26 U.S.C. § 7201 and willful failure to pay under 26 U.S.C. § 7203).  The cases construing the language of the § 2T1.1 application note have held that where evasion of penalties is the object of the offense, an underling conviction under 26 U.S.C. § 7201 and 26 U.S.C. § 7203 is not necessary. *See United States v. Adams*, ("Thus, even where a defendant has not been convicted of willful evasion of payment under § 7201 or willful failure to pay under § 7203, penalties and interest may still be included in the tax loss calculation if the object of the offense is to avoid the tax, penalties, and interest"); *United States v. Black*, 815 F.3d 1048, 1055 (7th Cir. 2015) (same); *United States v. Thomas*, 635 F.3d 13, 17 (1st Cir. 2011) (same).

22

| Penalty | Amount |
|---|---|
| 2011 Delinquency Penalties (Late filing and late payment) | $ 1,365,075 |
| 2011 Estimated Tax Penalty | $ 55,209 |
| 2012 Delinquency Penalties (Late filing and late payment) | $ 530,529 |
| 2012 Estimated Tax Penalty | $ 21,749 |
| 2013 Delinquency Penalties (Late filing and late payment) | $ 823,697 |
| 2013 Estimated Tax Penalty | $ 17,123 |
| 2013 Willful FBAR Penalty (50% of aggregate balance on 06/30/14) | $ 45,495,219 |
| **Total** | **$48,308,601** |

In sum, the objects of Gyetvay's false statement offense—evasion of the tax delinquency and FBAR penalties—are properly included in the tax loss for that offense.

### C.   Count Ten through Twelve Total Offense Level

As Counts 10 through 12 are covered by U.S.S.G. § 2T1.1, they are grouped pursuant to U.S.S.G. § 3D1.2(d).  And the total loss quantities are aggregated pursuant to U.S.S.G. § 3D1.3(b).   Totaling the tax losses from Count Ten/Eleven offenses ($29,623,340) and the Count Twelve offense ($48,308,601) yields a total tax loss of $77,931,941, which corresponds to a level 30 under 2T4.1(M).  With the addition of the sophisticated means enhancement, the total offense level is 32 for the Count Ten through Twelve offenses.

### D.   Count Thirteen—Failure to File FBAR

#### 1.   Value of the Unreported Funds

The offense level for the Count Thirteen (FBAR) offense is calculated under § 2S1.3. The base offense level is 6, plus the number of offense levels from the table in § 2B1.1 corresponding to the value of the undeclared funds in the account.  § 2S1.3(a)(2).

As an initial matter, the value of the funds resulting directly from the count of conviction was $8,700,000, which was the approximate high balance for the unreported Opotiki account for 2014.[9]  However, like any other count of conviction to which the grouping rules of § 3D1.2(d) apply, the Court must consider relevant conduct. *See* § 3D1.2(d) (listing § 2S1.3 as Guidelines subject to grouping rules).

As demonstrated at trial, the defendant failed to timely file FBARs for 2008-2013, and he never filed FBARs for 2005-2007.  The defendant filed his 2008-2013 FBARs only when he filed his false Streamlined Procedures submission with the IRS in August 2015, with the intent to fraudulently avoid FBAR penalties.

The defendant's unfiled 2005-2007 FBARs as well as his untimely 2008-2013 FBARs are plainly "relevant conduct" that must be included in assessing the total value of unreported funds. Under § 1B1.3(a)(2), the Court must consider all acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction if that offense of conviction is one that requires grouping under § 3D1.2(d). Offenses under § 2S1.3 require such grouping.  The count of conviction and the earlier failures to disclose were part of a common scheme or plan given the common victim (the Department of Treasury) and the common purpose of the offense (concealing assets in foreign financial accounts). They were also part of the same course of conduct, as the

---

[9]   The value of funds for FBAR reporting and § 2S1.3 purposes is based on the high balance of the assets during the tax year, rather than the amount in the account on the reporting date—which was June 15 of the following year. The latter date is applicable only when computing the civil penalty for failing to comply with the statute. 31 U.S.C. §§ 5321(a)(5)(C)-(D).

defendant willfully failed to disclose his Swiss bank accounts for almost a decade.[10]

Accordingly, when considering both the offense conduct and relevant conduct, he total value of funds, for purposes of in § 2S1.3 and § 2B1.1, is $102,112,774, which is the sum of the unreported Opotiki account for 2014 and the high amount for 2013. This figure, falling squarely between $65,000,000 and $150,000,000, yields a 24-level increase to the base offense level. § 2S1.3(a)(2); § 2B1.1(b)(1)(M). The resulting base offense level is therefore 30.

### 2.    Pattern of Unlawful Activity Enhancement

The defendant also qualifies for a 2-level enhancement under § 2S1.3(b)(2) because he committed the offense as part of a pattern of unlawful activity involving more than $100,000 in a 12-month period. Section 2S1.3 defines this enhancement as "at least two separate occasions of unlawful activity involving a total amount of more than $100,000 in a 12-month period, without regard to whether any such occasion occurred during the course of the offense or resulted in a conviction for the conduct that occurred on that occasion." U.S.S.G. § 2S1.3 Application Note 3. One of the required "occasions of unlawful activity" is the count of conviction itself—that is, the defendant's willful failure

---

[10] Although each year of willfully failing to report foreign assets could theoretically be considered relevant conduct for FBAR violations, the Government believes that, given that the unreported accounts were the same Swiss accounts during the whole period, it is more appropriate to add the value of those unreported accounts only once as relevant conduct. In other words, if they were worth $90 million in 2011 and $86 million in 2012, the Government does not believe it is appropriate to add these two amounts for relevant conduct, considering that the amounts pertained to the same accounts. The highest combined value of the unreported Felicis and Opotiki accounts was from 2013, when the assets in the accounts were collectively valued at $93,412,774. GX 238.

to report the Opotiki account that was valued at over $8.7 million dollars. S*ee United States v. Valdes-Guerra*, 758 F.2d 1411, 1413-14 (11th Cir. 1985) (part of "pattern" can be based on underlying reporting violation).

There are also at least three additional occasions of unlawful activity involving more than $100,000 in a 12-month period from the date of the offense (June 30, 2015). Although not required by the statute, two of these other "occasions of unlawful activity" were also separate counts of conviction. The jury found the defendant guilty of Count Eleven, which charged him with willfully failing to file his 2014 federal income tax return by the due date, which was April 15, 2015. The jury separately convicted the defendant of Count Twelve, which charged him with making a materially false statement to the IRS when he filed his Streamlined Procedures submission in July 2015.

The conduct underlying the Count Eleven and Count Twelve convictions both involved more than $100,000.  As noted above, the defendant failed to report income in excess of $5.8 million and tax due of $1,544,887 when he willfully failed to file his 2014 tax return. Moreover, the defendant's false filing in the IRS's Streamlined Procedures was designed to cause the IRS to forgo assessing significant delinquent tax return filing and FBAR penalties against the defendant. The Government's conservative estimate of those penalties is over $48 million.

The law is clear that the occasions of unlawful activity do not need to be separate Title 31 violations. The Title 31 violation can be combined with other unlawful activity. *See, e.g., United States v. Bradley*, 644 F.3d 1213, 1241 (11th Cir. 2011) (failing to file an

FBAR while also committing mail and wire fraud); *United States v. Curtis*, 2012 WL 2913734 (6th Cir. 2012) (upholding "pattern" finding based on jury determination that defendant "committed wire fraud [conspiracy offense] as part of pattern of unlawful activity" that involved structuring of embezzled funds). Accordingly, a third occasion of criminal activity can properly be found in the falsity of the FBAR the defendant filed for 2014. As noted, that FBAR, in addition to being criminally incomplete and thereby violative of the FBAR filing statute, falsely stated that the defendant had only signatory authority over the Felicis account. In truth, the defendant was the owner of the account. The defendant's false statement, therefore, can provide support for the pattern. *United States v. Bucey*, 691 F. Supp. 1077, 1081, 1083 (N.D. Ill. 1988) (upholding "pattern" based on filing false currency transaction reports and violating 18 U.S.C. § 1001), *aff'd in part, rev'd in part*, 876 F.2d 1297 (7th Cir. 1989); *Beusch v. United States*, 596 F.2d 871, 879 (9th Cir. 1979) (explaining that "Congress intended to impose more severe penalties in cases involving particularly serious violations, whether violations of the Act alone, or violations of the Act in conjunction with some other illegal activity"). *See also* Senate Report 99-433, at 20 (1986) (Congress sought to "make[] explicit that illegal activities involving more than $100,000 are not restricted to violations under the Bank Secrecy Act itself, but to any illegal activity involving the requisite amount"). As such, the enhancement applies in this case because of the Title 31 violation and the separate offenses committed within a 12-

month period.[11]

Application of the two-level adjustment for "pattern of unlawful activity" yields an adjusted offense level of 32 for the Count Thirteen FBAR violation.

### 3. The § 2S1.3 Cross-Reference to Tax Offense Guidelines

The final provision of § 2S1.3 instructs the Court to apply the tax offense guidelines if the offense was committed for the purpose of violating the Internal Revenue laws *and* the resulting offense level is greater under Part T. Although the FBAR offense was plainly committed for the purpose of violating the Internal Revenue laws, the tax guidelines (at level 32) result in an equal but not higher offense level. Therefore, the § 2S1.3 Guideline governs. *See United States v. Hill*, 171 Fed. Appx. 815, 821-22 (11th Cir. 2006) ("Additionally, § 2S1.3(c)(1) was not applicable because the offense level of 16 that would have resulted from the court's application of U.S.S.G. § 2T1.1(a)(1), would have been less than 17—the offense level that resulted from the court's application of § 2S1.3(a) & (b)(1)").

### E. Acceptance of Responsibility

Contrary to the defendant's claim, he is not entitled to acceptance of responsibility. U.S.S.G. § 3E1.1(a) provides that if "the defendant clearly demonstrates acceptance of responsibility for his offense," a two-level reduction is appropriate. The second

---

[11] Additionally, the defendant willfully failed to timely file an FBAR for 2013, which had a due date of June 30, 2014, exactly one year prior to the offense committed in Count Thirteen.

Application Note to this section states "this adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." The note carves out "rare situations" where a defendant may qualify for acceptance of responsibility even though he went to trial because he challenged the prosecution on non-factual grounds, such as a constitutional challenge.  However, in these rare situations, "a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct."

Application of the foregoing standards warrants rejection of any acceptance of responsibility claim.  Following his arrest, Gyetvay publicly denied his guilt via Twitter. He proceeded to trial, where he vigorously denied his guilt. He denies his guilt to this day and has advanced, in connection with his challenges to the PSR, a false denial of the facts and the amounts of income he received. He refused to cooperate with the Probation Department by providing full financial disclosures. At no point has the defendant expressed a shred of remorse or even admitted that he did anything wrong.  Far from making Gyetvay a candidate for acceptance of responsibility, this conduct makes Gyetvay the avatar of a criminal actor for whom acceptance should be swiftly denied.

## V.   SECTION 3553(a) ANALYSIS

The Government respectfully submits that a sentence of 121 months, within the sentencing range properly calculated by the Probation Department in the PSR, *see* PSR ¶ 62, is

necessary to reflect the seriousness of Gyetvay's offense conduct, provide just punishment, afford deterrence, and promote respect for the law.

A.   <u>**Nature and Circumstances of the Offense**</u>

Tax fraud is a serious crime and violates the most basic covenant between citizens and the government. *See United States v. Zukerman*, 897 F.3d 423, 428 (2d Cir. 2018) ("[t]ax crimes represent an especially damaging category of criminal offense" which "strike[] at the foundation of a functioning government'"); *United States v. Carlson*, 498 F.3d 761, 764 (8th Cir. 2007) ("[t]ax offenses, in and of themselves, are serious offenses") (cleaned up). Put simply, tax fraud constitutes theft from the pockets of every taxpaying citizen of this nation. The Supreme Court has long recognized that "[t]he United States has relied for the collection of its income  largely upon the taxpayer's own disclosures rather than upon a system of withholding the tax from him by those from whom income may be received." *Spies v. United States*, 317 U.S. 492, 495 (1943). A functioning government relies on its citizens and residents to report timely, completely, and honestly all taxes they owe, which is why Congress has made it a criminal offense to file false returns, evade income taxes, or fail to file tax returns. As Justice Oliver Wendell Holmes famously observed, "[t]axes are what we pay for a civilized society . . . ." *Compania General de Tabacos de Filipinas v. Collector of Internal Revenue*, 275 U.S. 87, 100 (1927) (Holmes, *J.*, dissenting).

The criminal activity of Gyetvay that was revealed in this case was breathtaking in scope.[12]  The staggering amounts involved— $93 million of hidden assets and tax losses exceeding $29—alone warrant a sentence within the range calculated by Probation. Gyetvay caused those tax losses by making the conscious decision, year after year, to flout his tax reporting and FBAR reporting responsibilities. He did so by filing false returns, lying to his tax preparers, hiding his income and assets in the Swiss accounts, and lying on his Streamlined Procedures filing in an attempt to fraudulently evade even more amounts that were due to the IRS. And Gyetvay chose that criminal path notwithstanding the fact that he had an avenue open to truly come clean and even avoid prosecution, through OVDP. But Gyetvay consciously decided not to take that path because he refused to part with the unreported income he had accumulated, much of which he would have been required to pay through a 50% FBAR penalty and examination of his taxes going back to 2007-2008.

In sum, Gyetvay's prolonged and serious criminal conduct warrants a term of incarceration of 121 months.

**B.**     **History and Characteristics of the Defendant**

Unlike many defendants who appear before this Court, Gyetvay grew up in a stable and secure home with a large and loving family and no history of drugs or abuse. *See* PSR

---

[12] Gyetvay's FBAR violation also is a serious offense.  FBAR statutes and regulations facilitate the U.S. Government's identification of "persons who may be using foreign financial accounts to circumvent United States law."  The information gathered by the FBARs "can help identify or trace funds used for illicit purposes or identify unreported income maintained or generated abroad." IRS FBAR Reference Guide, at 1 (https://www.irs.gov/pub/irs-pdf/p5569.pdf).

¶¶ 72-75. He obtained an accounting degree at Arizona State University and later worked as a consultant to large, multi-national companies.  He later became a certified public accountant, a partner at PWC, and CFO of Novatek, Russia's largest private energy company. *Id.* ¶¶ 98; 100; 104-05. Despite this solid personal and professional background—which provided him all the material comforts needed—Gyetvay deliberately chose to conduct his business and personal tax affairs through fraud, by cheating the tax authorities of tens of millions of dollars over the course of a decade. Gyetvay plainly knew right from wrong; he knew that he was obligated to report his foreign financial accounts and he knew he was required to pay his share of taxes. And yet, unlike millions of hard-working taxpayers who timely file and pay their taxes each year, Gyetvay chose to evade his obligations through a multi-faceted, decade-long tax evasion scheme that he carried out on multiple continents until the investigatory steps of the DOJ and IRS led him to believe he would be found out. But even then, he decided to continue to willfully dodge his obligations by making a false filing in the IRS's Streamlined Procedures designed to evade additional amounts he owed.

Gyetvay's tax fraud was plainly a crime of opportunity driven by outlandish greed and not necessity; a multi-millionaire committing tax crimes to get tens of millions more. And even now, as he stands to be sentenced, Gyetvay audaciously attempts to explain away his conduct by contending he is blameless and that, through his Streamlined Procedures filings, he was simply trying to become tax compliant, albeit belatedly.

32

This explanation is risible. Gyetvay had every opportunity to follow the law, given his accountancy background that provided him easy access to accountants and tax preparers. But even when he retained tax preparers (like Dorea Rolle from PWC or Alex Knight, the international tax expert), he lied to them year after year to willfully dodge his obligations to report his foreign assets and all of his income. And even when given a chance to come into tax compliance in 2010 when Coutts demanded that he regularize his Swiss accounts, Gyetvay made the cold, calculated, and greed-driven decision to keep the accounts hidden and, remarkably, to enlist his wife in doing so.  There is simply no excuse for his criminal conduct. He thought he was above the law.

The fact that Gyetvay paid some measure of the taxes he owed does little or nothing to mitigate his crimes. Gyetvay paid a portion of what he owed only when he learned that Coutts was preparing to turn over information to DOJ concerning his accounts. Thus, it is clear that he began to report not because he had a crisis of conscience but because he feared being found out. As one court astutely observed, tax cheats deserve no "good citizenship reward" for belatedly paying that which is owed. *See United States v. Zukerman*, 16-cr-194 (AT) (S.D.N.Y. 1017), Sent. Tr. at 18-19 (Doc. 60) (deriding suggestion by defense counsel that defendant deserved special credit for belatedly paying taxes: Court: "So do you think [the defendant] should get a good citizenship reward for paying the back taxes?").

Gyetvay has submitted certain letters attesting to his good character and his positive traits. It is, of course, entirely appropriate for the Court to take these letters into

33

account in connection with sentencing. However, the Government asks that, in so doing, the Court also consider the following three points. First, the attestations to Gyetvay's good character do not distinguish him from the typical white-collar defendant. Instead, as Southern District of New York Judge Victor Marerro astutely observed, this collection of letters:

> falls into a pattern advanced by a subset of the white-collar criminal. This category encompasses a select class: distinguished, reputable, highly esteemed model citizens such as this defendant. The list of their achievements and virtues is long and impressive. Let us count the ways. At home, they are good family men and women, caring spouses, loving parents, loyal and reliable to friends. At work, they are looked up to as outstanding professionals and business partners. To their community's charities and public causes they are generous patrons and sponsors.

*United States* v. *Regensberg*, 635 F. Supp. 2d 306 (S.D.N.Y. 2009), *aff'd*, 381 F. App'x 60 (2d Cir. 2010); *see also United States* v. *McClatchey*, 316 F.3d 1122, 1135 (10th Cir. 2003) ("excellent character references are not out of the ordinary for an executive who commits white-collar crime; one would be surprised to see a person rise to an elevated position in business if people did not think highly of him or her"). In other words, the letters proffered by Gyetvay are in many ways typical of the letters submitted by white collar criminals, and do not set Gyetvay apart from other similarly situated defendants.

Second, to the extent that the letter writers and Gyetvay contend that the humiliation and loss of social standing suffered by him as a result of his guilty plea should be given paramount consideration, that claim should be rejected. "It is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar

34

defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction." *United States* v. *Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012). Similarly, the loss of his professional licenses or standing, the legal fees he has incurred, and the felony convictions associated with his name are not factors this Court should take into account. "None of these things are his sentence. Nor are they consequences of his sentence; a diminished sentence based on these considerations does not reflect the seriousness of his offense or effect just punishment." *United States* v. *Musgrave*, 761 F.3d 602, 608 (6th Cir. 2014) (quotations omitted); *see also United States* v. *Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) ("The Sentencing Guidelines authorize no special sentencing discounts on account of economic or social status."). And, as the Seventh Circuit has observed:

> [N]o "middle class" sentencing discounts are authorized. Business criminals are not to be treated more leniently than members of the "criminal class" just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity. It is natural for judges, drawn as they (as we) are from the middle or upper-middle class, to sympathize with criminals drawn from the same class. But in this instance we must fight our nature. Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime.

*United States* v. *Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999).

Finally, while there certainly are cases where it can be said that a defendant's offense conduct was in some way wildly aberrant or representative of so brief and isolated a lapse in judgment that it is appropriate to give significant weight to an otherwise blameless life, this demonstrably is not such a case. For over a decade, the defendant

35

participated in a multi-faceted tax fraud designed to cheat the IRS and hide over $93 million. That cheating involved multiple false statements made under oath, on both tax returns and other documents. What is more, the four counts of conviction do not come close to representing the full range of the harm caused by the defendant's criminal activities, as the facts in the PSR and those facts outlined above make plain that he engaged in massive tax misconduct resulting in tens of millions of tax liabilities that exist to this day.

Accordingly, even crediting any testimonials he has submitted in connection with sentencing—and we do not in any way question the sincerity of those testimonials—the defendant, through his lengthy, greed-driven criminal conduct, has shown that he is not someone who deserves any benefit of the doubt with respect to this Court's judgment of his character.

Finally, Gyetvay argues that he deserves leniency because he is a first-time, non-violent offender, and thus qualifies for the upcoming Guidelines amendment based on the so-called "zero offender" category.  The Government recognizes that this upcoming amendment, while not yet effective, is likely to impact the defendant's ultimate sentence. We accordingly believe that the Court should take the proposed amendment into account but, in doing so, sentence the defendant at the top of the range of any reduced final offense level.  More concretely, we agree that the final offense level of 32 can be reduced to level 30, but urge that justice demands that Gyetvay be sentenced at the top of that range—121 months.

## C.      The Need to Afford Adequate Deterrence

One of the paramount factors that the Court must consider in imposing sentence under Section 3553(a) is the need for the sentence to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). General deterrence is vitally important in cases like this because it is essential to reducing the ever-increasing amount of money lost each year through tax fraud. According to the IRS, "the underreporting of business income by individual taxpayers—income of sole proprietors, farmers and those earning rental, royalty, partnership, and S Corporation income—is a major contributor" to the "Gross Tax Gap (the amount of 'true' tax that is not paid voluntarily or timely)," which the IRS estimates at approximately $441 billion annually. *See* Chuck Rettig (former IRS Commissioner), "A Closer Look - Impacting the Tax Gap," at 1–3, *available at* https://www.irs.gov/pub/foia/ig/cl/tax-gap-for-web.pdf (last visited Aug. 11, 2023). That is because such income is generally not visible to the IRS absent voluntary reporting. This means that hundreds of billions of dollars are lost every year because people like Gyetvay—who otherwise fully enjoy the myriad public benefits that the tax system supports, like roads, schools, and citizenship for foreign spouses—choose to shirk their responsibilities as taxpayers. Noncompliance with the Internal Revenue Code is an ongoing problem that merits the Court's strong consideration when imposing sentence. Meaningful sentences must be given in cases such as this to forewarn others of the consequences for engaging in multi-year tax fraud. *See* Joshua D. Blank, *In Defense of Individual Tax Privacy*, 61 Emory L.J. 265, 321 (2011) ("Studies have shown that salient

examples of tax-enforcement actions against specific taxpayers, especially those that involve criminal sanctions, have a significant and positive deterrent effect.").

The importance of affording general deterrence through meaningful sentences is particularly acute in criminal tax cases. As a result of the significant resources required to mount a criminal tax prosecution, such prosecutions are relatively rare. As the Sentencing Commission explained:

> The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system. Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

U.S.S.G. chi 2, pt. T, introductory cmt. Where the incidence of prosecution is lower, the level of punishment must be higher to obtain the same level of deterrence.

The need for general deterrence is at its peak in tax fraud cases, which are lucrative, easy to perpetrate, and difficult to detect. *See States v. Zukerman*, 897 F.3d 423, 428 (2d Cir. 2018) (upholding above-Guidelines $10 million fine on 74-year old tax offender who received 70-month within-Guidelines prison term, and finding reasonable district court's rationale for upward variance based on vital need for deterrence to fight tax crimes); *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of

38

a crime and hence the punishment required to deter it."); *see also United States v. Hassebrock*, 663 F.3d 906, 922 (7th Cir. 2011) (affirming as reasonable a within-Guidelines 32-month sentence for a tax evader when the district court explained that "a sentence of probation would not promote respect for the law, but encourage people to flaunt it"). Thus, in order to provide adequate general deterrence, sentences in criminal tax cases must be substantial.

A sentence of probation, or even a period of home confinement with monitoring, would fail *entirely* to serve the goal of general deterrence. The message that would be sent to the community by such a lenient sentence is that tax fraud is not a big deal and that a decade-long, lucrative tax fraud is, in essence, not worthy of serious punishment at all. Such a sentence would provide a would-be tax cheat every incentive to perpetrate a tax evasion scheme—the reward is high, the chance of being caught and successfully prosecuted is very low, and the punishment in the unlikely event of a successful prosecution is minimal (home confinement and the requirement to pay back the stolen money, which should have been paid to the Government in the first place). Respectfully, that is *not* the message that this Court should send to the public through its sentence of Gyetvay.

As Southern District of New York Judge Edward J. Weinfeld aptly observed, *in a pre-Guidelines setting*:

> This court has long had the view that income tax evasion cases where defendants are found guilty, whether upon their pleas of guilty or after jury verdict, require a term of imprisonment. The income tax laws of our country

39

in effect reflect an honor system under which the citizens are required to cooperate with the government, to file true and accurate returns. I have been of the view that unless a citizen lives up to his responsibility there must follow, barring an extraordinary situation, a term of imprisonment as an example to other people in the community.

*United States v. Tana*, 85 Cr. 1119 (EJW) (June 17, 1986; Tr. at 12-13); *United States v. Engle*, 592 F.3d 495, 502 (4th Cir. 2010) ("Without a real possibility of imprisonment, there would be little incentive for a wavering would-be evader to choose the straight-and-narrow over the wayward path."). Likewise, in a relatively recent case involving a business owner defendant who used unreported corporate receipts over a three-year period to pay personal expenses as well as payroll, resulting in a tax loss of between $250,000 and $550,000 and a Guidelines range of 18 to 24 months, Judge Alvin K. Hellerstein imposed an 18-month sentence on the 54-year-old, first-time offender, explaining that:

> I think the obligation to pay taxes is basic to our civilization. It makes it possible to have a lawful society. You read every day of crimes and violence in our country. But so much so in so many other countries where people can't get out of their house without fearing their lives. Where the path of getting food is strewn with threats and violence against them.
>
> In order to have a society, you must have money. You must be able to pay what society requires. And its basic functions of policing and other functions of making sure there is a safety net under people. If people don't pay their taxes, they cheat each other. Your not paying taxes cheats me. If I don't pay my taxes, I cheat you. It's as bad, in many ways, as ripping off the delivery worker that the last fellow did. You're ripping off everybody else by not paying your share of taxes. So I look upon this and I think the guidelines have it right here. I think a year and a half, 18 months, is a just sentence. I impose it.

> I think you're going to have to reflect on what you did and the seriousness of what you did. You just can't make it good by paying the back tax. You've got to understand that when you do something bad, you get punished. It's got to be a lesson to everyone else. Everyone else is tempted to draw a line and cheat a little bit, get an extra edge.

*United States v. Joseph Ciccarella*, 16 Cr. 738 (AKH), Sent. Tr. at 22-23 (Doc. 19).

In short, compliance with the Internal Revenue Code will be unattainable if the general public believes there are no impactful repercussions for willful failure to comply with the tax laws. Sentencing Gyetvay to a meaningful term of incarceration is, therefore, necessary to send the message to others in our society that systematic and repeated efforts to cheat on one's taxes will be met with serious punishment. Or as Judge Hellerstein succinctly put it in *Ciccarella*: "You've got to understand that when you do something bad, you get punished." *Id.*

### D.   The Need to Avoid Unwarranted Disparities

The Sentencing Guidelines were promulgated, in significant measure, to minimize disparities in federal sentences. Although those Guidelines are no longer mandatory, the importance of eliminating sentencing disparities remains an important factor that the Court must consider pursuant to 18 U.S.C. § 3553(a)(6). To that end, the Government attaches for the Court's consideration a chart of sentences in other recent tax cases (or cases that had a significant tax component), including cases with comparable loss amounts to the loss amount in this case. *See* Exhibit A. The sentencing chart breaks out the sentences imposed and various other sentencing data in a broad variety of criminal tax contexts.

Although the Government believes that there is significant utility in having the Court consider sentencings in other tax cases, the Government understands that, at best, such guidance can get the Court only so far. Every case is unique; every individual defendant is unique. We do not mean to suggest otherwise. The reason for our reference to the other relevant sentences is straightforward: while we recognize that the Government's recommendation in this case calls for a substantial sentence, the data shows that sentences within or slightly below the Guidelines range are common in criminal tax cases. In fact, as the attached chart shows, defendants who have caused smaller losses to the IRS have received and served significant prison sentences.

## V.     GYETVAY'S ARGUMENTS

In his communications with Probation, Gyetvay advanced a host of arguments in contesting the facts and the Sentencing Guidelines calculations.  None of these arguments has merit.

### A.     The IPO Shares were Vested, Valuable, and Reportable Income in 2009

Gyetvay contends that the 7.2 million shares of Novatek stock he received in his Swiss bank account in 2009 do not constitute income to him because the shares were subject to a substantial risk of forfeiture and they had no value. The risk of forfeiture existed, he maintains, because "Mr. Gyetvay, as a U.S. citizen living in Russia, was dependent on his continued employment with Novatek and the whims of Mr. Mikhelson who was one of the richest individuals in Russia."  08/02/23 Ltr. to Probation at 16. In other words, Gyetvay appears to argue that Mikhelson could have simply taken back the

shares whenever he wanted to. These contentions fail for several reasons.

First, the Novatek shares were fully transferred to Gyetvay's Swiss bank account in March 2009, at which time he could do with them what he liked.  Indeed, he began receiving dividends from the shares in 2009 and sold significant blocks in 2010, 2011, and 2014. These are the classic hallmarks of unfettered ownership of valuable, share-based compensation. *Gudmundsson v. United States*, 634 F.3d 212, 219 (2d Cir. 2011) (if shares are either transferrable *or* not subject to a substantial risk of forfeiture, income must be recognized under § 83). Simply put, Gyetvay's ability to transfer the shares, as evidenced by the 2010, 2011, and 2014 sales, and his receipt of Novatek dividends beginning in 2009, demonstrate that he fully owned them upon transfer to his account.  It also shows, through his receipt of substantial capital gains upon sale, that the shares had significant value—as reflected on the amounts listed on his tax returns.

Second, Gyetvay admitted, through his sworn tax filing for 2009, that the Novatek shares he received in March 2009 constituted income to him at the time.  *See* Gov. Ex. 19. Gyetvay should not be permitted to walk away from his sworn statement that the shares constituted more than $14 million of income in 2009.

Third, Gyetvay admitted, in filings made in this Court, that the Novatek shares vested in 2009 and constituted reportable income for that year.  In his response to the Government's motion to compel his Swiss attorneys to provide records pursuant to the crime/fraud exception to the attorney/client privilege, the defendant represented to this Court on multiple occasions that he received share-based income in 2009 after those

43

shares vested.   *See* Gyetvay's Response to Government's Crime/Fraud Motion, the first ten pages of which are attached as Exhibit B, at 2 ("In 2009, Mr. Gyetvay received shares of Novatek and reported approximately $14.5 million of income on his 2009 U.S. individual income tax return based on the 2005 fair market value of the *vested* Novatek shares he received in 2009") (emphasis added); *id.* at 10 ("Thus, Mr. Gyetvay reported all income incident to the ownership and receipt of the 7,287,134 ordinary shares of Novatek attributable to the 2005 IPO").

Finally, the snippets of trial transcript Gyetvay relies on in claiming that the shares were subject to forfeiture do not support his claim. Doug Miller and Greg Madick, neither of whom had first-hand knowledge of the issue, suggested only that Mikhelson wanted a right of first refusal for Gyetvay's IPO shares. But a right of first refusal is not a right of confiscation. Instead, it simply gives the person holding the right an initial opportunity to contract with the owner before the owner attempts to sell to third parties. In any event, the existence of a right of first refusal does not mean that such a right was exercised. The fact that Gyetvay *got* the shares in 2009 and  subsequently sold blocks of them make clear that any right of first refusal enjoyed by Mikhelson was not exercised. What is more, Mikhelson hardly would have released control of the shares if he intended to claw them back through confiscation—for which absolutely no evidence exists.

In sum, the evidence plainly establishes that the Novatek shares constituted reportable income to Gyetvay in 2009.[13]

## B. The Russian Income Records are Reliable

At trial, the Court admitted into evidence, over defense objection, records from the Russian Federal Tax Service ("FTS"), obtained through a tax treaty with the Russian government. GXs 7 & 7a. Those FTS records, reflecting the compensation Novatek paid to Gyetvay from 2005 to 2018, demonstrated that Gyetvay underreported his wages from Novatek on his 2006-2008 tax returns by providing his CPA, Alex Knight, with false information. *See* GX 235; 03/22/23 Tr. at 111-121. The Government has therefore used the FTS records for sentencing purposes to calculate a portion of the tax loss that was the object of Gyetvay's offenses.

Notwithstanding this Court's receipt of the FTS records into evidence at trial, Gyetvay now argues that the FTS records are too unreliable to be considered at sentencing. Def.'s Obj. to PSR at 7-10. Gyetvay advances several reasons for this, all of which the Court should reject. First, Gyetvay argues that the Russian government's certification of the records is unreliable because the certification did not specifically state that it was made under penalties of perjury. The Court, however, already rejected that

---

[13] It bears noting that although Gyetvay ignores this proof establishing that the Novatek shares constituted income when he received them in 2009, he is shrilly silent with respect to when precisely the income had to be recognized.

argument. When Gyetvay attempted to exclude the FTS records from trial, the Court held that the governing statute, 18 U.S.C. § 3505, did not require the certification to state that criminal penalties applied to making a false certification, but rather, as a factual predicate, the signer had to be subject to criminal penalties in his or her country for subscribing a false certification. The Court concluded that the Government satisfied its burden to show this factual predicate. *See* 03/10/23 Final Pretrial Conference, Tr. at 48. The FTS's certification, signed by a Russian government official, satisfied all of Section 3505's requirements and the nearly identical requirements of Federal Rule of Evidence 803(6)'s business records exception. Moreover, the certification specifically states that the FTS provided the records "upon requests of the IRS in accordance with the Article 25 of the Tax Treaty between Russia and the United States." GX 9. Therefore, there is nothing about Russia's certification that renders the records unreliable.

Gyetvay nonetheless argues that the FTS records are unreliable because they lack a corporate seal and signature from Novatek. Def.'s Obj. to PSR at 8. But the trial testimony of Government witness Professor William Butler, who has extensive (and probably unparalleled, for an American) expertise in Russian law, made clear that the lack of signature and seal did not render the records unreliable. In particular, while under cross examination by defense counsel, Butler made clear that the FTS wage records are not documents that *would* have seals and signatures:

> Q. If I can direct your attention is to the bottom, this particular tax record is not signed or bearing the seal of Novatek either, is it?

A. No. And it wouldn't be. If it's issued but [sic] the tax service, it would
not be issued a seal by the tax agent.

03/21/23, at 81-82. Similarly, Bridget Flannery, a supervisor in the IRS department that
handles exchanges of information with foreign governments, confirmed that tax
documents her office received from Russia in other cases did not have signatures and seals
either. *Id.* at 99-100; GX 252. Therefore, Gyetvay is simply wrong in continuing to assert
that the absence of signature or seal renders the FTS documents unreliable.

Perhaps the best indication of the reliability of the FTS records is that Gyetvay
himself has previously adopted some of the same figures they report. When providing
Alex Knight with information to prepare his tax returns, Gyetvay informed Knight that
he paid Russian taxes in amounts that match those reported in the FTS documents. *See*
03/22/23 Tr. at 115-121. For example, Gyetvay provided Knight a summary of his wages
for 2006, excerpted here:

> **Mark A.  Gyetvay**
> **Summary – Wages and Taxes Paid in Russia for 2006**
>
> (A.) Wages (in Russian roubles translated into USD at the monthly
> exchange rates)
>
>    1. OAO NOVATEK – wages of RR 12,420,471 (or $463,309) and other
>      compensation of RR 3,500,000 (or $130,391)
>
> (B.) Taxes Paid to the Russian Federation (RF)
>
>    1. OAO NOVATEK – RR 3,026,425 or $114,942

GX 197, at 2. The figure Gyetvay provided of his 2006 Russian tax payments— 3,026,425

Rubles—is *exactly* the same as what the FTS documents report:

| 5. Total amounts of revenue and tax for results of tax period | |
| --- | --- |
| 5.1   Total amount of revenue | |
| 5.2   Taxable amount of revenue | 23280194.58 |
| 5.3   Calculated amount of tax | 23280194.58 |
| 5.4   Amount of tax withheld | 3026425 |
| 5.5   Amount of refund of tax under recalculation of revenues from past years | 3026425 |
| 5.6   Amount set off in event of payment of tax under recalculation of revenues from past years | |
| 5.7   Amount withheld in event of payment of tax under recalculation of revenues from past years | |
| 5.8   Taxpayer tax indebtedness | |
| 5.9   Amount of tax withheld in excess by tax agent | |
| 5.10 Amount of tax transferred for levy to tax agency | |

GX 7, at 4.  For 2008, the figures also exactly match.  And for 2007, the numbers are very close: Gyetvay told Knight he paid RR 4,235,590 in Russian taxes; the FTS documents report RR 4,435,829. 03/22/23 Tr. at 115-121; GX 7, at 6; GX 200, at 3.

The problem for Gyetvay, of course, is that while he gave Knight accurate figures of the Russian taxes he *paid*, he falsely understated the income he *earned* according to the FTS records. Elsewhere, however, Gyetvay adopted income figures that match the FTS documents, specifically, when corresponding with another accounting firm to belatedly file his 2013-2017 tax returns.  For example, here is an excerpt of Gyetvay's handwritten notes to that accounting firm summarizing his monthly compensation in 2013:[14]

---

[14] Produced to the defendant at USPROD-0250394.

2013 - Compensation

| | RR | Exch | USD |
|---|---|---|---|
| 1 RA | 3,887,181 | 30.01 | $ 129,530 |
| 2 | 4,573,154 | 30.56 | 149,645 |
| 3 | 3,264,694 | 31.04 | 105,177 |
| 4 | 2,699,011 | 31.11 | 86,754 |
| 5 | 3,750,871 | 31.63 | 118,586 |
| 6 | 5,608,325 | 32.80 | 170,986 |
| 7 | 4,209,632 | 32.89 | 127,991 |
| 8 | 4,424,212 | 33.24 | 133,099 |
| 9 | 6,523,458 | 32.28 | 202,090 |
| 10 | 7,105,862 | 32.02 | 221,920 |
| 11 | 4,863,355 | 33.14 | 146,752 |
| 12 | 4,230,604 | 32.77 | 129,100 |
| Total | RR 55,140,359 | | $ 1,721,633 |

Profit
Sharing   92,843,096   (April/Aug/Nov)   2,905,937

Misc   1,850,966   32.77   56,484

RR 149,834,421   $ 4,684,054

And here are the corresponding FTS records, with matching numbers:

| Month | Revenue Code | Revenue Amount | Deduction Code | Deduction Amount | Month | Revenue Code | Revenue Amount | Deduction Code | Deduction Amount |
|---|---|---|---|---|---|---|---|---|---|
| 01 | 2000 | 3887180.9 | | | | | | | |
| 02 | 2000 | 4573154 | | | | | | | |
| 03 | 2000 | 3264693.92 | | | | | | | |
| 04 | 2000 | 53973083.95 | | | | | | | |
| 04 | 2012 | 2699010.6 | | | | | | | |
| 05 | 2000 | 3750870.92 | | | | | | | |
| 06 | 2000 | 5608324.93 | | | | | | | |
| 07 | 2000 | 4209631.86 | | | | | | | |
| 08 | 2000 | 20668845.64 | | | | | | | |
| 08 | 2012 | 4424211.75 | | | | | | | |
| 09 | 2000 | 6523457.97 | | | | | | | |
| 10 | 2000 | 7105862.64 | | | | | | | |
| 11 | 2000 | 4863355.08 | | | | | | | |
| 11 | 2012 | 18201165.47 | | | | | | | |
| 12 | 2000 | 4230603.81 | | | | | | | |
| 12 | 2012 | 1850965.98 | | | | | | | |

GX 7, at 23.  The same basically holds true for the figures Gyetvay provided his accountants for 2014-2017.[15]

Notwithstanding the Government's burden of proof, the defendant is free to offer admissible evidence. If there were truly some infirmities in the numbers reported on the FTS records, Gyetvay is uniquely positioned to bring forward proof to demonstrate those infirmities. In particular, he could have offered at trial—or could offer now—his own Russian bank records to show the income Novatek paid him, down to the Ruble.  Or, he could access directly from Novatek the records that reflect his compensation.  His failure to do so speaks volumes. And as the record stands now, Gyetvay's attempts to attack the reliability of the FTS records remains unavailing.

### C.   Gyetvay's Attack on the Call Option Agreement is Meritless

In a contrived argument designed to escape accountability for his fraudulent failure to report over $43 million of income from his exercise of the Call Option Agreement in 2007, Gyetvay continues to argue that the Agreement is a fiction and that the only share-based income he received in 2007-2008 is the $9,350,552 he received in his bank account in late 2007 and early 2008.  This argument fails.

As an initial matter, the existence of the Call Option Agreement was clearly established through GX 210, the second page of which indisputably contains Gyetvay's

---

[15]  The figures contained on the wage summary drafted by Gyetvay eviscerates his argument that the FTS records are unreliable because they reflect "widely variable amounts for Mr. Gyetvay's monthly compensation." Def.'s Obj. to PSR at 9.  The disparate figures make plain that Gyetvay fully understood that he did not receive a standard monthly salary from Novatek.

signature upon exercising the agreement. The tax effect of that agreement was explained by Revenue Agent Ranahan, who showed the various steps of the transaction and how Gyetvay purchased all 120,000 shares of SWGI Growth; sold 55,122 of those shares to generate cash to pay for the 120,000; directed that $9,350,552 be deposited in his Opotiki account at Coutts; and directed that the balance of his shares be placed in the name of his secret offshore company, Felicis. 03/23/23 Tr. at 125-131; GX 246.

Gyetvay's attack on this taxable event is multi-pronged, arguing that he never received the shares; the shares never truly vested; that the shares were not received in connection with services; and that the Government did not prove value.  These argument are easily dispatched.

Gyetvay "received" the shares, after they had vested, because he exercised the power to order their purchase and the disposition of the proceeds, over $9 million of which went to his Opotiki account. Moreover, he became owner of the balance of the shares (64,878) when they were listed, at his direction, in the share registry of SWGI Growth as being owned by his company, Felicis.  GX 216 (showing Felicis as owner of 64,878 shares in 2007).  To the extent that Gyetvay's argument hinges on the premise that receipt of the shares depends on actual receipt in one's own account, that premise is wrong.  The law is clear that share ownership hinges on the ability to transfer the shares and receive the benefits of share ownership. It cannot be persuasively disputed that Gyetvay controlled the transfer and disposition of the shares when he directed that some be sold and others placed in his name. Moreover, it is undisputed that he received dividends based on his

ownership of the shares. Gyetvay's own witness confirmed he received over $600,000 of dividends from those shares in 2008. In sum, Gyetvay received the shares after they validly vested.

Gyetvay's contention that the shares were not given in connection with services is ridiculous. The Call Option Agreement itself recites that the agreement was being entered into as an incentive for "joining the staff" of Novatek. This language plainly indicates that the shares were being given in exchange for agreeing to join the staff of, and perform services for, Novatek, a principal shareholder of which was SWGI Growth (Cayman).

Finally, contrary to Gyetvay's claim, the Government proved the value of the SWGI shares through reference to regulatory filings made by SWGI, which, as Agent Ranahan made clear, indicated that the value of the shares around the time of exercise was $526.86, just twenty cents different from the $526.66 value assigned the shares in the Call Option exercise document. GX 223; 03/23/23 Tr. at 138.

In short, Gyetvay's attempt to fictionalize the Call Option Agreement is without foundation.

## VI.   <u>CONCLUSION</u>

The orderly financial functioning of this country depends largely upon voluntary compliance with the internal revenue laws by all citizens, regardless of wealth or status. That system of voluntary compliance would crumble if businessmen who engage in multi-year tax fraud schemes, through their corporate entities and otherwise, believed they could cheat with impunity or that the most severe sanctions that they would face when

caught were merely the payment of financial penalties and a term of probation or similar slap on the wrist. Moreover, a meaningful term of imprisonment is indispensable in a case like this one, lest the massive fraud perpetrated by the defendant breed skepticism among honest taxpayers and lead them to ask, "Why follow the tax laws if there are no meaningful consequences for flouting them?"

On the facts of this case,  involving a defendant who engaged in a breathtaking tax fraud borne not of necessity but unmitigated greed, a 121-month sentence is entirely appropriate and eminently just. In the parlance of the Guidelines, such a sentence would be sufficient but not greater than necessary to comply with the statutory imperatives of the sentencing statutes.

Respectfully submitted,

DAVID A. HUBBERT
Deputy Assistant Attorney General

STUART M. GOLDBERG
Acting Deputy Assistant Attorney General
U.S. Department of Justice—Tax Division

By:   *Stanley J. Okula, Jr.*

Stanley J. Okula, Jr.
Senior Litigation Counsel
David Zisserson
Assistant Chief
Kevin Schneider
Trial Attorney
202-514-2839/stan.j.okula@usdoj.gov

53

**Certificate of Service**

I certify that on September 13, 2023, I caused a copy of this document to be filed with the Clerk of Court by ECF filing.

*Stanley J. Okula, Jr.*
Senior Litigation Counsel
U.S. Department of Justice, Tax Division