# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# FORT MYERS DIVISION

UNITED STATES OF AMERICA,


v.                                                    CASE NO. 2:21-cr-83-JNE-NPM

MARK A. GYETVAY,

     Defendant.

_____/

## DEFENDANT'S SENTENCING MEMORANDUM
## AND REQUEST FOR VARIANCE AND DOWNWARD DEPARTURE

     Mark A. Gyetvay, by and through counsel, respectfully submits that a sentence below the advisory Guidelines range would be sufficient but not greater than necessary to serve the ends of sentencing set forth at 18 U.S.C. § 3553(a). In support of this recommendation, Mr. Gyetvay submits the following memorandum.

     Mark Gyetvay has strong family and community ties, a history of gainful employment, a long-standing record of generosity and good works, and is the primary caregiver for his twin daughters who are thriving under his loving and watchful care. Given his background and history, his age, and the fact this is a first offense, there is virtually no risk of reoffending. Moreover, given that he had already paid all of the taxes owed to the IRS for the years in question, closed his foreign accounts, and repatriated the funds and securities to the

1

United States all prior to the onset of the criminal investigation, he is clearly distinguished from the types of criminal tax defendants that might expect to receive a sentence approaching the Draconian sentence espoused by the government in this case. The sentence advocated for by the government on these facts, which approaches a life sentence for Mr. Gyetvay, is both procedurally and substantively unreasonable.

## II.    Background

Mark Anthony Gyetvay, age 66, was born in Orange, New Jersey in July of 1957. Mr. Gyetvay was raised in a "lower middle income family" that was "very close knit." (Doc. 288, hereinafter "PSR", ¶ 74). His father, who was a blue-collar laborer, died of a heart attack at the age of 41 when Mr. Gyetvay was 6 years old. Mr. Gyetvay and his five siblings were raised by his mother, who also worked to support the family, and his grandparents, who had emigrated from Italy. (PSR at ¶ 74). He was "very involved" in sports growing up and described athletics as the family's "saving grace" that kept them away from drugs and crime. (PSR at ¶ 75). Mr. Gyetvay remains very close to his mother, age 95, and his siblings. (PSR at ¶¶ 76-77).

The work ethic and character that Mr. Gyetvay gained from his close-knit family and blue-collar upbringing helped him to achieve academic and professional success. He graduated from Arizona State University with an accounting degree in 1981 and embarked on a career in the oil and gas

industry. (PSR at ¶¶ 98, 105, and 106). His lengthy career in that field took him to New York, Texas, South America, and later Moscow where he worked for a U.S. based accounting firm that would eventually become part of PricewaterhouseCoopers LLP ("PwC"). (PSR at ¶¶ 78-80 and 104-106). In 2003 he accepted a position as Chief Financial Officer with Novatek, a natural gas company based in Moscow, Russia. (PSR at ¶ 104). His work with Novatek has led to numerous professional accomplishments and accolades but also involved extensive travel often to regions that suffered from extreme climates and were otherwise inhospitable. (PSR at ¶¶ 105 and 106).

Despite those professional accolades, Mr. Gyetvay is "most proud of his children." (PSR at ¶ 82). Mr. Gyetvay has full-time custody of his twin 13 year-old daughters, Lilia and Mirra, who live with him in Naples, Florida. (PSR at ¶ 81). Mr. Gyetvay's ex-wife previously had primary custody of the girls in Colorado. (PSR at ¶ 81). Although Ms. Gavrilova is a loving and supportive mother of the twins, under her care they were plagued by tardiness and absence from school as Mr. Gyetvay discovered before working out the current custody arrangement. He is now the girls' primary caregiver and Mr. Gyetvay's daughters are thriving under his loving and watchful care.

Both girls are "very athletic" and Mr. Gyetvay relishes attending each and every sporting event and also discussing his daughters' impressive accomplishments with anyone who will listen. (PSR at ¶ 81). Emblematic of

Mr. Gyetvay's work ethic, his daughters are diligent in school and have excelled academically. (PSR at ¶ 81). No doubt fueled in part from having lost his father at such a young age, Mr. Gyetvay has been completely committed to having a positive and influential role in his daughters' upbringing and development. The girls are not only regularly attending school now, but they are excelling. (PSR at ¶ 81).

Mr. Gyetvay stands before the Court having been convicted on four counts, two misdemeanor counts and two felony counts, and having been acquitted on one count of wire fraud. As the Court is aware, the jury did not reach a verdict on ten of the charged counts. Even in the wake of these trial convictions, Mr. Gyetvay is blessed to have the continued support of family, friends, and former colleagues.

### III.   Mark Gyetvay as told by those who know him best

As the many letters from family, friends, and colleagues demonstrate, Mr. Gyetvay is a man of "exceptional character" with a well-earned reputation for honesty and integrity, a palpable devotion to family, and an inherent drive to help others in need. Those who know Mr. Gyetvay best unanimously confirm that any involvement in illegal activity is an aberration and not consistent with his character.

His daughters' heartfelt letter describes Mr. Gyetvay as "our primary parent." (Letter of Lilia and Mirra Gyetvay, **Exhibit 1** at 1). He "encourages

us to study, be active and social, and play various sports as female athletes, and he is with us all the time." (*Id*.). His ex-wife supported the daughters' decision to live with Mr. Gyetvay and has seen them flourish under his care. (Letter of Nadezda Gavrilova, **Exhibit 1** at 5). The girls' volleyball coach describes Mr. Gyetvay as "one of the most empathetic, loving, and selfless fathers out there." (Letter of Jessicah MacIntyre-Bullock, **Exhibit 1** at 2). Especially pertinent about Ms. MacIntyre-Bullock's letter is her description of Mr. Gyetvay's post-arrest behavior. She outlines how Mr. Gyetvay "held composure to stay strong for his daughters" and continues to show "unfathomable" strength and concern for his daughters. (*Id*.). Other friends and parents make similar observations. (*See, e.g.*, Letter of Teresa D. Kontos, **Exhibit 1** at 4) ("[h]e places his daughters above all and his love for them is great."); (Letter of Laura Simmelink, **Exhibit 1** at 3) ("Mark is an active, engaged parent who gives quite a bit of his time to supporting the girls' school and sports in which they participate.").

The letters addressing Mr. Gyetvay's devotion to his daughters reveal his long-standing character traits. These positive attributes extend beyond his role as a father. Mr. Gyetvay's sister Sarah discusses her "unique bond" with him that has "grown stronger over the years." (Letter of Sarah Gyetvay Hyatt, **Exhibit 2** at 1). Sarah describes her brother Mark as "an exceptional, brother, and son." (*Id*.). She compares Mr. Gyetvay's dedication and love to that of their

mother—the ultimate compliment she could give. Daniel Scagliozzi, who has known Mr. Gyetvay since they were both eight years old in Orange, New Jersey, trusts him "unequivocally" and describes him as "of the highest caliber of character; truthful, honest, respectful, and extremely generous to those friends and family members in need." (**Exhibit 2** at 6). Rosario Costanzo has also known Mr. Gyetvay since they were classmates in New Jersey and describes him as "like the big brother I didn't have" and more recently as his "Guardian Angel" who always supports him "mentally, physically and financially." (**Exhibit 2** at 7).

Mr. Gyetvay's willingness to help those in need is also a long-standing character trait. He provided emotional and financial support to his friends (Daria Porsolova, Ogla Kedik, and Nadzeya Hurynovich) and family (Frank Gyetvay) when they were in need. (*See* **Exhibit 3,** Letter of Daria Prosolova (Mr. Gyetvay paid for her college tuition and "continuously demonstrated his commitment to my academic and personal successes, guiding me through numerous life obstacles"), Letter of Olga Kedik ("When my husband and I were struggling financially, after moving to the USA and having to start from ground zero, Mark came to the rescue without ever being asked to do it. He selflessly contributed to my college tuition, which enabled me to graduate and pursue a very successful career in advertising."), Letter of Frank Gyetvay (when Mr. Gyetvay's older brother was diagnosed with Multiple Sclerosis

"Mark immediately stepped in and told me not to worry, that he would help me out, and everything will be ok. Mark had ramps installed in my house, paid for my medical insurance until the time that SS Disability kicked in, bought me a car to accommodate my needs. All this plus more through his compassion, kindness and generosity."), and Letter of Nadzeya Hurynovich (after meeting in an airport, Mr. Gyetvay helped Ms. Hurynovich—an immigrant from Belarus—with job advice and friendship)).

Mr. Gyetvay's former colleagues echo the same refrain as friends and family: that he possesses the utmost integrity and is a person who consistently goes above and beyond what is expected of an ordinary colleague. Perhaps most notably, Douglas Miller, who testified as a government witness at trial, submitted a detailed letter supporting Mr. Gyetvay. (Letter of Douglas R. Miller, **Exhibit 4** at 1). Mr. Miller worked with Mr. Gyetvay at PwC in Moscow and recalled an occasion early in his career where he approached Mr. Gyetvay for assistance with a difficult issue. *(Id.).* Rather than only offering suggestions and guidance, Mr. Gyetvay flew to London and "took on a major role with almost no notice just to be helpful." (*Id*.). Mr. Miller remained in touch with Mr. Gyetvay and described in positive terms Mr. Gyetvay's impact and leadership at Novatek. (*Id*. at 1-2). Miller calls Gyetvay "a good person, a great and loving father, an amazing colleague and professional." (*Id*. at 2).

Mr. Miller's view is shared by many other former colleagues of Mr. Gyetvay who describe him as an "excellent mentor" with "an outstanding reputation of reliability, trustworthiness, and professionalism." (Letter of Alexander Nazarov, **Exhibit 4** at 3-4); *see also* Letter of Jason Ferrara (**Exhibit 4** at 5) ("a consistent pillar of support and guidance, always ready to listen, advise, and help me navigate personal and professional obstacles"); Letter of Thomas Kolibas (**Exhibit 4** at 6) ("Mark is a very generous and giving person…").

Mr. Gyetvay respectfully asks the Court to review the letters of support filed as exhibits to this memorandum and provides the following Index for the Court's reference:

**Exhibit 1**
Letter of Lilia and Mirra Gyetvay
Letter of Coach Jessicah MacIntyre-Bullock
Letter of Laura Simmelink
Letter of Teresa Kontos
Letter of Chuck Bullock
Letter of Scott Thomas
Letter of Nadezda Gavrilova

**Exhibit 2**
Letter of Sarah Gyetvay Hyatt
Letter of Michele Gyetvay Quinn
Letter of Karen Gyetvay Lang
Letter Daniel Scagliozzi
Letter of Rosario Costanzo
Letter of Andrew Luce

**Exhibit 3**
Letter of Daria Prosolova

Letter of Olga Kedik
Letter of Frank Gyetvay
Letter of Nadzeya Hurynovich

**Exhibit 4**
Letter of Douglas R. Miller
Letter of Alexander Nazarov
Letter of Jason Ferrera
Letter of Thomas Kolibas
Letter of Jeffrey Zamora
Letter of Ray Hornsby

## IV.    The IRS Streamlined Procedures Amnesty Program

Beginning in 2009, the Internal Revenue Service (IRS) began offering amnesty programs for U.S. taxpayers with undisclosed Swiss bank accounts. The first program, the Offshore Voluntary Disclosure Program (OVDP), allowed taxpayers to file income tax returns reporting the income from the Swiss/foreign bank accounts and delinquent Foreign Bank Account Reports (FBARs) in exchange for reduced civil penalties and to avoid potential criminal investigation/prosecution. In 2014, the IRS announced expanded amnesty programs—"Streamlined Procedures"—designed to bring in additional U.S. taxpayers into compliance with their foreign account reporting. Referrals for criminal investigation/prosecution under the Streamlined Procedures were within the sole discretion of the Civil division of the IRS.[1] *See United States v.*

---

[1] *See* IR-2014-73: IRS Makes Changes to Offshore Programs; Revisions Ease Burden and Help More Taxpayers Come into Compliance (June 18, 2014) *available at* https://www.irs.gov/pub/irs-news/IR-14-073.pdf, last visited Mar. 9, 2023.

*Tenzer,* 127 F.3d 222, 227 (2d Cir. 1997) ("The IRS must afford a taxpayer who has acted in reliance upon the voluntary disclosure policy a reasonable opportunity to satisfy all of the conditions of that policy[.]")

## 1. The Swiss Bank Program

In 2013, the Department of Justice Tax Division (the "Tax Division") and the Swiss government announced the Swiss Bank Program ("SBP"), which provided a path for Swiss banks that had assisted U.S. taxpayers in hiding their Swiss bank accounts. If accepted, a Swiss bank was required to cooperate with the Tax Division, pay a penalty, and enter into an agreement wherein the Tax Division agreed not to investigate/prosecute the Swiss bank.

## 2. Coutts and the Tax Division SBP

Coutts & Co. ("Coutts"), a Swiss bank, participated in the Tax Division SBP. In December 2015, Coutts entered into a non-prosecution agreement with the Tax Division (the "Coutts NPA"), admitted to holding 1,337 accounts for U.S. customers, paid a penalty of $78,484,000, and agreed to cooperate with the Tax Division's efforts to investigate and prosecute U.S. taxpayers with unreported foreign accounts. Four years later Coutts admitted that it lied during negotiations related to the Coutts NPA. Coutts agreed to an addendum to the Coutts NPA and paid an additional penalty of $27,900,000. Two other Swiss banks, Hyposwiss Private Bank Genève S.A. ("Hyposwiss") and Falcon

Private Bank AG ("Falcon") entered into non-prosecution agreements to resolve each bank's criminal misconduct.

### 3. Mr. Gyetvay's Swiss Bank Accounts and Participation in the Streamlined Program

Mr. Gyetvay opened bank accounts at Coutts during a period when he worked and resided in Russia. Mr. Gyetvay later moved the Coutts accounts to Hyposwiss, which was then acquired by Falcon. In 2014, Mr. Gyetvay retained Matthew Ledvina (a U.S.-licensed lawyer and former partner at a prestigious international law firm) to advise him with respect to disclosing his Swiss accounts to the IRS. Shortly thereafter, Mr. Gyetvay authorized Coutts to provide the Tax Division with information related to his accounts, so that Coutts could mitigate its own penalties under the SBP. (*See* GX065L). In 2015, Mr. Ledvina advised Mr. Gyetvay to enter the Streamlined Procedures by filing tax returns for 2011, 2012, and 2013, paying $4,649,609 in tax for those years, and filing Foreign Bank Account Reports reporting the Swiss accounts for 2008 through 2013. (*See* DX151; GX050 at 3). In December 2015, Mr. Gyetvay's attorneys submitted a letter to Coutts allowing the bank to notify the Tax Division that Mr. Gyetvay had entered the Streamlined Procedures amnesty program reporting his Swiss accounts and related income. (*See* DX217A; *see also* DX217).

The lawyers and accountants who prepared Mr. Gyetvay's Streamlined Procedures submission were aware that Mr. Gyetvay had Swiss accounts in 2006, 2007, and 2008. The lawyers and accountants did not recommend that Mr. Gyetvay amend tax returns for 2006, 2007, or 2008. Rather, those professionals advised him initially to file only returns for 2011 through 2013 and later to file the 2009 and 2010 returns. Mr. Gyetvay relied on those lawyers to identify the correct amnesty program for him to disclose his foreign accounts. Based on their review of the facts and the law, those lawyers advised Mr. Gyetvay to enter into the Streamlined program and the government introduced no evidence to the contrary. (*See* DX152) (Mr. Ledvina concluding that, "[b]ased on the legal standards for willfulness" and the facts known of Mr. Gyetvay's case, "Mr. Gyetvay has been negligent, but neither willful nor reckless in failing to timely meet his tax obligations.").

This is not a case where Mr. Gyetvay was caught by the government. Rather, this is a case where Mr. Gyetvay relied on competent professionals to clean up his foreign account issues and regularize his filings with the IRS. Mr. Gyetvay's intent to come clean to the IRS in 2014 is clear. In 2014—prior to Mr. Gyetvay entering the amnesty program—Mr. Gyetvay's lawyers told Coutts that he was entering the IRS Streamlined Procedures program and that Coutts, which was under criminal investigation at the time, was authorized to disclose that letter and related information to DOJ and IRS. (*See* GX065L).

12

Moreover, when Mr. Gyetvay filed his Streamlined Procedures filings in 2015, he filed an accurate 2008 FBAR that advised DOJ and IRS that he had foreign accounts that were not listed on filed 2008 tax return. (*See* GX056; GX016).

A few months after filing his 2008 through 2013 FBARs and 2011 through 2013 tax returns under the amnesty program, Anaford advised Coutts that Mr. Gyetvay had entered the Streamlined program, and that "Anaford has prepared the required US federal tax returns and reporting forms. The Client [Mr. Gyetvay] has followed all Streamlined procedures, including the execution of IRS Form 14653: Certification by US Person Residing Outside of the US." (*See* DX217A at p. 1). To prove that Mr. Gyetvay had made the Streamlined disclosure, Anaford attached a copy of the August 10, 2015 cover letter accompanying the Streamlined filing which identified Mr. Gyetvay by name and social security number. (*See* DX217A at p. 4). On December 18, 2015, Coutts' lawyers sent the December 16, 2015 letter from Anaford to the Department of Justice and specifically tied Mr. Gyetvay to the Opotiki and Felicis accounts. (*See* DX217). Thus, it is clear from the record that Mr. Gyetvay came clean to both the IRS and Department of Justice Tax Division in 2015 and following the direction of attorneys at Anaford who were experienced in navigating the IRS amnesty programs. While Anaford made mistakes with respect to the amnesty program and filings, the evidence clearly reflects that Mr. Gyetvay intended to come clean, entered the program that

Anaford advised him to enter, filed the returns that Anaford advised him to file, and paid the tax, interest, and penalties that Anaford told him he owed.

Consistent with his 2014 decision to come clean to the IRS, Mr. Gyetvay's pre-trial conduct shows that when the case was filed Mr. Gyetvay had already accepted responsibility years earlier. Mr. Gyetvay filed delinquent returns, and paid all assessed taxes, tax penalties, and interest prior to the commencement of the government's investigation. In addition, he has continued to file returns, file FBARs, and has paid more than the required amount of tax such that his IRS account shows he is owed a refund that more than covers the alleged tax loss. Furthermore, as permitted by the FinCEN regulations, Mr. Gyetvay amended the 2014 and 2015 FBARs prior to the commencement of the government's investigation. (*See* Mar. 21, 2023 Trans. at 274:12-19) (FinCEN attorney Patrick Reid testifying that Mr. Gyetvay amended the 2014 FBAR pursuant to FinCEN published guidance related to correcting a previously filed FBAR); *see also* Mar. 21, 2023 Trans. at 275:10-15 (Mr. Reid testifying that Mr. Gyetvay amended the 2014 prior to the March 2018 onset of the criminal investigation against him).

At trial, Mr. Gyetvay did not contest that the 2006, 2007, and 2008 returns failed to include interest income from the Coutts account. And Mr. Gyetvay proved that those returns also failed to include Novatek dividend income that the revenue agent ignored because she did not evaluate all of the

14

documents relating to the Novatek transaction. (*See* PSR at p. 94). While Mr. Gyetvay challenged the government's erroneous theory of taxation, Mr. Gyetvay's main defense prior to trial and during the trial, as evidenced by the Motions to Dismiss (Dkts. 33, 122, and 249) and Motions for Judgment of Acquittal (Dkts. 256 and 275), was that the government could not prove that the case was filed within the statute of limitations and that the combination of two tolling statutes, with no case law supporting this use, violated his due process rights. Furthermore, Mr. Gyetvay moved for judgment of acquittal on Count 13 because he did file an FBAR for the year 2014, and the government improperly charged him with failing to file an FBAR (Dkts. 256 and 275).

With respect to the counts of conviction, Mr. Gyetvay did not argue that he was not required to file tax returns for the tax years 2013 and 2014 (Counts 10 and 11). Instead, the evidence he presented at trial showed that he filed the returns and paid all of the tax and interest due for these years, prior to the government initiating the investigation—a fact which the government never contested. Similarly, Mr. Gyetvay did not deny that he omitted the Opotiki account from the 2014 FBAR that was filed on June 25, 2015, since in fact, he amended the 2014 FBAR to add this account, again prior to the government initiating the investigation of this case. Accordingly, Mr. Gyetvay's conduct shows that he came forward to correct his mistakes and bring himself into compliance with the U.S. tax laws.

Prior to the government's investigation, for tax years 2009 through 2015, Mr. Gyetvay paid over $22.3 million in tax, penalties, and interest:

| 2009 | | | Exhibit |
|---|---|---|---|
| Total Tax Per Return | | 5,551,117 | GX019 |
| Interest Per IRS Transcript | | 1,521,887 | GX018 |
| Penalties Per IRS Transcript | | 2,312,303 | GX018 |
| **2010** | | | |
| Total Tax Per Return | | 1,068,372 | GX021 |
| Interest Per IRS Transcript | | 67,097 | GX020 |
| Penalties Per IRS Transcript | | 129,532 | GX020 |
| **2011** | | | |
| Total Tax Per Return | | 3,750,766 | GX022 |
| Interest Per IRS Transcript | | - | GX024 |
| Penalties Per IRS Transcript | | - | GX024 |
| **2012** | | | |
| Total Tax Per Return | | 1,758,822 | GX025 |
| Interest Per IRS Transcript | | 90,454 | GX026 |
| Penalties Per IRS Transcript | | - | GX026 |
| **2013** | | | |
| Total Tax Per Return | | 1,443,136 | GX027 |
| Interest Per IRS Transcript | | 22,511 | GX028 |
| Penalties Per IRS Transcript | | - | GX028 |
| **2014** | | | |
| Total Tax Per Return | | 2,793,091 | GX029 |
| Interest Per IRS Transcript | | 99,125 | GX030 |
| Penalties Per IRS Transcript | | 15,235 | GX030 |
| **2015** | | | |
| Total Tax Per Return | | 1,704,636 | DX148 |
| Interest Per IRS Transcript | | 23,252 | DX179 |
| Penalties Per IRS Transcript | | 10,746 | DX179 |
| **Grand Total** | $ | 22,362,081 | |

Moreover, IRS transcripts reflect that Mr. Gyetvay has a credit balance for 2014 and 2015 totaling over $1.2 million. *See* GX030 (2014 IRS Transcript); DX179 (2015 IRS Transcript).

## IV.    Unresolved PSR Objections

Mr. Gyetvay asserts that the government cannot meet its burden of proof, under any standard, for the disputed PSR provisions. The burden of proving the applicability of a Guideline provision in the face of an objection lies with the government. *United States v. Washington*, 714 F.3d 1358, 1361 (11th Cir. 2013). Mr. Gyetvay addressed the specific PSR objections that remain unresolved in his Notice of Unresolved Objections to the Presentence Report and Memorandum in Support, Doc. 292.

As detailed therein, if the Court sustains Mr. Gyetvay's objections, his advisory Guideline range would be 0-6 months of imprisonment. In the event the Court overrules the objections and applies the advisory Guideline range set forth in the PSR, Mr. Gyetvay respectfully moves the Court for a substantial downward variance and departure.

## V.    Request for Variance under Title 18, United States Code, Section 3553(a) and for Downward Departure

As the Court is aware, the Guidelines are no longer mandatory and may not be presumed reasonable. *See United States v. Nelson*, 555 U.S. 350 (2009). District courts must consider the Guidelines but should "tailor the sentence in light of other statutory concerns, as well." *Kimbrough v. United States,* 552 U.S. 85, 101 (2007). In so doing, the court "may not presume that the Guidelines range is reasonable," and "must make an individualized

assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 50 (2007) (citing *Rita v. United States,* 551 U.S. 338, 351 (2007)).

Indeed, there are ". . . many instances where the Guideline range will not yield a reasonable sentence. . ." *United States v. Hunt*, 459 F.3d 1180, 1184 (11th Cir. 2006). This case is such an instance. A consideration of the factors addressed in Section 3553(a) supports a sentence below the advisory Guideline range recommended in the PSR.

### A.    Sentence must be sufficient, but not greater than necessary under Section 3553(a)

Section 3553(a) makes clear that the appropriate sentence is one that is "sufficient, but not greater than necessary" to accomplish the objectives of the sentencing statutes. Towards that end, the Supreme Court's jurisprudence directs "the sentencing judge [to] consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *Gall*, 552 U.S. at 52 (quoting *Koon v. United States,* 518 U.S. 81, 113 (1996)). Mr. Gyetvay submits that a sentence within the advisory Guidelines range proposed by the government would be inconsistent with the ends of sentencing. The Court is fully able to promote respect for the law, protect the public, and afford adequate deterrence by imposing a sentence well below the advisory Guidelines range in this case.

The offenses of conviction in this case are serious offenses, even though the only two tax convictions are misdemeanors for failure to file tax returns. That said, a review of the nature and characteristics of the defendant, the circumstances surrounding the offenses, the types of sentences available to the Court, and the need to avoid unwarranted sentencing disparities strongly suggests that a substantial downward variance is appropriate. The advisory Guideline range overstates the severity of the offenses of conviction to the extent it is based on exorbitant civil penalties not assessed by IRS at the time the offenses were committed or based on the "value of funds" which Mr. Gyetvay lawfully earned. As detailed in Mr. Gyetvay's Memorandum in support of PSR objections, there is no actual restitution due to IRS for income taxes alleged to have been evaded in the indictment.

### B. Nature and characteristics of Mr. Gyetvay support significant downward variance and departure

Mr. Gyetvay's long-standing character traits and supportive network of friends and family and history of employment demonstrate a low risk of re-offending and obviate the need for lengthy incarceration. Furthermore, Mr. Gyetvay's support network has and will continue to allow him to abide by any special conditions imposed by the Court. For the two years since his indictment, Mr. Gyetvay has diligently complied with all conditions of pretrial release.

Friends, family, and former colleagues also catalog Mr. Gyetvay's history of good and charitable deeds. The defendant's history of good works is one ground indicating a downward variance is called for here. Although letter writers used the term "exceptional" to describe Mr. Gyetvay's generosity, appellate courts have made it clear that "good works must be sufficient to justify the variant sentence, but they need not necessarily be exceptional." *United States v. Warner*, 792 F.3d 847, 856 (7th Cir. 2015) (downward variance to probation in offshore tax evasion case was reasonable where "generosity went back many years, that his motivations were sincere, and that he was not trying to game the system or create a record to use at sentencing.").

Mr. Gyetvay has strong ties to the community, having lived in the Naples, Florida area since approximately 2010. He has a strong bond with his family, including his mother, children, and his ex-wife. These family ties also reduce the likelihood that Mr. Gyetvay will run afoul of the law following sentencing. In a recent campaign to improve the reentry success of prisoners upon release, the Department of Justice has emphasized that: "[r]esearch shows that close and positive family relationships reduce recidivism, improve an individual's likelihood of finding and keeping a job after leaving prison. . ."[2]

---

[2] Available at https://www.justice.gov/archives/reentry/file/844356/download, last visited November 14, 2022.

In light of Mr. Gyetvay's age, there is virtually no risk of recidivism in this case given the harsh lesson Mr. Gyetvay has already learned. *See, e.g., United States v. Smith*, 275 F. App'x 184, 187 (4th Cir. 2008) (affirming 54 months downward variance in part because of low risk of recidivism). Statistical data from a study commissioned by the United States Sentencing Commission shows that "[r]ecidivism rates decline relatively consistently as age increases." *See* U.S.S.C., *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 12 .[3] A U.S.S.C. study indicates that a defendant over the age of 50 in criminal history category I has a 6.2 percent likelihood of recidivating. (*Id.*).[4]

Recent scholarship also indicates that the length of a given defendant's sentence has little specific or general deterrent effect. *See e.g.*, Nagin, Daniel S., "Deterrence in the Twenty-First Century," in Crime and Justice in America: 1975-2025, ed. M. Tonry, Chicago, Ill., University of Chicago Press, 2013: 199-264. The National Institute of Justice ("NIJ")—"the research, development and

---

[3]     Available at:   https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf, last visited September 11, 2023.

[4] A related study of recidivism rates by "true" first offenders (*i.e.*, those with no prior involvement with the criminal justice system) showed that such first offenders had a "primary" recidivism rate (including supervised release/probation violations, re-arrest, and re-convicted) of 6.8 percent, and a re-conviction rate (involving an actual conviction for a subsequent offense) of only 2.5 percent. U.S.S.C., *Recidivism and the "First Offender," available at*: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf).

evaluation agency of the U.S. Department of Justice"—agrees with Nagin's conclusions on deterrence finding that the certainty of being caught is a vastly more effective deterrent than imprisonment and that prison sentences are ineffective at deterring crime (and may be counterproductive).[5]

In this case, a lengthy term of imprisonment risks jeopardizing the goal of general deterrence. Seeing someone punished so severely who engaged counsel to enter into an IRS amnesty program advertised as fresh start for noncompliant taxpayers is likely to undermine participation in future IRS amnesty programs. A severe punishment would be more detrimental in this case where Mr. Gyetvay filed returns, filed amended FBARs, and moved his assets to the United States all before the government began its investigation.

### C.   Need to avoid unwarranted sentencing disparities also supports significant variance and departure

Tax offenders have increasingly received sentences well below the advisory Guidelines range. A review of sentencing outcomes for all defendants sentenced under § 2T1.1 reflects that the average tax sentence has decreased from 17 months in fiscal year 2017 to 14 months in fiscal year 2021.[6] Moreover, defendants sentenced under § 2T1.1 nationwide in 2021 who received a

---

[5] Found at https://nij.ojp.gov/topics/articles/five-things-about-deterrence, last visited September 17, 2023.

[6] *See* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Tax_Fraud_FY21.pdf, last visited September 17, 2023.

downward variance saw an average sentence reduction of 65%.[7] In 2021, 41.8% of *all* defendants sentenced in the Middle District of Florida received downward variances.[8]

Nationwide, Guidelines sentences have rarely been imposed on in cases—like this one—that involve **legal** source income and the use of offshore bank accounts. Sentences imposed in other offshore tax cases are instructive and should be considered by the Court. Indeed, while defendants have been punished, variances in tax fraud cases involving the use of foreign accounts have been the rule—not the exception. Many of the cases highlighted below involve defendants who did not enter IRS amnesty programs, did not file tax returns or FBARs, and did not pay outstanding tax, interest, and tax penalties prior to being investigated by the IRS and Department of Justice.

- Ty Warner was sentenced to 2 years' probation. Mr. Warner was prosecuted for an undisclosed offshore bank account that held a high balance of over $100,000,000 which resulted in a tax loss of over $5.5 million. (*United States v. Warner*, Case No. 13-CR-731 (CPK) (N.D. Ill. Jan. 14, 2014)).

- Dan Horsky was sentenced to seven months' imprisonment followed by a period of supervised release with special conditions. Mr. Horsky was a former business professor at the University of Rochester who was convicted of hiding over $200 million in offshore accounts resulting in an

---

[7] *See* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Tax_Fraud_FY21.pdf, last visited September 17, 2023.

[8] U.S. Sentencing Commission, United States Sentencing Commission Quarterly Data Report, Fiscal Year 2021 at p. 16.

approximate tax loss of $18 million. (*United States v. Horsky*, Case No. 16-CR-224 (E.D. Va. Feb. 10, 2017)).

- Mary Estelle Curran was sentenced to five (5) seconds of probation. Ms. Curran owned an undisclosed $47 million Swiss bank account which resulted in a $21 million FBAR penalty. (*United States v. Curran*, Case No. 12-CR-80206 (KLR) (S.D. Fl. Apr. 25, 2013)).

- Igor Olenicoff was sentenced to two years' probation. Mr. Olenicoff, a businessman and investor, had undisclosed offshore bank accounts holding more than $200 million and owed $52 million in back taxes, interest, and penalties. (*United States v. Olenicoff*, Case No. 07-CR-227 (CJC) (C.D. Cal. Apr. 16, 2008)).

- Hyung Kwon Kim was sentenced to six months' imprisonment. Mr. Kim failed to report $28 million in income hidden in a Swiss bank account, used coded messages to communicate with Swiss bankers, and ultimately repatriated his funds by conspiring with a Swiss jeweler to ship jewelry to the United States in an effort to disguise the transfer. (*United States v. Kim*, Case No. 17-CR-248 (E.D. Va. Jan. 25, 2018).

- Markus Hager was sentenced to 6 months' imprisonment. Mr. Hager maintained offshore accounts in multiple countries held by a sham foreign entity, used those accounts to evade over $650,000 in U.S. taxes, and established new offshore accounts even after he became aware that he was under federal investigation. (*United States v. Hager*, Case No. 16-CR-447 (PKC) (E.D.N.Y. May 31, 2017)).

- Albert Kershi Cambata was sentenced to one year of probation and a $15,000 fine. Mr. Cambata did not report interest income from Swiss accounts despite receiving a transfer of $12 million from a Belizean company which was deposited into an undisclosed account at a Swiss bank in the name of Hong Kong Corporate entity. (*United States v. Cambata*, Case No. 15-CR-362 (E.D. Va. May 3, 2016)).

- Ashvin Desai was sentenced to 6 months' imprisonment and 6 months' home detention despite a Guidelines range of 78-96 months of incarceration. Mr. Desai was convicted at trial of hiding over $8 million in an Indian bank account and failing to report more than $1.2 million of interest income. (*United States v. Desai*, Case No. 11-CR-846 (EJD) (N.D. Cal. July 11, 2014)).

- Jacques Wajsfelner was sentenced to three months home detention. Mr. Wajsfelner worked in real estate and advertising, held a Swiss bank account valued at over $5 million and owed more than $400,000 in back taxes, interest, and penalties. (*United States v. Wajsfelner*, Case No. 12-CR-641 (NRB) (S.D.N.Y. Mar. 8, 2013)).

- Josephine Bhasin was sentenced to 2 years' probation, the first 3 months to be served in home confinement, and 150 hours of community service. Ms. Bhasin had an account at HSBC in India that held a high balance of $8.3 million and filed a false FBAR after being contacted by the DOJ. (*United States v. Bhasin*, Case No. 11-CR-268 (ADS) (E.D.N.Y. Mar. 8, 2013)).

- Arvind Ahuja was sentenced to 3 years' probation, 3 months home detention, a $350,000 fine, and 450 hours community service despite a Guidelines range of 41-51 months of incarceration. Mr. Ahuja was convicted in jury trial of willfully filing a false return and willfully failing to file an FBAR due to a failure to disclose more than $8.5 million held in bank accounts at HSBC India. (*United States v. Ahuja*, Case No. 11-CR-135 (CNC) (E.D. Wisc. Feb. 6, 2013)).

- Lothar Hoess was sentenced to 3 years' probation despite a Guidelines range of 30-37 months of incarceration. Mr. Hoess owned a company that sold office supplies and equipment, and had a tax loss of between $400,000 and $1,000,000. (*United States v. Hoess*, Case No. 11-CR-154 (SM) (D.N.H. Mar. 30, 2012)).

- Kenneth Heller was sentenced to 6 weeks' imprisonment despite a Guidelines' range of 30-37 months of incarceration.

Mr. Heller was a disbarred attorney who failed to report a $25 million account in Switzerland. (*United States v. Heller*, Case No. 10-CR-388 (PKC) (S.D.N.Y. Jan. 23, 2012)).

- Michael Reiss was sentenced to 3 years' probation, the first 8 months to be served in a community confinement center, and 30 hours of community service a week for 3 years despite facing a Guidelines' range of 30-37 months of incarceration. Mr. Reiss moved his offshore account to various institutions and countries, failed to participate in the IRS' offshore voluntary disclosure program, and filed false FBARs. (*United States v. Reiss*, Case No. 11-CR-668 (RMB) (S.D.N.Y. Jan. 1, 2011)).

- Ernest Vogliano, was sentenced to 2 years' probation. Mr. Vogliano opened UBS accounts in the names of Liechtenstein and Hong Kong shell corporations, and actively used those accounts funds and transferred asserts after learning of the government's criminal investigation. (*United States v. Vogliano*, Case No. 10-CR-327 (TPG) (S.D.N.Y. Apr. 26, 2011)).

- Jules Robbins was sentenced to 12 months' probation given his "otherwise unblemished life". Mr. Robbins created a sham Hong Kong corporation to be listed as the nominal holder of his UBS accounts that held nearly $42 million. (*United States v. Robbins*, Case No. 10-CR-333 (RJH) (S.D.N.Y. Oct. 8, 2010)).

- Paul Zabczuk was sentenced to 3 years' probation, 12 months' home detention, and community service. Mr. Zabczuk instructed clients to make payments to him through undisclosed accounts in Switzerland and the Bahamas. (*United States v. Zabczuk*, Case No. 10-CR-60112 (WPD) (S.D. Fl. July 27, 2010)).

- John McCarthy was sentenced to 3 years' probation with 6 months of home detention and 300 hours of community service. Mr. McCarthy transferred over $1,000,000 to an unreported Swiss bank account and communicated with bank representatives to orchestrate various offshore

transactions. (Case No. 09-CR-784 (VBF) (C.D. Cal. Mar. 25, 2010)).

- Juergen Homann was sentenced to 5 years' probation and community service. Mr. Homman failed to disclose a Swiss account holding approximately $5 million. (*United States v. Homman*, Case No. 09-CR-724 (SRC) (D.N.J. Jan. 6, 2010)).

- Steven Michael Rubinstein was sentenced to 3 years' probation with 12 months of home detention. Mr. Rubinstein hid approximately $7 million in unreported Swiss accounts that he used to invest in real estate (Case No. 09-CR-60166 (MGC) (S.D. Fl. Oct. 28, 2009)).

- Andrew B. Silva was sentenced to two years' probation with special conditions of four months' home detention and 100 hours of community service. Mr. Silva repatriated funds from his unreported offshore account into the United States by mailing himself 26 packages of currency and carrying another two packages into the United States. In addition, Mr. Silva structured the repatriation in amounts under $10,000 to avoid detection. (*United States v. Silva*, Case No. 10-CR-00044 (E.D. Va. June 11, 2010)).

Even if there were not numerous other factors warranting a sentence substantially below the Guidelines in this case, sentencing Mr. Gyetvay to prison for many years would create an undeniable and unwarranted disparity in the sentencing treatment of other similarly situated defendants in offshore tax fraud and FBAR cases. *See* 18 U.S.C. § 3553(a)(6). This factor alone weighs heavily in favor of a sentence that does not include a substantial term of imprisonment.

### D.   Consideration of the types of sentences available supports significant variance and departure

The Court has the authority and discretion to impose a wide range of alternatives to the term of incarceration contemplated by the Guidelines. *See* 18 U.S.C. §§ 3553(a)(3) and 3561(a)(1). No statute requires the Court to sentence Mr. Gyetvay to prison for these violations. The four counts of conviction each permit, by statute, the Court to sentence Gyetvay to a fine only, a term of imprisonment only, or both.

Mr. Gyetvay is eligible for probation under 18 U.S.C. § 3561. In fact, § 3553(a)(3) specifically directs the judge to consider sentences *other than* imprisonment and the severity of a probationary sentence should not be underestimated. As the Supreme Court stated in *Gall v. United States*:

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. *See United States v. Knights*, 534 U.S. 112, 119 (2001) ('Inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled.') (*quoting Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987)). Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excess drinking. U.S.S.G. § 5B1.3. Most probationers are also subject to individual 'special conditions' imposed by the court.

28

552 U.S. 38, 48 (2007) (footnote omitted).

Recent cases in this district reflect the same national trend towards significant downward variances in criminal tax cases. Recent sentencings in this district have resulted in probationary sentences or substantial variances where defendants have already paid restitution to the IRS. *E.g.*, *United States v. Clyburn*, MD Fla. Case No. 8:22-cr-00142-MSS-JSS, Doc. 25 (60 months' probation imposed on criminal history category II defendant in a tax fraud conspiracy case); *United States v. Lawrence et al.*, MD Fla. Case No. 8:21-cr-00036-TPB-AEP, Docs. 47, 48 (60 months' probation imposed on husband and wife in payroll tax fraud); *United States v. Comparetto*, MD Fla. Case No. 8:19-cr-00483-TPB-AAS, Doc. 27 (60 months' probation imposed on attorney who failed to tax returns for four years); *United States v. Brickner*, MD Fla. Case No. 8:21-cr-405-CEH-MRM, Doc. 44 (one year and a day sentence imposed on criminal history category II defendant in tax fraud case).

Loss, especially intended loss, is not always an appropriate proxy for the seriousness of the offense, as even the guidelines themselves concede. (*See* USSG § 2B1.1, cmt. n.19(C) (noting a downward departure may be warranted in cases where the guideline sentence "substantially overstates the seriousness of the offense")). Since the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), "virtually every judge faced with a top-level corporate fraud defendant in a very large fraud has concluded that sentences called for

by the Guidelines were too high. This near unanimity suggests that the judiciary sees a consistent disjunction between the sentences prescribed by the Guidelines [in economic offense cases] and the fundamental requirement of Section 3553(a) that judges impose sentences 'sufficient, but not greater than necessary' to comply with its objectives." *See* Frank O. Bowman, III, *Sentencing High-Loss Corporate Insider Frauds After Booker*, 20 Fed. Sent'g Rep. 167, 169 (Feb. 2008).

As Judge Underhill noted in a concurring opinion in *United States v. Corsey*, "the loss guideline is fundamentally flawed, and those flaws are magnified where, as here, the entire loss amount consists of intended loss." 733, F.3d 366, 377 (Underhill, J. concurring). Judge Underhill further noted that the Section 3553(a) factors should be more heavily weighted in cases where the Guidelines range is unreasonable:

> When the Guidelines range zooms off the sentencing table, sentencing judges are discouraged from undertaking close examination of the circumstances of the offense and the background and characteristics of the offender. That certainly happened here. But the low marginal utility of the guideline in this very high intended loss case should have prompted greater, not lesser, reliance on the section 3553(a) factors other than the Guidelines. As one District Court applying the loss guideline put it, "Where the Sentencing Guidelines provide reasonable guidance, they are of considerable help to any judge in fashioning a sentence that is fair, just, and reasonable. But where, as here, the calculations under the guidelines have so run amok that they are patently absurd on their face, a

> Court is forced to place greater reliance on the more general considerations set forth in section 3553(a), as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences." *United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006), *aff'd mem.*, 301 F. App'x 93 (2d Cir. 2008).

*United States v. Corsey*, 723 F.3d 366, 379-380 (2nd Cir. 2013) (Underhill, J. concurring).

A downward departure to a sentence other than a sentence of imprisonment will become specifically available by virtue of an Amendment to the Sentencing Guidelines set to take effect on November 1, 2023. Because "Zero-Point Offenders"—like Mr. Gyevtay—have such a reduced likely of recidivism as compared to even one-point offenders, Commentary to § 5C1.1 includes a specific note on "Zero-Point Offenders. Application Note 10(B) will read as follows:

> **Departure for Cases Where the Applicable Guideline Range Overstates the Gravity of the Offense**.—A departure, including a departure to a sentence other than a sentence of imprisonment, may be appropriate if the defendant received an adjustment under §4C1.1 (Adjustment for Certain Zero-Point Offenders) and the defendant's applicable guideline range overstates the gravity of the offense because the offense of conviction is not a crime of violence or an otherwise serious offense. *See* 28 U.S.C. § 994(j).[9]

---

[9] Available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202305_RF.pdf, last visited September 10, 2023.

Because there is no actual loss to the Treasury here and the Guidelines have been artificially inflated by the value of legal source funds, this departure to a sentence other than a sentence of imprisonment is appropriate.

Here, based on all of Section 3553(a) factors, the sentence that is sufficient but not greater than necessary, is a probationary sentence with the appropriate special conditions.

## IV.   Conclusion

For all the foregoing reasons, the statutory objectives of sentencing do not require a period of imprisonment. Mr. Gyetvay respectfully asks the Court to impose a sentence of probation with conditions that are sufficient but not greater than necessary to recognize the seriousness of the offense while promoting respect for the law.

Respectfully submitted,

**/s/ Kevin Downing**
Kevin Downing
(Admitted *pro hac vice*)
Law Offices of Kevin Downing
601 New Jersey Avenue NW
Suite 260
Washington, D.C. 20001
Tel: 202-754-1982
Email: kevindowning@kdowninglaw.com


**/s/ Matthew J. Mueller**
Matthew J. Mueller, FBN: 0047366
FOGARTY MUELLER HARRIS, PLLC
501 E. Kennedy Blvd.
Suite 790
Tampa, Florida 33602
Tel:   813-682-1730
Fax:  813-682-1731
Email: matt@fmhlegal.com

*Attorneys for Defendant Mark A. Gyetvay*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 17, 2023, I electronically filed the foregoing with the Clerk of Court by using the Court's CM/ECF system, thereby serving this document on all parties of record in this case.

<u>**/s/ Matthew J. Mueller**</u>
Matthew J. Mueller
*Attorney for Defendant Mark A. Gyetvay*