```
1   UNITED STATES DISTRICT COURT
    MIDDLE DISTRICT OF FLORIDA - FORT MYERS DIVISION
2   ------------------------------x
    UNITED STATES OF AMERICA,
3
             v.                            2:21-cr-83-JNE-NPM
4
    MARK A. GYETVAY,
5
                 Defendant.
6   ------------------------------x
                                     November 13, 2025
7                                    9:30 a.m.

8
    Before:
9
                    HON. JOAN N. ERICKSEN,
10
                                     District Judge
11

12                           APPEARANCES

13
    UNITED STATES DEPARTMENT OF JUSTICE - TAX DIVISION
14        150 M. St., N.W.
          4 Constitution Square
15        Washington, DC 20002
    DAVID ZISSERSON, Assistant United States Attorney
16

17  FOGARTY MUELLER HARRIS
          Attorneys for Defendant
18        501 East Kennedy Boulevard, Suite 1030
          Tampa, FL  33602
19  BY:  MATTHEW MUELLER

20

21              Michael McDaniel, RMR, FCRR
                  Official Court Reporter
22                  2110 First Street
                Fort Myers, Florida 33901
23         michael_mcdaniel@flmd.uscourts.gov
                    (239) 461-2064
24
            Proceedings recorded by machine shorthand
25     Transcript produced by computer-assisted transcription
```

1                          APPEARANCES  (Continued)

2    LAW OFFICE OF KEVIN DOWNING
          Attorneys for Defendant
3         601 New Jersey Avenue NW, Suite 260
          Washington, DC 20001
4    BY:  KEVIN DOWNING

5

     ALSO PRESENT:
6
     NICHOLAS R. METCALF, ESQ.
7    BRIAN BONILLA, Special Agent, IRS Criminal Investigation

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                    (9:36 a.m., defendant present)

 2              THE COURT:  This is United States versus Mark Gyetvay,

 3     and we are here for sentencing, resentencing.

 4              Counsel, would you identify yourselves for the record,

 5     please.

 6              MR. ZISSERSON:  David Zisserson for the United States,

 7     and with me I have Special Agent Brian Bonilla from IRS Criminal

 8     Investigation.

 9              THE COURT:  Welcome.

10              MR. DOWNING:  Good morning, your Honor, Kevin Downing

11     for Mr. Gyetvay.

12              THE COURT:  Sure enough.

13              MR. MUELLER:  Good morning, your Honor, Matthew

14     Mueller also for Mr. Gyetvay.

15              MR. METCALF:  Good morning, your Honor, Nicholas

16     Metcalf for Mr. Gyetvay.

17              THE COURT:  Mr. Metcalf, I don't think you made a

18     formal appearance.

19              MR. METCALF:  No.

20              THE COURT:  So you're not really for him.

21              MR. METCALF:  No, I'm here sitting with him.

22              THE COURT:  But you're not --

23              MR. METCALF:  I am not making an appearance.

24              THE COURT:  Okay.

25              MR. METCALF:  Thank you.

1          THE COURT:  And Mr. Gyetvay, you are here.

2          Let me make sure first that Mr. Gyetvay has had an

3   opportunity to review the presentence investigation report.

4          MR. DOWNING:  He has, your Honor.

5          THE COURT:  Okay.  And it looked to me from the record

6   like there were some disagreements about the presentence

7   investigation report that had been worked out and then, of

8   course, some that have not.

9          MR. DOWNING:  That's correct.

10          THE COURT:  I will hear first from you, Mr. Downing,

11   about the remaining disputes with respect to the presentence

12   investigation report.

13          MR. DOWNING:  Thank you, your Honor.  Mr. Mueller will

14   address those.

15          MR. MUELLER:  Thank you, your Honor.  Mr. Gyetvay

16   objects to a number of paragraphs in the presentence report.

17          THE COURT:  Let me get it in front of me so I can

18   follow along with whatever it is that you're about to say.

19          All right.  I'm ready.

20          MR. MUELLER:  Thank you, your Honor.  For what I

21   thought would be for-the-record purposes, I'm going to announce

22   the paragraphs for which we have remaining objections.  We

23   recognize, though, in light of the Eleventh Circuit's opinion,

24   there were certain issues that have been affirmed on appeal and

25   certain issues that were sent back to your Honor, but the

1    objections remain because those factual allegations in those

2    paragraphs, had we not preserved objections, could be used in

3    support of the remaining issues that you're here to determine.

4            So the paragraphs in the presentence report for which

5    Mr. Gyetvay remains to object are paragraphs 19 to 20,

6    paragraphs 24 to 27, paragraphs 29 to 53, paragraph 55,

7    paragraph 58 through 61, paragraph 65, paragraph --

8            MR. DOWNING:  Your Honor, you got all that?

9            THE COURT:  If you're intending to argue all these,

10   you'll have to go back and make your argument.

11           MR. MUELLER:  Yes, your Honor.  I don't intend to

12   argue all these, but if I may just finish the --

13           THE COURT:  It's not much of a record if you just list

14   them and don't articulate a reason why I should make any finding

15   on them.  But go ahead, you were at 65 through something.

16           MR. MUELLER:  Thank you.  I promise I have a reason

17   for this, your Honor, paragraph 67 and 68.

18           THE COURT:  So 65, 67 and 68.

19           MR. MUELLER:  Yes.  Paragraph 124, paragraph 127,

20   paragraph 132 through 134, paragraph 137, and finally, paragraph

21   139 and 140.

22           And the relevance of all those objections for your

23   purposes this morning are they all relate to our objection that

24   had been sent back from the Eleventh Circuit on the issue of

25   restitution.  Our position is spelled out in our memo, document

 1    336, so I will summarize it, is that Count 12 was not an offense

 2    against property as that term is defined, and because it's not

 3    an offense against property, no restitution ought to be ordered.

 4            In addition to not being -- well, part of why it's not

 5    an offense against property is that there was no evidence

 6    introduced at trial that the false statement with respect to

 7    whether or not his prior non-compliance had been willful.  That

 8    was the false statement charged in Count 12 for which he was

 9    convicted.  There was no evidence introduced that that false

10    statement was done with an intention to deprive the government

11    of any property.

12            The only property that they cite to as restitution is

13    the civil penalties that they claim ought to be assessed as

14    restitution.  But it's important to note, right, when a tax

15    return is filed, there's additional -- there could be additional

16    tax due and then there could be -- if it's late, there could be

17    penalties, and then, of course, there's interest.  In the

18    criminal context, the tax is typically what the restitution

19    would be.  And so I think it's clear from the record, your

20    Honor, that it's sort of an implicit concession, because they're

21    only seeking penalties as restitution it means that there's no

22    tax owed.

23            I think your Honor knows that's been our position all

24    along.  But the reason that's important here as it relates to

25    restitution is that, as we cited in our brief, restitution is

1  for restorative purposes, to return the victim to the status

2  quo.  And in this case, these penalties had never been assessed

3  by the IRS.  They could have been assessed when those returns

4  were filed, but they weren't.  So there's no debt on the books

5  with the IRS for which restitution ought to be imposed for those

6  years.

7          So for those reasons, because it's not a -- because

8  it's not an offense against property, there's no proof of that,

9  and then that's what those objections relate to.  We recognize

10  that a number of our objections that flow from those paragraphs

11  were sustained by the Eleventh Circuit, we get that, but the

12  remaining objection on restitution invokes the nature of the

13  evidence at trial because, again, we would submit there was no

14  testimony that this was the reason why that false statement was

15  made and there was no finding by the jury.  To the contrary, I

16  would remind the Court that the jury acquitted Mr. Gyetvay on

17  Count 14, which charged a scheme to defraud the IRS through his

18  streamlined filing.

19          So we believe the record shows, at most, at best for

20  the government, that certainly he was convicted of Count 12, but

21  there's no evidence that that was done in any way to deprive the

22  government of property.  And in fact, the offenses against

23  property that were charged, he was acquitted on Count 14 and the

24  jury hung on Count 15.

25          So that's our objection with respect to the

1    restitution, your Honor.

2           THE COURT:  So it's the legal issue of -- legal

3    factual issue of whether the false statement that forms the

4    basis of the Count 12 conviction had as its purpose the

5    deprivation of property to the government versus that just being

6    a collateral consequence of making the false statement.  That's

7    your issue, as opposed to the calculation of the amount.  I saw

8    a couple of references to the fact the amount was not

9    challenged.  So we have the total of 4 million something, but

10   that breaks down to -- you probably know this better than I do,

11   but 2,813,382 in the penalty, and then the interest, the

12   additional on that is 1,207,692.

13          MR. MUELLER:  Yes, your Honor, that's correct.  There

14   is no dispute between the parties as to the amount of

15   restitution.

16          THE COURT:  It's just whether it's applicable at all.

17          MR. MUELLER:  Right.

18          THE COURT:  Thank you.

19          MR. MUELLER:  And if I may make one more point and

20   then I'm happy to answer any questions if you have any more.

21   The other thing that it invokes -- again, as I said, there's no

22   record evidence, there was no witness that said this is why

23   Mr. Gyetvay made that statement.  There's no statement

24   attributed to Mr. Gyetvay as to why he made that statement for

25   which he was convicted.

1          So in light of the fact that there is no evidence

2    suggesting that that was an object of the offense, coupled with

3    the fact that there's -- nobody is claiming there's additional

4    tax due for those years, there really isn't any restitution to

5    impose.  They're stretching the idea that penalties can be

6    included as a restitution payment, but they cite no case.  And

7    to the contrary, we have included in footnote 8, page 10 of our

8    brief, while it may not be binding as a legal matter, it's a

9    publication that the Department of Justice attorneys from the

10   tax division wrote in 2023 where they stated that civil

11   penalties generally should not be included in restitution.

12         And the reason they said "generally" is there is one

13   occasion the guidelines recognize when penalties should be

14   included in restitution, and that's when the penalties had

15   already been assessed, the defendant owed them and then took

16   steps to avoid the collection of penalties.  It's called evasion

17   of payment.  And that's the exception under the guidelines when

18   the penalties are counted.  In the typical tax case, restitution

19   is based on the principal tax owed.  Here there is none.

20         THE COURT:  In the basic tax case.

21         MR. MUELLER:  In the basic tax case, other than an

22   evasion of payment case, which we don't have here.  You have a

23   conviction under 1001 for making a false statement.  There's no

24   evidence, we would submit, that proves that that false statement

25   was made to avoid these penalties or that he even knew that

1    these penalties would apply, right, because these are things

2    that the IRS assesses as tax returns get processed in the

3    ordinary course.

4              So you have a case here -- it's not just that, well,

5    the ordinary case you don't get it but this is an is

6    extraordinary case.  This is not an applicable case for that

7    type of restitution.  This is not an IDA.  Because in those

8    cases the defendant has had the chance, and the IRS, to contest

9    the penalties.  They have been imposed.  They have been

10   assessed.  So it's on the books, he owes those penalties.  And

11   if he takes the steps to evade those penalties, that could be

12   included as restitution.  Here we're talking about completely

13   unassessed penalties that they're trying to seek now through a

14   criminal case, and we believe it's not supported by the evidence

15   or the law and it's not an appropriate application of 18, USC,

16   3663(A)

17             THE COURT:  So that is your argument with respect to

18   whether the restitution should be enforced, and you listed all

19   of the paragraphs of the PSI that, in your view, bear on that

20   question, is that correct?

21             MR. MUELLER:  Yes, your Honor, for the simple reason

22   that if I'm here -- we're objecting that this was an offense

23   against property.  If we don't also object to all these, I would

24   say collateral paragraphs, because they all relate to crimes for

25   which he was not convicted or some of the cases for which he was

1    not even charged.  So we're objecting to those paragraphs

2    because if we don't, the Court could make those findings

3    potentially to support the government's view on restitution.  So

4    it's important that we preserve our objections because the case

5    evidence does not support any of those assertions in those

6    paragraphs because, again, there was no trial testimony about

7    Mr. Gyetvay's intentions with respect to this document.

8            The other thing that we think is worth noting as it

9    relates to that is to this day the IRS has a voluntary

10   disclosure program, right, so someone could report if they had

11   some out-of-compliance foreign accounts, they could come in

12   through the voluntary disclosure program now.

13           Interestingly, your Honor, the government, the IRS,

14   has removed that question about willfulness from the voluntary

15   disclosure form.  So it's sort of a unique circumstance where

16   Mr. Gyetvay is not only punished in terms of imprisonment but

17   also has this restitution that they're seeking to impose for a

18   false statement falsely certifying to a legal conclusion that he

19   wasn't willful, but it's a question they don't even make people

20   answer in his shoes going forward.

21           So we understand the jury's verdict, but the evidence

22   doesn't support what the government is seeking here.

23           THE COURT:  On that last point, are you saying that

24   there was some change such that there's no longer a distinction

25   to be made on the fulcrum of willfulness between the OVDP and

 1    the streamlined procedures?

 2              MR. MUELLER:  Well, those programs, as I understand

 3    it, have been merged into the current voluntary disclosure

 4    practice, so the landscape is different sitting here today in

 5    2025 than it was, let's say, in 2015.

 6              THE COURT:  But is that what you're saying?

 7              MR. MUELLER:  Yes, they no longer ask, when you come

 8    through the voluntary disclosure, if you're willful.

 9              THE COURT:  But when you say they changed the whole

10    program, I'm unclear on what the relevance is.

11              MR. MUELLER:  Well, if it was a vital question for the

12    operation of the government or for the processing by the IRS,

13    they would have kept that question.

14         So we're not sort of quarreling that it was in place

15    at the time he made his submission, we're just pointing out that

16    in evaluating the seriousness of the offense, it's, again, just

17    not a vital question for the operation of the IRS and it

18    certainly is no longer a question they ask with respect to

19    voluntary disclosure.

20              THE COURT:  All right.  Anything else?

21              MR. MUELLER:  No, your Honor.

22              THE COURT:  All right.  So you object to paragraph 19,

23    which says in 2003 he was hired by Novatek, stock options, a

24    certain number of shares of stock, set price over a five-year

25    period, helped Novatek begin initial public offering, London

 1   stock exchange, beginning in '05 promised significant shares of

 2   Novatek.  What's your objection to paragraph 19?

 3              MR. MUELLER:  Our objection is that that's not

 4   supported by the evidence.

 5              Now I would also suggest it's not relevant --

 6              THE COURT:  I remember there being testimony about

 7   that.  So the only reason I'm pressing you on this is I just

 8   want to understand, are you objecting to everything that has to

 9   do with his finances because you believe that this false

10   statements conviction shouldn't have any restitution, or are you

11   really saying that there's no evidence to support the assertions

12   in paragraph 19?

13              I'm just thrown by the volume of your objections on

14   what is a particular point.

15              MR. MUELLER:  Yes, your Honor.

16              THE COURT:  So don't you remember there being

17   testimony about those shares and the IPO?  That was --

18              MR. MUELLER:  Right.  And you might recall, I know

19   it's been a few years, our defense was that it didn't happen in

20   that manner, and the jury hung on any of the counts that related

21   to that option.  And so again --

22              THE COURT:  Again, I just don't understand your

23   objection to paragraph 19, just as an example.  I think we could

24   pick a different one, but we'll start with the first one.  There

25   was the IPO, he was the CFO, there was the IPO on the London

1  stock exchange, all of which -- I mean I know it was a while

2  ago, but I remember there being testimony about that.

3          So maybe you're not saying there's anything wrong

4  substantively with that paragraph, it just shouldn't relate.  Is

5  that what you're saying?

6          MR. MUELLER:  Well, I think we're saying both.  We're

7  saying we disagree factually with all the paragraphs that I read

8  off.  I also think many of these paragraphs are irrelevant to

9  the question before the Court today, which is:  Ought this

10 restitution be applied?

11         But we're not going to -- we can't be in a position

12 where we concede that these things are true when we believe

13 they're not true.  And we're concerned about -- I'm sure as your

14 Honor reviewed the Eleventh Circuit opinion, they were

15 incredibly scrutinizing about the detail in which both

16 objections were preserved and the detail to which findings were

17 made.  And so as a matter of thoroughness -- we didn't draft the

18 presentence report, but we were given one with a number of

19 paragraphs that we still, as a factual matter, believe are

20 inaccurate, so we are compelled to object.

21         THE COURT:  So to preserve an objection, you have to

22 be specific about what your objection is.

23         MR. MUELLER:  We submitted a detailed letter outlining

24 all our objections.

25         THE COURT:  All right.  Anything else on the

1  presentence investigation report?

2                    MR. MUELLER:  May I confer with counsel?

3                    THE COURT:  Okay.

4                    MR. MUELLER:  Thank you.

5                    (Pause)

6                    MR. MUELLER:  Nothing further, your Honor.  We believe

7  for today's purposes the restitution order is the primary issue,

8  but we wanted to preserve the record and happy to answer any

9  further questions.

10                   THE COURT:  All right.  Thank you, Mr. Mueller.

11                   MR. DOWNING:  And your Honor, I know you asked the

12 questions Mr. Mueller led with, but I definitely would like to

13 address the Court with respect to resentencing today.

14                   THE COURT:  The reason I asked him that is that I was

15 looking for guideline objections so I could find the guidelines

16 before we move on to sentencing, but then he moved right into

17 this resentencing on that.  So the restitution argument has been

18 made.

19                   MR. DOWNING:  Yes, understood.

20                   THE COURT:  But we're not done.

21                   MR. DOWNING:  Yes.

22                   THE COURT:  Right.

23                   Mr. Zisserson, do you want to have any say in this?

24                   MR. ZISSERSON:  I do, your Honor, thank you.

25                   THE COURT:  Now's your chance.

 1              MR. ZISSERSON:  Would the Court mind if I stay here?

 2     Because I got my computer hooked up to the system so I could

 3     display some slides.

 4              THE COURT:  You go right ahead, but right now we're

 5     just talking about the guidelines.

 6              MR. ZISSERSON:  Yes, as far as -- you mean the PSR?

 7              THE COURT:  The PSR.  I need to make my findings on

 8     the guidelines.

 9              MR. ZISSERSON:  Yes.

10              THE COURT:  I know we have done this before.  We all

11     read the opinion.  Nevertheless, you got --

12              MR. ZISSERSON:  Understood.

13              THE COURT:  Okay.

14              MR. ZISSERSON:  As far as the defendant's objections

15     to all these various paragraphs of the PSR, I think the example

16     the Court pointed out of paragraph 19 is a perfect example,

17     because they seem to be objecting to things that were plainly

18     presented at trial.  We're not in a position right now to go

19     line by line.  For example, Mr. Gyetvay was the CFO of Novatek.

20     I don't see how that's something that is actually contested.

21              So as far as from a factual standpoint, I believe that

22     the Court should overrule these objections and adopt these facts

23     as they're presented in the PSR.  These are all things that were

24     done at trial and things that the Court adopted the first time,

25     I believe, at the first sentencing.

1        Now whether or not all of those things amount to the

2   1001 conviction being a crime against property, in my mind is a

3   completely different issue from whether these facts are correct.

4   And I believe that the trial record demonstrates that these

5   facts are correct.

6        Would you like me to address the issue of restitution

7   at this point?

8        THE COURT:  Do you mind if I just ask defense counsel

9   whether he's going to say anything more about this?  Because on

10  the one hand, I am ready to make my findings on the guidelines,

11  on the other, we did hear this argument about the restitution

12  portion of the resentencing.

13       So is there -- should I make my findings on the

14  guidelines now and then hear the arguments on the resentencing

15  both with the commitment to the Bureau of Prisons time and

16  the -- do you want to say anything else on restitution?

17       MR. DOWNING:  No.

18       THE COURT:  Okay.

19       MR. DOWNING:  No on restitution.

20       THE COURT:  All right.

21       MR. DOWNING:  But yes with respect to findings for a

22  guideline range, yes with respect to variance, downward

23  departure, yes to all these things, but not on restitution.

24       THE COURT:  So let me say I need to hear -- as you all

25  know, I'm required to make a finding with respect to what the

United States District Court
Middle District of Florida

 1    guidelines are.  Having done that, I then move on to determining

 2    the sentence.  So at this point I'm just trying to make sure

 3    that I heard everybody out on what the guidelines are.  And I

 4    was under the impression that that was Mr. Mueller's job was to

 5    talk about any objections to the PSI.

 6              MR. DOWNING:  Then I totally misunderstood.

 7    Mr. Mueller was addressing in particular our filings with

 8    respect to objections to the PSR as opposed to coming here today

 9    and talking about the guidelines, which is what I was going to

10    do.

11              THE COURT:  Okay.  So the PSR includes factual

12    assertions and guideline calculations.

13              MR. DOWNING:  Correct.

14              THE COURT:  All right.  So why don't you make any

15    argument that you wish to make in that regard and then I will

16    hear back again from Mr. Zisserson on that, and then --

17              MR. DOWNING:  Then I will come back after that.

18              THE COURT:  Yes.

19              MR. DOWNING:  So right now what I would say is it's

20    important for the Court to consider -- and it has been a little

21    bit lost in all of this, but not one tax count resulted -- not

22    one of the tax counts did the jury find guilt on, and the

23    Eleventh Circuit said the statutes weren't applicable, that they

24    had run.

25              So not one tax count stands at the end of this trial.

1    There's one count for a late-filed FBAR -- not for not filing an

2    FBAR, but a late-filed FBAR -- and one count of 1001 for a

3    statement about willfulness about not timely filing.  That's

4    what we're left with.  We're not left with the indictment that

5    was returned which was just utter nonsense that the government

6    couldn't prove at trial.  So we're down to two counts, a

7    late-filed FBAR and a 1001 on a statement that the government

8    doesn't even ask about anymore.

9           And in order to get to the sentence last time, the one

10   count of late filed -- not failure to file, late filed -- was an

11   $8.7 million account.  To get to the seven-year sentence, the

12   Court went and said, you know what, there was another late

13   filed -- this is at the request of the government, and

14   understandably, you can do this, the government can ask for

15   it -- but for the other year where the return was filed, it was

16   filed, this Court added almost $90 million to go to a

17   guideline -- not a tax guideline because there were no tax

18   offenses at the end of the day for which this Court could

19   sentence, and even if there was, and we made the argument and

20   the pretrial service report has included it, it would be about a

21   three and a half million dollar tax loss in a case where all the

22   tax was paid before there was any investigation.

23          So the idea that under a tax guideline there would be

24   a probationary sentence, but to go to an FBAR guideline -- not

25   only used the FBAR guideline, which at this point in time the

United States District Court
Middle District of Florida

 1    Court has to use because not one count of tax was there a

 2    conviction on, but under that guideline, if you use the

 3    guideline as it's intended for the offense for which he was

 4    convicted, the loss would be -- under the guideline range would

 5    be $8.7 million, not over $90 million for another year when that

 6    form was filed.

 7           So in calculating the guideline range, we think it

 8    is -- under the facts of this case, under the trial of this case

 9    it makes no sense to go and just chuck $80 million on top of the

10    8.7.  8.7 million under the FBAR guidelines T tables is what

11    this Court should determine the guideline range on and not go to

12    a year which was not charged, for which no guilt was found, and

13    add over $80 million.

14           That's it on that.  Thank you.

15           THE COURT:  Anything else on the PSI or the

16    calculations contained there?

17           MR. DOWNING:  No, your Honor.

18           THE COURT:  Mr. Zisserson?

19           MR. ZISSERSON:  Judge, I don't have anything else on

20    the facts of the PSI.  As far as the guidelines calculation, we

21    believe the Court got it correct the first time, so did the

22    Eleventh Circuit.  It's law of the case.  And that guideline

23    calculation under 2S1.3, that's the guideline calculation of

24    this case.

25           THE COURT:  And would you just articulate again why

1    the 2013 -- 2013 was the high amount.

2              MR. ZISSERSON:  Right.  This was conduct that

3    Mr. Gyetvay engaged for about a decade.  So the final -- that

4    count of conviction was the one that the government charged

5    which was within the statute of limitations.  But the same

6    pattern of conduct of failing year after year to disclose tens

7    of millions of dollars of secret Swiss bank account money, this

8    was just the last point in that chain of events.  So that's why

9    it was appropriate to count as relevant conduct.

10             THE COURT:  Thank you.

11             MR. DOWNING:  Your Honor, if I might, the ten years'

12   long conduct that the government talks about they couldn't prove

13   at trial.  There was no finding by the jury of this fantastical

14   indictment that they returned.  Every single tax count they did

15   not get a conviction on, and yet they come into this courtroom

16   and ask you to consider what they couldn't prove at trial to

17   sentence somebody in a tax case to an astronomical amount of

18   time.

19             And by the way, if the government had offered

20   Mr. Gyetvay a plea to one count of a late-filed FBAR, one count

21   of 1001 for saying I didn't willfully do something, there is no

22   way the government could ask for this kind of sentence.  So he

23   exercises his constitutional right and they ask you, under some

24   fanciful theme which wasn't proved at trial --

25             THE COURT:  Mr. Downing, I have heard you out on the

1  guidelines and I will hear from you again on sentencing, but we

2  are now talking about the presentence investigation report and

3  the calculations contained therein.

4         The Court went through this calculation initially and

5  the calculations take into account what is relevant conduct

6  because the counts of conviction are part of the same course of

7  conduct.  Under any standard, the prior conduct that we have

8  discussed is properly relevant conduct, otherwise the sentence

9  would not take into account the totality of the criminal conduct

10 that took place here.

11        Beyond that, the Eleventh Circuit has already affirmed

12 that guideline calculation and it is the law of the case.  I

13 understand that they used a different standard because that was

14 the standard that they were looking at, but having reviewed the

15 Eleventh Circuit's calculation, having reviewed this Court's

16 prior calculation, the determination is again affirmed.

17        And I find that we do have a base offense level of 30,

18 and so we have a guideline range capped at 120 months.  As

19 before, that doesn't take into account the now-in-effect

20 two-point reduction.  I sentenced before as if that reduction

21 had been in place, it is in place now, so anyway, that gets us

22 to a range of 97 to 120 months.

23        The supervised release range under the guidelines for

24 Counts 12 and 13 is one year to three years.

25        The fine range, guideline fine range is 35,000 to

1    350,000.

2          The special assessment is $100 per count.  I know that

3    the defendant has already paid the special assessment on Counts

4    12 and 13 and then also $25 each on Counts 10 and 11, and that

5    $50 will be applied by the clerk's office toward the defendant's

6    fine, which I understand has not yet been paid.

7          So because it's law of the case, and even if it wasn't

8    law of the case, the Court adopts the guideline calculations

9    contained in the presentence investigation report, and I am

10   ready to hear argument.

11         Mr. Downing, it seems like you are going to argue on

12   behalf of Mr. Gyetvay with respect to sentencing, and I'm ready

13   to hear you.

14         MR. DOWNING:  Thank you, your Honor.

15         So we have filing with the Court and mentioned another

16   case that we think is extraordinarily relevant in terms of the

17   sentence to be handed down in this resentencing, and the name of

18   the case was Rosenberg, that was the defendant.  And it's

19   somebody that had offshore accounts that were not reported and

20   FBARs that were never filed and tax returns that never reported

21   the income for tax that was never paid for a magnitude of an

22   account which is about the size of the accounts we're talking

23   about in this case.

24         That person entered into a plea to one count for

25   conspiring to defraud the government, to file false tax returns,

1    the usual litany.  So in that plea, the same guideline range,

2    that person was capped at five years.  The government, on top of

3    capping it at five years, said, well, actually we're only asking

4    for 40 months with somebody that has a prior fraud conviction

5    for defrauding a Texas public school system, so has a prior

6    record, has much more egregious conduct, got caught by the

7    government, and ends up with 40 months.

8            Now I mentioned this before, and the reason why I

9    think it's important -- and Judge Barber, who presided over this

10   case before the trial, had pointed this out -- the charges that

11   Mr. Gyetvay faced were crazy.  They were so over the top, it was

12   so overcharged, and the jury didn't buy it.

13           THE COURT:  What judge are you talking about?

14           MR. DOWNING:  Judge Barber, who had the original -- he

15   had the case.  He ruled on all the pretrial motions.

16           THE COURT:  And he said that the indictment was

17   nonsense?

18           MR. DOWNING:  He said the case was totally

19   overcharged.  The government -- this is -- by the way, this is a

20   Biden era case, the last connections of Russia that the

21   government tried to -- the first exhibit was a picture of the

22   CEO of the Russian company that Mr. Gyetvay worked for.  Judge

23   Barber is like:  We're not getting into this.

24           That's what this is that's a remnant of.  That's why

25   they went after somebody who had paid all their tax before there

1    was ever an investigation.

2            Now I make this point because there seems to be an

3    incredible penalty for going to trial.  But we had no choice.

4    He was charged with a mail/wire fraud conspiracy.  The jury said

5    not guilty.  He was charged with filing false returns.  Hung.

6    Late filed.  Hung.

7            We had to go to the Eleventh Circuit to get the

8    Eleventh Circuit to say:  By the way, those two counts, you

9    don't have a statute of limitations on them.

10           So at the end of the day, we ended up with one count

11   of a late filed FBAR.  It was filed.  It was amended before

12   there was ever a government investigation.  One count, one count

13   of saying:  I didn't willfully file late.  One count.

14           If he would have been offered that plea and we walked

15   into this Court or any court in the land, it's inconceivable

16   that you could end up with a different result than the

17   government agreed to in the Rosenberg case.

18           THE COURT:  We didn't hear much about her,

19   Ms. Rosenberg, other than the guidelines that you put in, but

20   every case is individual.

21           MR. DOWNING:  Not really, your Honor, and that's the

22   problem here.  There's supposed to be a level of consistency of

23   punishment for a particular type of conduct.  That set of

24   facts -- and you can look at it, we referred to the case, the

25   plea agreement is available, the indictment, the underlying

1  facts.  It's much more egregious than this case.  It went over a

2  longer period of time, and she was caught.

3         Mr. Gyetvay came in and filed his returns.  A

4  seven-year sentence for someone that checks the box and says,

5  you know what, this got away from me.  I wasn't intending not to

6  pay my tax.  He didn't say anything more than that.

7         And by the way, during the entirety of the case, there

8  was not one scintilla of evidence that he did not accurately

9  report all of his income and pay what, if any, tax and penalties

10  and interest the IRS said he needed to pay.

11         And I would remind the Court, too, that he was working

12  through advisors, advisors that had taken a plea from the

13  prosecutor -- the lead prosecutor in the case who is not here

14  anymore -- that never came and testified.  There was no evidence

15  at trial that the statement about willfulness was some, like,

16  conjured fraudulent statement.  There was no evidence.

17         So I understand what the Court can do under the

18  guidelines, but the idea that two hours from here in another

19  courthouse where somebody has a prior conviction, same amount of

20  money on the table, actually got caught, gets 30 months.

21         And I will say one other thing, the lead prosecutor is

22  not on this case anymore.  He left the government.  If he

23  offered that plea of one count of a late filed FBAR and one

24  count of 1001, I would have advised my client not to go to

25  trial.  I would have advised my client to take that plea.  And I

1  think the Court should consider that in sentencing because not

2  one tax count stands.  He exercised his constitutional right and

3  he should not be punished for that.  Thank you.

4           THE COURT:  Mr. Zisserson.

5           MR. ZISSERSON:  Judge, one thing that I would like to

6  do is go over some of the evidence, and I promise it will be

7  brief.  I have them in slides, so if we can turn on the screen I

8  think that will help orient the argument of what I'm going to

9  say here.

10          But Judge, the evidence at trial did show that the

11 defendant engaged in a decade-long scheme to cheat on his taxes

12 and hide his money from the IRS.  Embedded within the counts of

13 conviction was the jury believing that.  For the jury to have

14 believed that he willfully -- that he actually lied when he said

15 that his conduct was non-willful, embedded within that decision

16 was everything that was leading up to that decision, and I'm

17 going to show some of it now.

18          So we see that this was going on -- Mr. Gyetvay's

19 conduct was going on back when he's lying to his accountants

20 about his 2006, '7 and '8 tax returns.  He's omitting over $2

21 million worth of income on those tax returns, lying to his

22 accountant about it.

23          All the while, through this entire time period, this

24 is the balance, according to the bank statements of his Swiss

25 bank accounts, that he's not reporting that he knows he's

1    supposed to report, and that, in fact, he's lying to his

2    accountant about the existence of this.

3              So this is not something that just happens and the

4    government gets him because he made a clerical error the final

5    year.  This is a pattern of conduct that goes on for about a

6    decade.

7              And it was not a mistake.  So this was an email from

8    his financial adviser, and the financial adviser is telling him

9    that his Swiss bank Coutts wants to either close the account or

10   have it declared tax compliant.

11             So the advisor says:  I want to open for your wife at

12   Hyposwiss, a Swiss bank with no foreign connections.  So here's

13   his financial adviser saying here's how we can remain with the

14   secrecy in Switzerland.

15             And Mr. Gyetvay says:  I will get you all the

16   signatures and send them to you.  He doesn't say no, this would

17   be a good time for me to become tax compliant, he goes along

18   with it.

19             Not only that, part of the same email chain, the

20   advisor says:  I think a visit here would be good.  Do you want

21   to visit the lawyers at the same time?

22             And Mr. Gyetvay says:  I'm a little skeptical on

23   visiting with U.S. lawyers.

24             Obviously, because he knows what the U.S. lawyers are

25   going to tell him to do, which is to become tax compliant, and

 1    he doesn't want to do it.  And so in fact, what he does -- he

 2    does, as the trial showed, use his wife to open the new account

 3    at Hyposwiss.

 4              Now all through this time period he continues to lie

 5    to his accountant.  His accountant is so concerned about it that

 6    the accountant commissions this memo to file that says:  We

 7    advise Mark Gyetvay of his obligation to file foreign bank

 8    account report forms for past years but Mark dismissed our

 9    recommendation and did not file such forms for years prior to

10    2010.

11              At this point, the accountant doesn't even know about

12    the Swiss bank accounts.  All the accountant knows is about a

13    Russian bank account that is much, much, much smaller that

14    Mr. Gyetvay did tell him about.  And even with that Russian bank

15    account, Mr. Gyetvay doesn't want to file the FBAR.  So he knows

16    about the FBAR and is refusing to file it against his own

17    accountant's advice.

18              Finally, his Swiss bank that he was previously at

19    starts to cooperate with the government as part of the Swiss

20    bank program.  And so they sent him this letter that says:  The

21    bank is participating in the U.S. program and will provide the

22    data and information concerning U.S.-related accounts as

23    required under the U.S. program.

24              So the bank is telling him we're going to disclose the

25    existence of your account to the United States government.  Only

1     then does Mr. Gyetvay decide:  Okay, I better come clean.

2     Because he knows he's about to get caught.

3             So then he goes to this law firm, Anaford.  And this

4     is what he tells Anaford.  And this idea that he's open and

5     honest with Anaford is also fanciful.  They ask him the

6     question:  Was there an FBAR filed for 2008?  If so, we will

7     need it.

8             And he responds:  To be honest with you, the first

9     time I ever heard about filing FBARs was in 2013.

10            We see that's plainly false.  We just saw in the email

11    he was lying to his accountant about it in 2011.  So he's not

12    providing honest information to this new law firm in order to

13    get the right advice.

14            Then it all culminates in this lie on the streamline

15    disclosure.  Now does Mr. Gyetvay pay a bunch of taxes along

16    with this streamline disclosure?  Yes, he does.  But this idea

17    that he did everything without being caught and Mr. Gyetvay

18    never got caught, that's not true.  He got caught filing the

19    false streamline.  And that was what the most serious thing was

20    here.  Because when other taxpayers are entering voluntary

21    disclosure programs, such as the OVDP that requires a payment of

22    significant penalties, Mr. Gyetvay intentionally went into this

23    program that he didn't qualify for because he didn't have to pay

24    anything.

25            This is a -- I'm not certainly going to read all of

1    this to you, your Honor, but this is an excerpt from the

2    question --

3              THE COURT:  That was attached to your submission.

4              MR. ZISSERSON:  Yes.  And so the IRS is saying if I

5    don't participate in OVDP -- now again, OVDP is the voluntary

6    disclosure program when somebody admits willfulness and has

7    significant penalties.  What if I don't participate in OVDP?

8    Well, then it goes ahead and lists two pages worth of penalties

9    that you could potentially have to pay.  So the idea that

10   there's no monetary reason for lying in the streamline is,

11   again, a fanciful notion.

12              And that brings us to the restitution.  The penalties

13   that the government is seeking as restitution are penalties that

14   under the code shall apply when somebody files a tax return

15   that's late or underpays.  That's why we pick these that we're

16   seeking restitution for.

17              And it's clear that by the end of this scheme that

18   that's what Mr. Gyetvay was trying to do.  That was the whole

19   point of filing the false disclosure.  He had no choice but to

20   file it because the Swiss bank was going to tell the government

21   about the account, but he wanted to still do it with as little

22   damage as possible.  He didn't want to pay the big penalties of

23   OVDP so he tried to slip through the streamlining process, and

24   that's what got him here.

25              And that's in deep contrast to the Rosenberg case.  In

 1    the Rosenberg case, first, that defendant pled guilty, so she

 2    got the benefit of her bargain there, but second, she didn't

 3    file a false disclosure.

 4            This case is not related to some sort of anti-Russia

 5    thing.  This investigation began in 2018.

 6            And I think that the sentence that the Court gave the

 7    first time was correct.  We're really not in a materially

 8    different position here.  The Court gave the sentence of 86

 9    months, and that had certain counts run concurrently, certain

10    counts run consecutively, as long as it got to 86.  And

11    according to the Court's own judgment, this sentence would have

12    been the same without the misdemeanor counts.  It was one year

13    on each misdemeanor count plus five years on each felony count.

14    So without the misdemeanor counts, we're still in the same

15    position as we were before.

16            And for that reason, the government asks again for the

17    Court to issue the same sentence of 86 months and to find

18    specifically on the record that depriving the government of

19    property, specifically these penalties, was one of the objects

20    of Mr. Gyetvay's 1001 offense.

21            THE COURT:  Did you want to say anything about what

22    both Mr. Mueller and Mr. Downing made a point of, which is that

23    apparently the -- if I understand them correctly, the OVDP and

24    the streamline procedures have subsequently been changed and

25    it's a whole different system now.  Do you want to address that

1    at all?

2              MR. ZISSERSON:  As a whole different system, I can't

3    speak to that in detail, I don't know about it.  But the thing

4    about the streamlining program is this was specifically for

5    non-willful actors.  The streamline program, in contrast to

6    OVDP, was for somebody who inherited an account from their aunt

7    when they were eight and had no idea it was there and didn't

8    know what they were supposed to do.  That was the type of thing

9    that streamline was for.

10             THE COURT:  Right.  I understand the schemes as they

11   were elicited at trial and all of that, I just wanted to know if

12   there was anything you wanted to say about -- they picked one

13   aspect of whatever apparently is some new system and I didn't

14   know if you wanted to address that part of their argument at

15   all.  Obviously, whatever the new system is, whatever the

16   improvements or whatever the opposite of an improvement is, is

17   not before us.

18             MR. ZISSERSON:  I would just emphasize that regardless

19   of what the new system is, the willfulness component was a key

20   feature of the streamline procedures.  So it kind of doesn't

21   matter what's changed, because what's being offered now is not

22   the same as what was being offered to Mr. Gyetvay then that he

23   cheated on.

24             THE COURT:  Right, no, obviously not.  They just say,

25   well, they don't even ask anymore so it couldn't have been that

 1   big a deal.

 2            MR. DOWNING:  Your Honor, might I just address a

 3   couple things?

 4            THE COURT:  You can come up to the podium.  Then I'm

 5   going to give Mr. Zisserson a chance also.

 6            MR. DOWNING:  Sure.  To quip about a change on a very

 7   question that the government claims was so important to the

 8   Internal Revenue Service, it wasn't.  That's why they got rid of

 9   it.

10            THE COURT:  Do you have a copy of the new form?

11            MR. DOWNING:  Yes.

12            THE COURT:  Do you want to make that part of the

13   record?  And do you want to put on testimony about it or take a

14   recess so that we can establish what differences there are in

15   the new versus the old?

16            MR. DOWNING:  Sure, that would be great.  All of the

17   above.  We would like a recess, we would like a little time, and

18   we would like to present to the Court.

19            THE COURT:  So first tell me why it's relevant.

20            MR. DOWNING:  Well, it's relevant because the law as

21   you have under a 1001, it has to be a materially false

22   statement.  Materiality is what affects the function of the

23   government.  The government, subsequent to the years in question

24   here, says the question is not material to us.  We're not going

25   to ask it anymore.  It should matter to this Court that the

 1   government of the United States decided that question is not

 2   important.

 3              THE COURT:  But we don't know --

 4              MR. DOWNING:  Even --

 5              THE COURT:  Let me talk.  It's outside the scope of

 6   the evidence that we had at trial.  It's outside the scope of

 7   whether Mr. Gyetvay is in fact guilty of Count 12.  What total

 8   changes are made -- I doubt if the IRS made one change and said

 9   that all they did was remove the willfulness.  There must be

10   pages and pages of whatever this new program is.

11              MR. DOWNING:  There's actually not.  And the reason I

12   know that, your Honor, I started this whole thing.  I was the

13   prosecutor that prosecuted UBS.  I was the reason why they got a

14   voluntary disclosure program together.  And I could tell you at

15   the end of the day there's plenty of fine argument by the

16   government but there wasn't evidence at trial that there was an

17   intent to evade certain penalties.  There was no charge for

18   that.  There was no evidentiary finding.

19              What I really find very difficult to deal with is that

20   the Court is taking government argument and substituting that

21   for the failure to produce evidence and prove a case at trial.

22              THE COURT:  I reject your implication that -- I sat

23   through the trial and you have already made your argument.  If

24   there's something specific that you wanted to say, now is your

25   chance, but don't tell me what I'm believing.

1          MR. DOWNING:  But that's the point.  The jury didn't

2    believe it, and you're going to sentence on your belief, not

3    that the jury found him not guilty or hung.  That's what I'm

4    objecting to.

5          THE COURT:  All right.  Thank you.  Your objection is

6    noted.

7          Mr. Zisserson, did you want to have any response to

8    this?

9          MR. ZISSERSON:  Judge, I would just reiterate that it

10   doesn't really matter what the current voluntary disclosure

11   program looks like.  If the IRS changed programs, that's

12   immaterial to what Mr. Gyetvay did regarding the program that

13   existed at the time.  So it just doesn't really mean anything.

14         And I also -- I just also want to respond to the idea

15   that the jury didn't believe it.  Again, for the jury to have

16   found that Mr. Gyetvay's non-willfulness certification was a

17   lie, the jury had to believe that he acted willfully and

18   therefore lied about whether he was willful.  And that belief

19   that he acted willfully encompassed all the history of his tax

20   misconduct that we presented.

21         THE COURT:  All right.  Thank you.

22         MR. DOWNING:  Your Honor, could we take --

23         THE COURT:  First I would like to say that, once

24   again, the Court sat through the trial, heard the evidence.  And

25   to a great extent, the arguments that Mr. Zisserson has made

 1    about the evidence at trial are accurate.

 2              This was litigated once before.  It was taken up to

 3    the Eleventh Circuit.  So the idea that the Court is taking what

 4    the government says is completely made up, because I sat here

 5    through the entire trial, and we have been through this before.

 6    So if there's testimony and it proves X and then one of the

 7    lawyers says X, X it is, not because the lawyer said so but

 8    because we had the evidence about it.

 9              And Mr. Downing, you are seeming like you have

10    something additional that you want to say, so if you do, why

11    don't you say it now.

12              MR. DOWNING:  Well, your Honor, I wanted to take you

13    up on the idea of a brief recess so we can address the two other

14    issues and just figure out if there's anything else to be said.

15    I understand the Court's position.

16              THE COURT:  All right.  The issues being that you want

17    to litigate the current state of the voluntary disclosure

18    program?

19              MR. DOWNING:  Whether or not we want to produce the

20    form that -- you asked if we had the form.  I just want to

21    consult with the defendant about whether or not we want to

22    pursue anything with respect to that form.

23              THE COURT:  Okay.  Just listen.  I'm just asking you:

24    Is this with respect to the current program?

25              MR. DOWNING:  Correct, the change.

1              THE COURT:  I understand that.

2              MR. DOWNING:  Okay.

3              THE COURT:  And so it would be the form and then the

4     regulations underlying the form.

5              MR. DOWNING:  Well, that's what I would like a minute

6     to consult with.  I don't want to waste the Court's time.  If I

7     could have a couple minutes and just figure out if we want to do

8     this or not and just move on.

9              THE COURT:  Okay.  You could figure out if you want to

10    offer it, but we still have to have some finding that it's

11    relevant.

12             MR. DOWNING:  I understand that.

13             THE COURT:  So you can have some time to establish

14    whether you want to pursue it, and then understand that we also

15    have to reach the hurdle of whether or not it's relevant.

16             MR. DOWNING:  Understood.

17             THE COURT:  How much time do you need?

18             MR. DOWNING:  Ten minutes, your Honor.

19             THE COURT:  All right.  We're in recess.

20             (Recess taken 10:31 a.m. to 10:44 a.m.)

21             THE COURT:  Okay.  Mr. Downing, what's your plan?

22             MR. DOWNING:  Thank you, your Honor.  I think we'll

23    move on from the issue we were talking about about the change in

24    the willfulness standard.

25             I would like to just make one point.  The government

 1    had not -- just argued that Mr. Gyetvay was about to get caught

 2    because the bank was going to identify Mr. Gyetvay to the United

 3    States government.  That's actually not correct.  Coutts bank

 4    could not identify Mr. Gyetvay unless Mr. Gyetvay gave them the

 5    consent to do it, which he, in fact, did.

 6            And I would like to end on a good note.  On behalf of

 7    the defendant, we do thank you, your Honor, for a very fair

 8    trial, and it is greatly appreciated that we and our defendant

 9    got the day in court.  So thank you for that.

10            THE COURT:  It was a well-tried case.  It was a

11    pleasure working with you, right all the way up until you told

12    me I believed everything the government said.  You lost me there

13    for a moment.

14            MR. DOWNING:  Fair enough.

15            And your Honor --

16            THE COURT:  Not again.

17            MR. DOWNING:  Just before we finish, I said I'd end on

18    a good note, so I will shut up, but my client would like --

19    Mr. Gyetvay would like to address the Court.

20            THE COURT:  Which is his right, and I will.  Thank you

21    for reminding me of that.  But I told Mr. Zisserson, because I

22    let you talk again, I am going to let him talk again, but now I

23    have Mr. Mueller standing up.

24            MR. MUELLER:  I was going to accompany Mr. Gyetvay.

25            THE COURT:  Just hold off a second because I did tell

 1   Mr. Zisserson I would give him another chance, if you want.

 2             MR. ZISSERSON:  I will not take you up on it, Judge.

 3             THE COURT:  All right.  Well, there we go.

 4             MR. DOWNING:  My shutting up really paid off.

 5             THE COURT:  Mr. Gyetvay, a lot of talking about you.

 6   So I'm going to sentence you now.  And are you comfortable

 7   coming up to the podium?

 8             THE DEFENDANT:  Absolutely.

 9             THE COURT:  Why don't you come up to the podium with

10   one or more of your lawyers.

11             MR. MUELLER:  And before Mr. Gyetvay speaks, I want to

12   just take a brief moment.  I'm sure the Court notices the people

13   in attendance, but I want to make a couple of references.  We

14   have got Mr. Gyetvay's two sisters and his brother are here to

15   support him, his ex-wife is here along with his two daughters

16   who are here, along with a smattering or collection of

17   tremendous friends and family who made the trip.  Despite all of

18   the things that have been written and said about Mr. Gyetvay, I

19   think that's a great testimony to not only his great character

20   but his support system.

21             THE COURT:  Thank you.

22             THE DEFENDANT:  Thank you, your Honor, for an

23   opportunity to address this Court.

24             As you know, I spent now two years, 23 months in

25   Coleman Low satellite, and the last month shipped in between

1   Pinellas jail and then, last, Charlotte jail.

2            THE COURT:  Coleman was one of the places I

3   recommended on your request, right?  So did the BOP honor that

4   request?

5            THE DEFENDANT:  Yes, ma'am.

6            THE COURT:  Okay.  That's always good to know.

7            THE DEFENDANT:  Yeah.  And plus I had two years and

8   two months of sitting with an ankle monitor, GPS ankle monitor,

9   as I awaited trial.  So more than four years of my liberty has

10  been affected by this particular trial.

11           At Coleman I began working almost immediately upon

12  arrival after I went through the orientation program.  So I

13  worked 23 months at the institutional warehouse, which was

14  responsible for all of the commissary, clothes, products that

15  were shipped around all the institutions, including the two

16  penitentiaries, the medium, the low, and as well as the low

17  satellite, which some people call it a camp but it's really not

18  a camp.  My job there was essentially to handle all the

19  financial transactions there, help them out with the

20  reconciliations of all of the purchase orders.

21           And I did that, and I actually improved the process

22  because I saw that one of the financial people that were working

23  there knew that I had an idea that I could streamline and help

24  them improve how they did the reconciliation process on a

25  monthly basis, and I did that.

1    Well appreciated by all the CSOs I worked with, there

2    were eight COs, correction officers that worked in the facility,

3    and every one of them has given me an excellent review.

4        In addition, I volunteered on my own accord to prepare

5    a financial manual, with the expectation that I would be leaving

6    that facility one day, so the inmates that follow behind me

7    would be able to do their job correctly.  And because the COs

8    trusted me enough, I was always sent to the administration

9    building to discuss all this information in terms of how better

10   to improve the process with the people in the administration

11   process for the trust fund.  The trust fund really ran the

12   warehouse I worked at.

13       Also, at the time when I arrived, I had to take a

14   series of surveys.  And the surveys were conducted to see what

15   your assessment needs were while you were in prison, plus they

16   did a psychological assessment.  The results of all that,

17   surveys and reviews, came out that the inmate needs no

18   assessment, no needs.  So I had no requirements to take

19   anything, poverty, financial, parenting, drugs, alcohol, none of

20   that stuff was applicable to me.  And I think out of the people

21   I saw, I was probably the only one that I saw that had no needs

22   assessment from the people I met up with.

23       And so with that said, I was able to take any course

24   that I wanted to take, and I basically took Piano I and II,

25   Beginning Piano I and II.  I took a five-month program called

1    Threshold, which was the -- I would say the capstone course at

2    the facility.  I also took classes in energy awareness, which

3    the instructor asked me to be the lead person in class because

4    she was afraid that many of the inmates wouldn't speak.  And she

5    was a friend of the person who worked at my warehouse, the

6    senior person that worked at the warehouse, and so she got to

7    meet me and she asked me if I would take the lead in making sure

8    all the inmates would be active participants in the class, and I

9    gladly did that.

10           I was also asked by the education department to speak

11   in front of the finance class for a 30-minute presentation to

12   kind of give a background of what I did --

13           THE COURT:  That went on for two and a half hours,

14   right?

15           THE DEFENDANT:  It went on for two and a half hours

16   and not one inmate left.  They all stayed.  And as a result of

17   that, we had to leave because the chapel needed to be used.  And

18   so as a result of that, the education department asked me if I

19   would be interested in preparing two classes called A-C-E

20   because they were accredited for people to earn programming for

21   their First Step Act, and one was on financing and the other one

22   was on entrepreneurship, and I agreed to do that.  And before I

23   left, I was working on the financing side, so I started

24   preparing the drafts of all that material in relation to this

25   particular ACE class.

1          I was also selected to speak in front of Deputy BOP

2    Josh Smith, deputy BOP person.  Out of 400 people, I was

3    selected in my dorm to be the representative to go speak in

4    front of him in a private meeting because he wanted to

5    understand what were the problems going on at Coleman.  And he

6    also was concerned about all the issues related to FSA Second

7    Chance Act, which we all know has been a big problem at the BOP

8    institution in regard to that.  And he was there for a week and

9    I had a chance to sit and talk to him about that.

10         Also in the process I helped many inmates out who

11   didn't have the education that I had, and I helped them write

12   their commutation plans, their inmate release plans.  I helped

13   them with pro se motions to the court.  I also wrote a letter to

14   the Attorney General of the BOP on behalf of one of the inmates

15   because he did not get his administrative remedies done on a

16   carbon monoxide poisoning incident that we had at Coleman.

17         In my dorm where I lived, about 80 to 85 percent of

18   the inmates there were convicted of drugs or drugs and guns.

19   And ironically, those who had drug charges, most of them had a

20   lesser sentence than I did.  And they were there.  And we also

21   had four gangs that were resident inside, active gangs that are

22   inside that facility, two Puerto Rican gangs, one Black gang and

23   one Mexican gang.  Conditions were terrible, moldy and all that

24   stuff, but they said they don't have any money to fix this.

25         I was also involved in one of the carbon monoxide

1    incidents where the safety manager came into our complex, he had

2    a handheld monitor that went off, had to evacuate everybody out

3    of the facility, and lo and behold, the monitoring systems have

4    never been fixed.

5              And on January 20th of 2025, I ended up going to the

6    bathroom at 2:37 in the morning, collapsed at the urinal, fell

7    backwards, hit my side, hurt my ribs, I thought I broke my ribs,

8    smashed my head on the concrete, puddle of blood.  They had to

9    pick me up.  I was lucky, somebody was there, an orderly came

10   who was cleaning the bathroom is the one who got me.  And then I

11   found out subsequently from another inmate, at 2:30 in the

12   morning, seven minutes before mine, he collapsed, too, in that

13   same room.

14             THE COURT:  Carbon monoxide.

15             THE DEFENDANT:  From the carbon monoxide.

16             I sit here, and I know that Kevin Downing has stated

17   that there's a lot of material here that we went through in the

18   trial, and Mr. Zisserson keeps referring back to this

19   decade-long fraud.  I believe that the representation they put

20   on the board is not an accurate representation of the events

21   that happened.  I think they were selectively picked of specific

22   points in time.  And like the lady from the accountant, when she

23   wrote the memo, I would question to see the metadata on that

24   because my recollection of the event with her is that I didn't

25   say I didn't want to file an FBAR, I just asked her why I needed

1   to file an FBAR when I already put it on my tax returns.  And

2   that was the gist of the question I had.  I don't understand why

3   this memo was written the way it was written.

4              He went through the bunch of the --

5              MR. MUELLER:  Your Honor, I hate to interrupt my

6   client, but could I have a minute, please, to discuss with

7   Mr. Gyetvay?

8              THE COURT:  You may.

9              (Pause)

10             THE DEFENDANT:  So anyway, we went through all this

11  stuff, and I believe that Mr. Downing said a decade long tax

12  fraud has been essentially debunked.

13             A lot of this stuff, when it relates to Anaford and

14  Mr. Matthew Ledvina, one of the things that Mr. Downing tried to

15  talk about is that I didn't make a decision on this.  I mean I

16  didn't have the expertise on the programs that I was shown.  And

17  Anaford is the one that advised me, after doing the assessment

18  of all my tax obligations, that I should enter the streamline

19  process.  And I did what they told me.  And I think if they told

20  me at that particular time that the other program was more

21  suitable for me, I would have done that.  So I didn't make this

22  decision unilaterally, it was based on the work of the Anaford

23  law firm, who, by the way, Coutts bank is the one that

24  recommended that I go talk to them in terms of the filing

25  program.

 1          One of the things that I think came out of the time at

 2   Coleman for me was that there was a restoration of faith for me.

 3   I mean, I had a chance to restore my belief in my Christian

 4   background.  I attended church services every Sunday.  I would

 5   help the priest, Father Mike, with setting everything up and

 6   removing everything at the end of the service.  I walked around

 7   many times and I would ask:  Why is this happening to me?  Why

 8   is this prosecution being conducted in the manner in which it

 9   has been conducted?

10          And I would say that God has given me the strength to

11   continue going on and to look at his plan and to basically say

12   that in order for you to receive forgiveness, you have to

13   forgive those who commit a crime or enemies against you.  And

14   that was a hard thing that I learned.  But I read the Bible two

15   times from cover to cover, and I was on the third time before I

16   got pulled out, and the third one was just a different version

17   of the Bible that I read.  And the Bible, like I said, states

18   that you have to forgive everybody, and that's what I have done.

19          Through the time serving there I have seen a lot of

20   evil people in the prisons and the jails.  I have seen people

21   that have committed real crimes to society, people that hurt

22   communities, hurt schools, destroyed families, crimes such as

23   bank fraud where they ripped off tens of millions of dollars in

24   bank loans, crimes where we saw Covid-related crimes, crimes

25   where individuals essentially defrauded elderly out of all their

1   life savings.  I have seen crimes of pill mills, a lot of pill

2   mill people in prison for the opioid crisis.  I have seen a lot

3   of violent crimes, I mean murders, rapes, grand larceny, assault

4   and violence.  I mean my cellmate that I just was with in the

5   county jail was convicted of two murders and yet he sat there.

6   And I listened to their stories.  I tried to do the best I can,

7   but I'm not the evil person anything near what these people have

8   done.

9           And I basically have donated a huge amount of money

10  for good causes.  I helped a lot of people in my life, and some

11  of the people here in the audience I have helped by providing

12  for their schools, medical care, and everything else.  So I

13  think I have done a lot of good things in life, and the

14  characterization that they're painting me is completely

15  different than reality.

16          On November 7th of 2023 when I was getting ready to

17  self-report to Coleman, Nadezda and my two girls, we were

18  standing out front of the house, and at that particular time,

19  obviously a lot of tears were shed as I was getting ready to go.

20  And your Honor, this is the first time I have seen my girls in

21  two years.  I have not seen them at all.  And I said to them --

22  I said to them that I will not be defeated, I will not be

23  destroyed, and that you have to keep your head up.  Your father

24  is innocent.  Stay strong and we will get through all this

25  process.  And we have.  The bond of our family has not changed.

     1          So I think today, your Honor, this Court has the

     2    opportunity to correct the mistakes that were made through this

     3    trial, because there were mistakes.  I think everybody makes

     4    mistakes in their life.  I made a mistake, and I lived up to my

     5    mistakes.  The Court has the opportunity to right the injustice

     6    I believe that has been done to me and my family.  The Court has

     7    the opportunity to restore my name and my family's reputation

     8    that has been defamed through this whole process.

     9          One thing that I think that's been missed through this

    10    whole trial is that I have been completely debanked from the

    11    financial systems, Citibank, Bank of America, Wells Fargo, JP

    12    Morgan Private Bank, Chase, American Express Bank, the American

    13    Express Card, Charles Schwab all closed my accounts as a result

    14    of this.  I even wrote to President Trump a letter talking about

    15    this issue, because obviously he went through the same thing,

    16    and explained to him:  How are we supposed to survive in this

    17    society today when we don't have access to a financial

    18    institution?  How do I pay bills?  How do I pay car insurance?

    19    How do I pay health insurance?  How do I pay gas and electric

    20    and all this stuff?

    21          And even my girls' school, when Chase closed my

    22    account and I wrote a check, they said I had a month to pay

    23    before they closed my account.  Within one week, they didn't

    24    honor the check.  So we had to scramble around to pay for my

    25    girls' school while I'm sitting incarcerated.

1        So I believe that -- these are the same banks that had

2   various problems, but yet me, I'm debanked from them because

3   they believed that I was a reputational risk.  But again, as

4   Kevin said, as we stand here in front of the Court, there's no

5   outstanding tax charges against me.  This whole decade-long

6   fraud thing that they talked about has been completely debunked

7   by the jury.

8        And then to make matters worse is that we find out

9   that I'm subsequently listed in 2023 in a top ten IRS crimes

10  ranked at number two.  And this made not only national news,

11  local news that my girls had to handle at school.  I mean the

12  principal wrote to the teachers because the Naples Daily News

13  wrote that Florida man makes the top ten list for all the wrong

14  reasons.  And they used things like I hid $90 million of income.

15  There was no $90 million of income hidden.  It was unrealized

16  capital gains on stock.  That's the slide they showed you with

17  the growth in the value of the FBARs.  These are unrealized

18  capital gains that are not taxed until you sell it.  It's not

19  cash.  So they told the teachers, if the kids were being

20  bullied, to make sure that they were informed so that they would

21  take care of the kids.

22        So as Kevin also said, we had no choice but to defend

23  myself in this trial.  I mean there's 15 charges against me.

24  And as Kevin rightly said, Judge Barber said there was too many,

25  and I believe you even said on the record there's too many

 1   counts here on this particular case.  So now the Eleventh

 2   Circuit says I should not have been convicted and indicted on

 3   these tolling charges.  So I believe that I had no other choice

 4   but to defend myself in trial.

 5          And so the only justice I think that can be served

 6   here today, your Honor, is time served.  I spent, like I said,

 7   two years of my life plus two years, two months, so more than

 8   four years already under a prison cell, you know, and for what?

 9   I paid all my taxes.  I didn't owe any money.  I paid over $40

10   million in taxes during this time period that we're talking up

11   to 2024.  I have filed.  I did exactly what the IRS commissioner

12   stated in his intentions for this plan, to get U.S. taxpayers

13   back into compliance, and I have done that.  I am in compliance

14   every year up to 2024.  So actually I'm a model.  I showed that

15   these amnesty programs can work if you give people a chance to

16   correct the mistakes they made.  And that's exactly what I have

17   done.

18          And the last two years I had to file while I was

19   incarcerated.  And it was extremely difficult trying to get this

20   thing done when you have no access, no computers, no anything to

21   any of these records.  I must have drove my sister crazy trying

22   to get her to get this stuff filed, but we did.  And so I

23   believe the only justice that I think would be served is time

24   served.

25          I also need to be back with my girls, because this is

1   extremely important.  If anybody had teenage daughters or kids,

2   you understand these are the crucial and formative years of

3   their life.  I'm not there with them.  And I sit there and every

4   night you have to be concerned with the drugs, the alcohol, the

5   sex, what goes on in a kid's life today.

6          I'm blessed to have two beautiful girls.  They're

7   smart, strong, kind, respectful, and I'm glad they consider me

8   their dad.  I missed out on a bunch of stuff in their lives.  I

9   missed their graduation, middle school graduation, holidays,

10  birthdays, volleyball seasons, but most importantly, you miss

11  the opportunity to be there when they need you the most, they

12  have questions about life, to love them when they need to be

13  loved, just help them with sports, help them with their school

14  life.  For what?

15         I paid $40 million in taxes and I have done everything

16  proper.  And I was in court, and as this gentlemen here was

17  alluding to, I had the same problem, I lost my father at six

18  years old.  He died at 41.  And I had a huge void in my life

19  that I had to deal with.  And I did, I said it, I would not have

20  that happen to my girls.

21         I've also missed many days of family time.  I'm the

22  only one that didn't say goodbye to my mom when she died last

23  year.  But I keep saying there's nothing here that I have not

24  corrected that has been talked about.  I complied with

25  everything.  I owe no money to the IRS.  I settled all my

1  obligations.  Matter of fact, the Treasury owes me a large

2  refund.

3          I would say, your Honor, that if you looked at my

4  record before and after, it's the tales of two different people.

5  In terms of what the public thinks about me now, that this is

6  going to be my scarlet letter that I am going to wear the rest

7  of my life as people look at what I have done, and yet I sit

8  here and there's no tax crimes against me.

9          I just want to end this thing.  Basically, I rose up

10 in a middle class family, and I've worked very hard in my life

11 to achieve the success that I did.  I have done things that many

12 people would not have done.  I went to places, as you know

13 coming from Minnesota, I lived in remote, harsh conditions,

14 having to endure six months of minus 45-degree weather on these

15 projects that I used to work on.  I have lived almost a third of

16 my life in foreign countries between Brazil, Argentina, and

17 mainly Russia.  I have worked -- 60 percent of my work life has

18 been abroad.  And I think that many people here in the States

19 don't understand that the things that you get here in this

20 country that are easy, we don't get the same.  I never would

21 receive mail in a country because it would never get to me.  I

22 don't have access to the banking system when you're in these

23 remote locations, telephone access, sometimes we had to use

24 satellites just to get ourselves communicated to one another.

25          But I think the most important thing is I think that

1    what happened in my life when I was living abroad, I corrected

2    all those mistakes.  I corrected them more than a decade ago

3    when I accepted responsibility for these mistakes.  And I did

4    volunteer to come in.  Despite what they said about being

5    caught, I was not caught.  I volunteered to come in this program

6    and I paid all my taxes.  I paid everything that was owed to the

7    government.  Like I said, if it was the other program that my

8    lawyers would have advised me to do, I would have done that.  I

9    have no reason not to do that because I knew we were filing.

10            So I just want to come in this courtroom and say that,

11    you know, that it's been a hard four years of my life, and

12    particularly the last two being away from my girls.  And I

13    think, your Honor, that you have the opportunity now to correct

14    these mistakes that were made, and that, you know, I have asked

15    God for forgiveness and for his mercy and grace.  I have

16    repented any sins that I have done in the past.  And I believe

17    that I look for you to have the same compassion, mercy, leniency

18    and forgiveness, as I already served the time in prison that I

19    mentioned.  I've already had the two teenage girls that need me

20    to be there as a father.  I complied with all the obligations

21    that the IRS commissioner stated in the amnesty program.  I owe

22    no taxes.  And I just believe that it's time that we -- the time

23    that I already served is more than enough penalty for, as

24    Mr. Downing says, there's only two crimes, willfulness, which I

25    would disagree, this was not willful because I followed advice

251113GYE21CR83              Sentencing

55

1    of my counsel, and the FBAR case, which I did file.

2              But thank you, your Honor, for the opportunity to

3    address this Court.  I appreciate it.

4              THE COURT:  Thank you, Mr. Gyetvay.

5              MR. MUELLER:  Thank you, your Honor.

6         (Audience members applauded)

7              THE COURT:  We'll be in recess.  That is not an

8    appropriate response.  We'll be in recess.

9         (Recess taken 11:15 a.m. to 11:21 a.m.)

10             THE COURT:  Any further disturbances and we will clear

11   the courtroom.  And observers are specifically instructed to

12   abide by the standards of decorum and avoid outbursts such as we

13   just had following the conclusion of Mr. Gyetvay's allocution.

14             It is the duty of the Court to pronounce sentence.

15   Let me first address the prison time.  There's nothing about the

16   dismissal on the basis of what the Eleventh Circuit described as

17   a question of first impression, nothing about the now absent --

18   the absence of Counts 10 and 11 that affects the guideline

19   range.

20             It remains that the defendant has been shown to the

21   Court, certainly by a preponderance of the evidence, to have

22   engaged in a long pattern of financial transactions designed to

23   protect his assets from the eyes of the United States government

24   and to avoid paying taxes and penalties.  This is a serious

25   offense.

 1          Mr. Gyetvay appropriately points out that there are

 2   people in prison who are convicted of crimes of violence.  There

 3   are certainly different kinds of crimes.  Each person is

 4   different.  Some people who are incarcerated for drug or gun

 5   offenses might have had more difficult upbringings, some of them

 6   have longer sentences, some of them have shorter sentences.

 7          The case before the Court involves a serious offense

 8   of concerted efforts to protect your own assets, Mr. Gyetvay,

 9   and to avoid paying the taxes that were due and to avoid making

10   true statements to the government.

11          And the fact that you have engaged in positive

12   behavior while you've been incarcerated is certainly a positive

13   and it's something that I will take into account.  I would have

14   expected you to do well in prison and I would say you probably

15   have done even better than I expected.  I'm also impressed that

16   your family has stayed with you and is supportive of you.

17   There's no doubt that you have attributes that ought to be

18   recognized.

19          So considering your age, the progress that you made in

20   the last years, to sentence you today as you stand here or now

21   sit there, I probably -- well, I would give you a sentence that

22   is below the guideline range, which I did before.  And not

23   withstanding your persistence in denying any guilt, I am going

24   to reduce the amount of prison time to 70 months, and that will

25   be 60 months on Count 13 and 10 months on Count 12 to run

1    consecutively.

2            I'm doing it that way because last time I said the 60

3    months on each of Counts 12 and 13 to run however the Bureau of

4    Prisons -- that certainly is -- the Court's intention is to have

5    a 70-month sentence, so to the extent you want it broken down,

6    we'll say 60 on 13 and 10 on 12.

7            I want to move right to the fine.  The fine is

8    $350,000.  As I said before, the clerk's office will apply the

9    $50 -- the misdemeanor payments that were made on those special

10   assessments to that fine, but that fine will have to be paid.

11           Now on the question of restitution of the $2,813,382

12   plus the $1,207,692, totaling $4,021,074, it is the Court's

13   determination that that restitution is appropriate.  And the

14   reason is that the false statement that was made in order to

15   enter into the Streamlined Procedures Program was for the

16   purpose of avoiding the payment of penalties.  A review of the

17   two programs clearly indicates that the OVDP, which is for the

18   non-non-willful, so the willful, had benefits in that the

19   government was agreeing not to prosecute.  So the real downside

20   of doing that other program would have been the payment of the

21   penalties, which are substantial.

22           So if you do the streamlined procedures, well, you

23   don't have to pay those penalties.  But I can't think of any

24   other reason why a person would go into -- not any non-financial

25   reason that a person would make a false statement to get into

 1    the streamlined procedures other than to keep money for one's

 2    self that otherwise would have to be paid to the government,

 3    which qualifies as an offense against property.  It's the

 4    Court's view that this financial purpose was not only incidental

 5    to the making of the false statement.  And so the restitution is

 6    ordered in the amount previously stated.

 7            Mr. Gyetvay, you will be on supervised release for

 8    three years once you are released from the institution.  And

 9    these conditions are going to be the same as were previously

10    imposed, but let me go through them again.

11            You're to comply with the mandatory and standard

12    conditions adopted by the Court in the Middle District of

13    Florida, and those are found at Section 5B1.3(a) and 5B1.3(c) of

14    the United States Sentencing Guidelines.

15            And in addition, you are to comply with the following

16    special conditions:

17            Provide the probation officer access to any requested

18    financial information, cooperate with the Internal Revenue

19    Service regarding any and all outstanding taxes, interest and

20    penalties relating to the offense of conviction.

21            Having been convicted of a qualifying felony, you have

22    to cooperate in the collection of DNA as directed by the

23    probation officer.

24            The Violent Crime Control Act imposes certain

25    mandatory drug testing, which seems clear to me that they don't

1    apply to you, and so those are suspended in your instance.

2              The payment of restitution in the amount of $4,021,074

3    is to be made to the Internal Revenue Service.  The restitution

4    obligation is payable to the Clerk of the United States District

5    Court for distribution to the victim.

6              While in the Bureau of Prisons' custody, you shall

7    either pay at least $25 quarterly if you have a non-UNICOR job

8    or at least 50 percent of your monthly earnings if you have a

9    UNICOR job.

10             Upon release from custody you can begin making

11   payments of -- well, the entire amount is due once you're out.

12   I will consider you to be in compliance if you make payments of

13   at least $50,000 per month.  And that payment schedule shall

14   continue unless the victim, the government, or the defendant

15   notifies the Court of a material change in your ability to pay

16   and if the Court were to modify that schedule.

17             The $350,000 fine I already covered.

18             I don't believe there is any forfeiture matter to

19   consider.

20             As I guess is evident, you have to pay the $200

21   special assessment for Counts -- 100 for Count 12, 100 for Count

22   13, so that's 200, but you've already paid that.

23             I have some trepidation about reducing your sentence

24   in the way that I have, given the seriousness of the offense,

25   but I feel that it's appropriate to recognize your status as you

1    are here in court today, and even though it didn't have any

2    impact on the guidelines, the fact that you did have those two

3    misdemeanor counts removed.  I hope it's enough.  It's at

4    least -- the least I can live with.  So I guess I'm doing it

5    mostly just in the interest of general lenity that I'm dropping

6    that sentence, not because there's anything that I have seen

7    that really technically calls for it, but I think that the

8    70-month sentence, I think it's appropriate, I think it's

9    enough.

10           Now does the government have any objections to the

11   sentence or the manner in which it was imposed, anything that

12   you need me to go over again?

13           MR. ZISSERSON:  No objections, your Honor.

14           THE COURT:  Okay.  And Mr. Mueller?

15           MR. MUELLER:  Yes, your Honor, we would just repeat --

16   reincorporate our objections to the restitution order as we

17   stated in our sentencing memo, in our objections to the

18   presentence report, and in open court today.  For all those

19   reasons, we do object to the restitution order in addition to

20   the Court's rationale with respect to that.

21           I would say on behalf of Mr. Gyetvay and everyone on

22   our team, we do appreciate the Court's willingness to give us a

23   full hearing to reconsider the sentence.  We do appreciate that,

24   your Honor.

25           MR. DOWNING:  Thank you, your Honor.

 1              MR. MUELLER:  The other thing, to the extent -- this

 2     is applicable on a resentencing --

 3              THE COURT:  You all get paid by the pop-up, I think.

 4     You see the government gets paid just a regular salary and they

 5     don't keep popping up all the time.

 6              MR. MUELLER:  We had that job at one time, your Honor,

 7     so we do know that.

 8              This was important to Mr. Gyetvay.  I think just to

 9     the extent BOP cares about a recommendation, he's happy going

10     back to Coleman.  That would be his request, to be designated

11     back to Coleman.

12              THE COURT:  All right.  I'll recommend Coleman.

13              I do have to make sure he understands his appeal

14     rights.  I know you do, but you have a right to appeal from the

15     judgment and sentence within 14 days.  Failure to appeal within

16     the 14-day period constitutes a waiver of your right to appeal.

17              The government may appeal the sentence.

18              If you take an appeal and you can't afford a lawyer

19     then one is appointed to represent you at no cost.

20              Now the additional counts, are you -- were they

21     dismissed before?  Did we dismiss them?  I thought they were

22     dismissed at some point, but if not, do you have a motion?

23              MR. ZISSERSON:  Not at the moment because we would

24     wait for maybe a subsequent appeal.  If that doesn't happen or

25     when that's done, we dismiss the counts.

1          THE COURT:  Okay.  I know you can appeal the sentence,

2    and you're probably going to wish that I hadn't said that I

3    don't really have a good reason for dropping it other than just

4    lenity, but do your best.

5          MR. ZISSERSON:  I would be surprised.

6          THE COURT:  All right.  We're in recess.

7          (Adjourned 11:35 a.m.)

8                              * * *

9

10                C E R T I F I C A T I O N

11       I, Michael McDaniel, United States Official Court Reporter,

12   Registered Merit Reporter, and Federally Certified Realtime

13   Reporter, was authorized to and did attend the foregoing

14   proceedings and stenographically recorded the same.  The

15   transcript contained within this volume is a true and accurate

16   transcription of those proceedings, which has been produced from

17   stenographically-generated notes and transcribed with the

18   assistance of computer-aided transcription.

19

20                              *Michael McDaniel*

21                         Michael McDaniel, RMR, FCRR
                              Official Court Reporter
22                             November 20, 2025

23

24

25

                    United States District Court
                    Middle District of Florida